# 14-0058-cr(L),
## 14-0339-cr(CON), 14-0771-cr(CON), 14-1054-cr(CON), 14-1890-cr(CON)

# United States Court of Appeals
## for the
# Second Circuit

◆▮◆

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JERMEERE McKINNON, aka Hood, JEFFERY POWELL, aka Ghost,
TITUS NICKENS, aka Tit, KAHARI SMITH, aka Sealed Defendant,
aka Kiss, HABAKKUK NICKENS, aka HB,

*Defendants-Appellants,*

KENNETH JACKSON, aka Karome, RIADDA TRAVET, aka Rico, CHRISTOPHER
MIKE, aka Jah, aka C-Mike, NATHAN KING, aka NATE, DWAYNE HESTER,
aka BLACK, DONALD R. JOHNSON, JR., aka D-Jigga,

*Defendants.*

―――――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK (SYRACUSE)

## BRIEF and APPENDIX FOR DEFENDANT-APPELLANT
## KAHARI SMITH

LAURIE S. HERSHEY, ESQ.
*Attorney for Defendant-Appellant*
*Kahari Smith*
222 Park Avenue
Manhasset, New York 11030
(516) 424-9111

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT -------------------------------------- 2

ISSUE PRESENTED ----------------------------------------------- 2

STATEMENT OF THE CASE ---------------------------------------- 2

     The Plea Agreement ------------------------------------------- 4

     The Sentencing ------------------------------------------------ 6

ARGUMENT

THE SENTENCE OF 35 YEARS' IMPRISONMENT
WAS SUBSTANTIVELY UNREASONABLE -------------------------- 10

CONCLUSION----------------------------------------------------- 24

# TABLE OF AUTHORITIES

## CASES

Gall v. United States,
552 U.S. 38 (2007) ------------------------------------------------- 10

Kimbrough v. United States,
552 U.S. 85 (2007) ------------------------------------------------- 20

Rita v. United States,
551 U.S. 338 (2007) ------------------------------------------------10

United States v. Cavera,
550 F.3d 180 (2d Cir. 2008) (en banc) --------------------------------- 10, 11

United States v. Dorvee,
604 F.3d 84 (2d Cir. 2010) ------------------------------------------- 10, 11

United States v. Frias,
521 F.3d 229 (2d Cir. 2008) ------------------------------------------- 18

## STATUTES, RULES AND GUIDELINES

18 U.S.C. § 1962(d) ------------------------------------------------- 2

28 U.S.C. § 1291 --------------------------------------------------- 2

18 U.S.C. § 3553(a) ------------------------------------------------- 2, 14, n. 1

18 U.S.C. § 3553(a)(6) ---------------------------------------------- 16, 18

U.S.S.G. § 2A1.1 --------------------------------------------------- 5

U.S.S.G. § 2E1.1, cmt. 4 -------------------------------------------- 23

U.S.S.G. § 3E1.1(a) and (b) ----------------------------------------- 6

i

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT
# DOCKET NUMBER 14-58 (L), 14-339(con),
# 14-771(con), 14-1054(con)

—————————————————————————

United States of America,

Appellee,

v.

Jermeere McKinnon, AKA Hood, Jeffery Powell, AKA Ghost, Titus Nickens, AKA Tit, Kahari Smith, AKA SEALED DEFENDANT, AKA Kiss

Defendants - Appellants,

Habakkuk Nickens, AKA HB, Kenneth Jackson, AKA Karome, Riadda Travet, AKA Rico, Christopher Mike, AKA Jah, AKA C-Mike, Nathan King, AKA Nate, Dwayne Hester, AKA Black, Donald R. Johnson, Jr., AKA D-Jigga,

Defendants.

—————————————————————————

# ON APPEAL FROM A JUDGMENT OF CONVICTION
# OF THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN OF NEW YORK

—————————————————————————

# BRIEF ON BEHALF OF
# KAHARI SMITH

—————————————————————————

1

## JURISDICTIONAL STATEMENT

This appeal arises out of a criminal action brought pursuant to 18 U.S.C. § 1962(d) over which the District Court had subject matter jurisdiction. This Court has jurisdiction to entertain the appeal under 28 U.S.C. § 1291. The Judgment of Conviction was imposed on March 25, 2014 and the Notice of Appeal was entered on April 3, 2014. (A 93, 99).

## ISSUE PRESENTED

The sentence of 35 years of incarceration was greater than necessary to fulfill the sentencing goals of 18 U.S.C. § 3553 (a) and was substantively unreasonable.

## STATEMENT OF THE CASE

On September 19, 2013, Kahari Smith entered a plea to Count One of a two-count Superseding Indictment charging him with Conspiracy to Engage in a Pattern of Racketeering activity (hereafter "Rico") under 18 U.S.C. § 1962 (d). He was sentenced on March 25, 2014 by the Honorable Norman A. Mordue, Senior United States Judge of the Northern District of New York, to a term of imprisonment of 420 months (35 years) to be

followed by a period of supervised release of 5 years, and a $100 assessment. (A 93, 94, 95, 97).

The Government alleged that Smith was a member of a Syracuse based street gang known as the V-Not gang which engaged in the distribution of crack cocaine and related acts of violence. The gang operated within a specifically defined geographic area on the far south side of the City of Syracuse. To ensure that no rival gang members entered their territory to sell drugs, the V-Not Gang engaged in acts of violence, and thereby gained an exclusive territory within which only their members could distribute crack cocaine. PSR, ¶ ¶ 13-17.

In October of 2010, violence erupted between the V-Not gang and a rival gang known as Bricktown. These clashes culminated in a retaliatory shooting death of Bricktown gang associate Kihari Blue. PSR, ¶ 20. Smith was charged with using a .40 caliber handgun and firing multiple times at a Bricktown vehicle on a highway in Syracuse, New York on November 26, 2010. One bullet hit Kihari Blue in the back of the head killing him. PSR, ¶ 25.

While Smith accepted responsibility for the death of Kihari Blue, he did not have a specific victim in mind when he shot at the Bricktown

vehicle which had tinted windows and multiple occupants in addition to Kihari Blue. PSR, ¶ 25, (A 55). After the shooting of Kihari Blue, the retaliatory violence continued. On November 28, 2010, Bricktown gang leader Saquan Evans fired multiple shots into a van in retaliation for the death of Blue. He mistakenly killed a toddler named Rashad Walker, Jr. PSR, ¶ 26. This cycle of violence continued through March 19, 2011. PSR. ¶ 30.

## The Plea Agreement

Smith entered into a comprehensive 21-page plea agreement with the Government dated September 19, 2013. (A 31). Pursuant to the agreement, the defendant agreed to plead guilty to Count One charging that he engaged in a Rico conspiracy through his membership in the V-Not Gang. (A 31). Count Two, charging him with the murder of Kahari Blue, was dismissed. (A 32).

In the plea agreement, the defendant admitted his guilt and agreed to a series of sentencing stipulations. He admitted that at some point after 2003, up to May 2012, he conspired with other members of the V-Not gang to engage in the distribution of crack cocaine and related acts of violence. (A 33-36). He admitted that the gang operated within a

specifically defined geographic area on the far south side of the City of Syracuse, and that gang members engaged in acts of violence to gain exclusive territory within which only their members could distribute crack cocaine. (A 34).

The plea agreement included the prosecution's offer of proof that if the case went to trial, they would demonstrate Smith's membership in the V-Not Gang through testimony from cooperating gang members, tattoos the defendant had on his body which included a large "V," gang-related photographs appearing on the defendant's cell phone, and post-arrest admissions. (A 34-35). Additionally, the plea agreement referred to multiple overt acts in the Indictment demonstrating Smith's involvement in gang activity. (A 35).

The plea agreement stated that Smith's relevant conduct included at least 196 but less than 280 grams of crack cocaine and the possession of dangerous weapons including handguns in connection with the gang activity. (A 36).

Under the "Sentencing Stipulations" segment of the plea agreement, Smith agreed that he was accountable for the First Degree Murder of Kihary Blue, as alleged in overt act # 25 of the Indictment

giving rise to a total offense level of 43 under U.S.S.G. § 2A1.1. (A 36). He further stipulated that he was accountable for at least 196 but less than 280 grams of crack cocaine, and that he was accountable for possessing a dangerous weapon in connection with the V-Not Gang's drug activity. (A 36-37).

The agreement called for a 3-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b). (A 37).

The plea agreement set forth all the trial rights that Smith was waiving by pleading guilty. (A 38). It further explained the operation of the sentencing guidelines and the minimum and maximum sentences that Smith was confronting. (A 40-41). The agreement included a waiver of appellate rights of any sentence of imprisonment of 360 months or less. (A 38).

The defendant acknowledged in the plea agreement that he was pleading guilty knowingly and voluntarily with the assistance of counsel, and that nobody had forced, threated or promised him anything other than what was stated in the agreement. (A 51).

## The Sentencing

Smith appeared for sentencing before Judge Mordue on March 25, 2014. (A 64). The prosecutor claimed that Kihari Blue was merely an innocent bystander, and asked the court to sentence Smith within the Guideline range of 360 months to life imprisonment. (A 70-71).

Kihari Blue's mother, Twanda Rufus, and his sister, Jaleya Miller, addressed the Court before sentence was imposed. Both women testified to the terrible loss endured by their family in losing Kihari Blue. (A 72). Ms. Rufus added that she knew that the bullet that killed her son was not meant for him, and recognized that shootings into cars with tinted windows where family members and even babies were present had to be stopped. (A 72, 73). She expressed sorrow for Kahari Smith's family, particularly his three children, as well as for her own family. (A 73-74).

Defense counsel spoke on behalf of the defendant arguing that Smith had no idea who was inside the rival gang's vehicle when he fired his gun killing Kihari Blue. He only knew that the occupants of the car were members of the Bricktown gang who were at war with the V-Not gang. (A 80). Defense counsel stated:

> He (Smith) thought he (Blue) was in a car with Bricktown members and the V-Not members had been warring for sometime and anybody that hung around them knew that. So, you know, yes, he was

> an unwilling victim but he did place himself in the
> zone of danger by having those bad companions.

(A 80).

As defense counsel put it, Kahari Smith "got caught up in the life." (A 81). He emphasized that Smith accepted responsibility and offered to plead guilty at an early stage, and that he knew he was going to suffer for the rest of his life. (A 81, 82).

Smith spoke on his own behalf fully accepting responsibility for his actions and apologizing to the Blue family for their loss. (A 82). Smith recounted to the court the background of the shooting explaining that his six-year-old son was shot at the age of three and that he felt a need to protect his family (A 82). He noted that his young son still remembered the day he got shot and still asked his father questions about it three years later. (A 82). He added that, "It's the worst decision I ever made in my life." (A 82). Again Smith stated, "I'm sorry to his family once again. I also played basketball and he [referring to Kihari Blue] was a good kid, but at the same time, like as myself, who was a product of our environment." (A 83). Smith expressed love for his supportive family and thanked them for being present at his sentencing. (A 83).

Regina Cole Smith, the mother of the defendant spoke on behalf of her son. She conveyed sympathy to the family of Kihari Blue, stating that she and her family were deeply sorry for their loss. (A 83). While not making excuses for his crime, she noted that her son was a great father to his three sons, ages three, six and nine, and that he "has always been a loving, respectful and caring son, brother, father, uncle, nephew, cousin and friend." (A 84). She added, "The number of people present here today shows that others also have faith in his character and fundamental decency as a human being and how much he is truly loved." (A 84).

Ms. Smith expressed the hope that her son would use incarceration to "think clearly about how life is and how precious life is," but observed that decades of imprisonment would undermine his potential. (A 84). She asked the court to show leniency in sentencing her son. (A 84).

Judge Mordue adopted the factual information contained in the PSR. (A 85). He concluded that the total offense level was 40, the Criminal History Category VI and the guidelines range of sentencing 360 months to life imprisonment. (A 85). Adding five years to the bottom of the guideline range, Judge Mordue sentenced Smith to 420 months of incarceration giving his reasons on the record as follows:

9

I find the sentence to be sufficient but not greater
than necessary to comply with the purposes of
sentencing. After considering the defendant's background,
the extremely violent nature of the offense and the need
for adequate deterrence and to protect the community,
the court feels that this sentence reflects the seriousness
of the defendant's conduct, which includes multiple times
using firearms and involvement in numerous acts of
violence as a gang member, including the killing of Kihari
Blue.

(A 86).

The court added to its reasons for the sentence allegations that
Smith engaged in more gang activity after the death of Kihari Blue in
continuing rounds of retaliatory gang violence. (A 86-88).

## ARGUMENT

## THE SENTENCE OF 35 YEARS' IMPRISONMENT
## WAS SUBSTANTIVELY UNREASONABLE

## STANDARD OF REVIEW

In reviewing sentences, this Court applies a "deferential abuse-of-
discretion standard." United States v. Cavera, 550 F.3d 180, 189 (2d
Cir. 2008) (en banc); accord United States v. Dorvee, 604 F.3d 84, at 90
(2d Cir. 2010); Gall v. United States, 552 U.S. 38 (2007); Rita v. United
States, 551 U.S. 338 (2007) ("appellate 'reasonableness' review merely
asks whether the trial court abused its discretion.") Under this

standard of review, the Court must, " first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." Gall, 552 U.S. at 51.

The Court also ensures that the sentence is substantively reasonable, "reversing only when the trial court's sentence 'cannot be located within the range of permissible decisions.'" Dorvee, 604 F.3d at 90 (quoting Cavera, 550 F.3d at 189).

Under the terms of the plea agreement, Smith waived his right to appeal any sentence of 360 months or less. This appeal, therefore, only addresses the five additional years imposed by the district court for a sentence of 420 months' imprisonment.

### a) Lack of Specific Intent to Kill Kihari Blue

While Smith accepted responsibility for the death of Kihari Blue, he did not have the specific intent to kill him. As defense counsel asked in his sentencing memorandum: "Does firing at a motor vehicle with tinted windows with an unknown number and identity of occupants constitute

murder or was it an act of retribution without the specific goal of death?" (A 55).

Even Kihari Blue's mother stated at sentencing that the bullet that killed her son was not specifically directed at him, and recognized that the shooting was an outgrowth of a cycle of retributive gang violence. (A 72-74).

And while Kihari Blue certainly did not deserve to die, as defense counsel noted, he was not an innocent bystander. He was seen in the presence of Bricktown gang members on multiple occasions, and specifically with lead gang leader Saquan Evans. He was present at other violent gang scenes involving the Bricktown and V-Not gangs, including a fight at the Jute Box Bar in Syracuse when a V-Not member was stabbed. (A 56). Defense counsel presented a photograph of Saquan Evans with his arm around Kihary Blue who was extending his middle finger to the photographer. (A 57).

Nevertheless, defense counsel argued, Blue continued to place himself in the zone of danger by associating with violent criminals. (A 57). Defense counsel argued: "Kihari Blue hung around with violent people

who had no other purpose in life than survive by means of criminal conspiracies and various acts of violence." (A 57).

While none of these facts exonerate Smith from the death of Kihari Blue, they do demonstrate the excessiveness of his sentence. In adding five more years to the 360-month minimum term of the guidelines range, the district court sentenced Smith as if he set out to stalk and kill a specific human being, rather than as if his actions were part of a cycle of gang violence.

The gang violence both preceding and following this event were explanatory of the mentality that gripped these young men, and the shooting of Kihari Blue on November 26, 2010 should be seen in this context. Only two weeks before the death of Kihari Blue, on November 7, 2010, the V-Not gang was subjected to a violent attack by the Bricktown Gang. PSR, ¶ 24. Four associates of the V-Not gang were in a garage at 321 Shirley Drive in Syracuse when they were each shot by a single assailant. All four of the victims survived. Bricktown gang member Saquan Evans was subsequently identified as the shooter. He, along with multiple other Bricktown gang members, were indicted in a federal

Rico conspiracy in 2011 which included this shooting as an overt act. PSR, ¶ 24.

Only one month before the killing of Kihari Blue, Smith and codefendant Titus Nickens were in a vehicle driven by Nickens with Smith's four-year-old child present in the car. A car pulled up to them and opened fired hitting Nickens in the shoulder. The shooter was believed to be a member of the Bricktown gang named Joshua Hester and was in retaliation for the shooting of Bricktown gang members Jerome and Artell Clarke's house by V-NOT members. PSR, ¶ 23.

Only two days after the shooting of Kihari Blue, Bricktown gang member Saquan Evans fired multiple shots into a van in retaliation for the death of Kihari Blue in the mistaken belief that the van was the vehicle used in the shooting of Blue. PSR, ¶ 26. The van that Evans fired into was actually used by "110 gang" member Rashad Walker, Sr. Inside the van was Walker's 20-month-old child Rashad Walker, Jr who was killed instantly. PSR, ¶ 26.

It was out of this gang mentality and circle of retribution that the death of Kihary Blue occurred, not out of a specific intent to target and kill him. Under these circumstance, a sentence of 360 months of

14

imprisonment was certainly sufficient to fulfill all of the sentencing goals set forth in 18 U.S.C. § 3553(a), and adding five years to that sentence was unnecessarily excessive.[1] Smith's mother's plea to the Judge for some

---

[1] 18 U.S.C. § 3553(a) directs that the sentence to be imposed results from a consideration of:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; [7] and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for —

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .;

(5) any pertinent policy statement . . . [issued by the Sentencing Commission].

measure of leniency for her son was discarded by this harsh and unnecessary addition to the already lengthy 30-year term.

### b) <u>Unwarranted Sentencing Disparities</u>

This issue was preserved by defense counsel in his February 10, 2014 sentencing submission although not framed in terms of unwarranted sentencing disparities. (A 58-59). Smith's sentence far exceeded the sentences imposed on lead codefendants in this case, and created an unwarranted sentencing disparity under 18 U.S.C. § 3553 (a) (6).

The next longest sentence -- 240 months--was received by codefendant Habakkuk Nickens who was a prominent player in the conspiracy. Nickens took over the wheel of the V-NOT vehicle used in the shooting of Kihari Blue, and drove the vehicle into position so that Smith, who was sitting in the front passenger seat, could fire his weapon at the

---

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

rival car. PSR, ¶ 25. Yet he received a sentence that was 15 years shorter than Smith's.

What's more Habakkuk Nickens had a long history of violence and drug dealing going back to 2005. On August 23, 2005, Habakkuk Nickens was present when Titus Nickens brandished a handgun in the vicinity of 146 West Florence Avenue in Syracuse. PSR, page 13, ¶ 1. On May 2, 2009, he possessed approximately 12 grams of crack cocaine in the 100 Block of Grove Street, Syracuse. PSR, page 14, ¶ 12. On May 2, 2009, he assaulted a person in a residence on Columbus Avenue, Syracuse and then stole a .50 caliber handgun from the premises. Id., at ¶ 14. On May 4, 2009, he possessed a .38 caliber handgun at a residence on Crippen Place, Syracuse, and fired several shots at others with that handgun. Id., at ¶ 15. On the same date, he fired a handgun several times at a person in a building on West Brighton Avenue in Syracuse. Id., at ¶ 16. On December 31, 2009, he attempted to shoot two rival Elk Block Gang members in a barber shop in the 2000 Block of South Salina Street, Syracuse. Id, at ¶ 20. On August 8, 2010, he possessed approximately 2.69 grams of crack cocaine and a digital scale in a vehicle in the vicinity of 820 West Brighton Avenue, Syracuse. Id., at ¶ 22. On October 23, 2010,

he was present at the Juke Box Bar to celebrate Jeffrey Powell's birthday. A fight erupted between the V-NOT gang members and the Bricktown gang members and both groups were ejected from the bar. Outside the bar, one of the Bricktown gang members ran up and stabbed V-NOT member Dwayne Hester in the back. Nickens participated in this gang fight. PSR, p. 15, ¶ 23. On November 26, 2010, he took over the driving of the V-NOT vehicle when Kihari Blue was shot. Id, at ¶ 25.

Given these facts, the differential between Habakkuk Nickens' sentence of 240 months, and Smith's sentence of 420 months -- 15 years -- was unreasonable and unwarranted.

In <u>United States v. Frias</u>, 521 F.3d 229, 236 (2d Cir. 2008), this Court held that 18 U.S.C. § 3553(a)(6) requires a district court to consider nationwide sentence disparities, but does not require a district court to consider disparities between co-defendants. The Court further held, that even "assuming arguendo that 18 U.S.C. § 3553(a)(6) can support a reduced sentence designed to eliminate or diminish disparity between the sentences imposed on co-defendants, those co-defendants would have to be similarly situated."

Here, the PSR reflects Habakkuk Nickens' violent, criminal past and his central role in the instant offense. He was certainly "similarly situated" with Smith, yet received a sentence 15 years shorter than Smith's. While the district court may not have been "required" to consider the disparity between Smith's and Nickens' sentences, it was unreasonable for the court not to have done so in this case where the disparity was so egregious. The result was a substantively unreasonable sentence.

Similarly, the even wider differential between Smith's sentence and the 120-month sentence received by codefendant Jeffrey Powell was unwarranted.

Powell also had a long history of violence and gang activity. On November 1, 2009, he shot an Elk Block Gang member in the head. PSR, page 14, ¶ 19. He engaged in a gang fight with multiple members of the Bricktown Gang on October 23, 2010. PSR, p. 12, ¶ 23. He was present in a car on October 23, 1020 when another V NOT member fired at least 21 shots from an AK-47 assault rifle at Bricktown Gang member's house. PSR, p. 15, ¶ 24. On June 27, 2011, he possessed two 9 millimeter handguns and a cocaine base. PSR, p. 14, ¶ 32.

Significantly, when the shooting of Kihari Blue occurred on November 26, 2010, Jeffrey Powell was present in the van along with Smith and Habakkuk Nickens. PSR, p. 15, ¶ 25. Yet, he was never charged as an accomplice in Blue's death.

Given these facts, the egregious differential between Powell's sentence of 10 years and Smith's sentence of 35 years was unwarranted and unreasonable

Furthermore, codefendant Riadda Trivet, who also had a history of gang violence and was present at several shootings received a 92-month sentence which was a downward departure from his guideline range of 151 to 188 months. (A 59). Trivet was present at a shooting by Habakuuk Nickens, and at a shooting by Jeffrey Powell. PSR, p. 14, ¶ ¶15, 19. He also threatened a prospective witness against Nickens. PSR, p. 14, ¶ 17.

These disparities in sentencing created a substantively unreasonable sentence that should, respectfully, be rectified by this Court.

### c) Smith's Personal History and Characteristics

A sentence of 35 years of imprisonment for this 28-year-old

defendant contravened the parsimony clause which directs courts "to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007).

Smith has a disabled father and his mother, Regina Cole Smith has had a serious bout of cancer. As trial counsel pointed out, "These folks are going to die when he's in jail and every single birthday of his three sons and every Fathers' Day and every holiday, he's going to be in a prison and he going to know that he didn't have to be there." (A 81). Smith's mother is an office coordinator at Syracuse University in African-American studies. She was interviewed by Smith's Probation Officer and provided the following information:

> The defendant is a big-hearted person who is very family-oriented. For example, when his great aunt needed daily assistance at home, he was the only one in the family to step up and help care for her. He is also a very good father, son and brother. He is not a "gun-toting" person, but rather, he got mixed up in a difficult situation where he was forced to protect himself.

PSR, ¶ 106.

Smith has three young children for whom he was an attentive and loving father. PSR, ¶ 105. His mother urged the district court to show

mercy on her son by taking into consideration his overall character and

his three sons who need their father to teach then right from wrong and

take a significant role in their lives. PSR. ¶ 106.

Smith's sister Takeisha Smith who suffers from Lupus also

submitted a character letter to the district court which depicted a young

man who should not be defined only by his gang membership. She wrote:

> My brother is a kind and caring person, not only as my
> brother but as a person in general. He is an excellent
> father to his three sons. I have lupus and Kahari has
> always helped me. From taking me to Dr.'s appointments
> to picking up my meds and often going as far as to tie
> my shoes when necessary. He is talented and possesses
> a quality far beyond belief.  Again, I'd like to remind you
> he is not a person that the public has been led to believe
> he is. I humbly ask that all that is taken into consideration
> when determining his fate, because it will ultimately effect
> so many people not just my brother.

Smith earned his GED diploma on May 25, 2010, and also received

a carpentry certificate in 2010 after completing a nine-month program

offered by Jubilee Homes YouthBuild. PSR. ¶ 111.  Jubilee Homes

YouthBuild is an alternative educational program for young men and

women who earn their GEDs while renovating affordable housing and

taking part in other community service activities. PSR. ¶ 111.  In her

character letter to the court, Sharon Gatewood-Walley, a family friend of

Smith's mother since childhood, wrote that through this program, Smith

proved to a good student and leader and was chosen to represent the

program in interviews with news media. (A 52). He even met former

Governor Patterson as one of the program's consumer representatives. (A

52).

In pleading for a lenient sentence for Smith, Ms. Gatewood-Walley

wrote in her January 7, 2014 letter:

> To incarcerate this young man for the next 30 years
> without the possibility of rehabilitation and redemption
> seems to be more of a waste of human life and an even
> bigger lost [sic] to those 3 young children who have not
> made any mistakes. I agree that this young man has made
> a horrific mistake that he has to live with and face God for;
> No one should have lost their lives however there are no
> entirely innocent individuals involved in this incident.
> Please consider all of this at sentencing. America is the
> country of second chances and forgiveness is the greatest
> gift given to humanity by God, please reciprocate what God
> has given to us all, a fellow human being, not just another
> number on a case docket, thank you for this opportunity.

(A 52).

Smith had been incarcerated in state jails pending this case for

offenses which comprised the overt acts in this Indictment. Those prison

officials noted Smith's positive attitude and his strong family support. (A

60).

23

Finally, it should be considered that Smith's only two prior convictions were for overt acts named in the RICO conspiracy and but for those convictions, he would have been placed in Criminal History Category 1 with a far more lenient guideline range of imprisonment. While the Rico Guidelines permit this type of double counting, see U.S.S.G. § 2E1.1 cmt. 4, the result was to catapult Smith into career offender status with the resulting range of imprisonment of 360 months to life.

<b><u>CONCLUSION</u></b>

For the above-stated reasons, Smith's sentence of 42 years' imprisonment violated the parsimony clause and was substantively unreasonable. The case should therefore be remanded for resentencing.

Respectfully submitted,

s/Laurie S. Hershey
Laurie S. Hershey, Esq.
Assigned Counsel for Kahari Smith
222 Park Avenue
Manhasset, New York 11030
(516) 424-9111
LSHESQ@AOL.COM

Dated: July 15, 2014

# APPENDIX

i

# Table of Contents

**Page**

District Court Docket Entries .......................................................... A-1

Superseding Indictment, Filed March 29, 2012 ......................... A-15

Plea Agreement, Filed September 19, 2013 .............................. A-31

Letter to Judge, Dated January 7, 2014 ...................................... A-52

Sentencing Memorandum, Filed February 11, 2014 ................... A-53

    Exhibit A to Sentencing Memorandum -
    Syracuse Police Department Report ....................................... A-62

    Exhibit B to Sentencing Memorandum -
    Supplemental Report .............................................................. A-63

Sentencing Transcript, Dated March 25, 2014 ........................... A-64

Judgment of the United States District Court for the Northern
    District of New York, Dated March 25, 2014, and Filed
    March 28, 2014, Appealed From ............................................ A-93

Notice of Appeal, Filed April 4, 2014 ......................................... A-99

**A-1**

# U.S. District Court
## Northern District of New York - Main Office (Syracuse) [LIVE - Version 6.1] (Syracuse)
## CRIMINAL DOCKET FOR CASE #: 5:11-cr-00317-NAM-1

Case title: USA v. Smith et al

Date Filed: 07/08/2011
Date Terminated: 03/28/2014

---

Assigned to: Senior Judge Norman A. Mordue

Appeals court case number: 14-1054 2nd Circuit

**Defendant (1)**

**Kahari Smith**
*TERMINATED: 03/28/2014*
*also known as*
SEALED DEFENDANT
*TERMINATED: 03/28/2014*
*also known as*
Kiss
*TERMINATED: 03/28/2014*

represented by **Peter J. Pullano**
Tully, Rinckey Law Firm - Rochester Office
16 West Main Street
Suite 740
Rochester, NY 14614
585-492-4700
Email: PPullano@1888law4life.com
*TERMINATED: 12/21/2011*
*Designation: CJA Appointment*

**Thomas J. Murphy**
Greene, Hershdorfer Law Firm
One Lincoln Center
Suite 330
Syracuse, NY 13202-1309
315-422-6154
Fax: 315-475-2672
Email: tmurphy@greenehslaw.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| Pending Counts | Disposition |
|---|---|
| 18:1959-7474.F CONSPIRACY, MURDER, KIDNAP (1-2) | |
| 18:1962-3300.F CONSPIRACY TO COMMIT RICO (1s) | 420 months imprisonment; 5 years supervised release; $100.00 Special Assessment |

18:1959-7474.F CONSPIRACY,
MURDER, KIDNAP
(2s)

Dismissed on Motion of the
Government

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                    **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                           **Disposition**

None

---

**Plaintiff**

USA                        represented by    **Carla B. Freedman**
                                             Office of United States Attorney -
                                             Syracuse Office
                                             100 South Clinton Street
                                             P.O. Box 7198
                                             Syracuse, NY 13261
                                             315-448-0672
                                             Fax: 315-448-0658
                                             Email: carla.freedman@usdoj.gov
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*
                                             *Designation: Assistant US Attorney*

                                             **Geoffrey J.L. Brown**
                                             Office of United States Attorney -
                                             Syracuse Office
                                             100 South Clinton Street
                                             P.O. Box 7198
                                             Syracuse, NY 13261
                                             315-448-0695
                                             Fax: 315-448-0689
                                             Email: geoffrey.brown2@usdoj.gov
                                             *ATTORNEY TO BE NOTICED*
                                             *Designation: Assistant US Attorney*

                                             **John M. Katko**
                                             Office of the United States Attorney -

Syracuse
P.O. Box 7198
100 South Clinton Street
Syracuse, NY 13261-7198
315-448-0672
Fax: 315-448-0658
Email: John.Katko@USDOJ.GOV
*TERMINATED: 01/14/2014*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/07/2011 | 1 | INDICTMENT as to Kahari Smith (1) count(s) 1-2. (sal, ) . Unsealed on 8/3/2011 (sal, ). (Entered: 07/08/2011) |
| 07/07/2011 | 2 | Order to Seal 1 Indictment as to SEALED DEFENDANT. Signed by Magistrate Judge David E. Peebles on 7/7/11. (sal, ) (sal, ). (Entered: 07/08/2011) |
| 07/07/2011 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: GRAND JURY makes a partial report and returns Indictment. Sealed Indictment is authorized for filing. Sealing order is signed. Arrest warrant is signed. Tally Sheet is ordered sealed. APP: Tamara Thomson, AUSA, Steno: Sue Byrne, Grand Jury Foreperson. Clerk: Shelly Muller. (sal, ) (Entered: 07/08/2011) |
| 08/03/2011 | | TEXT Order to Unseal Case as to Kahari Smith. Authorized by US Magistrate Judge Andrew T. Baxter by phone to the Government on 7/30/11. (sal, ) (Entered: 08/03/2011) |
| 08/26/2011 | | ORAL MOTION for Writ of Habeas Corpus ad prosequendum by USA as to Kahari Smith. (rjb, ) (Entered: 08/26/2011) |
| 08/26/2011 | 3 | ORDER granting Oral Motion for Writ of Habeas Corpus ad prosequendum as to Kahari Smith (1). Signed by Magistrate Judge George H. Lowe on 8/26/11. (rjb, ) (Entered: 08/26/2011) |
| 08/30/2011 | | Attorney update in case as to Kahari Smith. Attorney Thomas J. Murphy added. (rjb, ) (Entered: 08/30/2011) |
| 08/30/2011 | | TEXT Minute Entry for proceedings held before Magistrate Judge George H. Lowe:Arraignment as to Kahari Smith (1) Count 1-2 held on 8/30/2011/Initial Appearance as to Kahari Smith held on 8/30/2011. Appearances: Tamara Thomson, AUSA for the United States; Thomas Murphy, Esq. for Defendant; USPO Eric Wiggins. Defendant appears with counsel, copy of the Indictment provided. Defendant is advised of the charges and his rights. Financial affidavit is submitted, Judge Lowe appoints Mr. Murphy. Defendant waives a formal reading of the Indictment and pleads not guilty. A scheduling order will be issued. Gov't. seeks detention, detention hearing scheduled for 9/6/2011 at 2:00 PM before Magistrate Judge Lowe. Defendant is remanded to the custody of the USMS. (FTR Recorded) (rjb, ) (Entered: 08/30/2011) |

Case 14-58, Document 132, 07/15/2014, 1271380, Page33 of 128

**A-4**

| 08/30/2011 | 4 | WAIVER of Detention Hearing by Kahari Smith (rjb, ) (Entered: 08/30/2011) |
|---|---|---|
| 08/30/2011 | 5 | CRIMINAL PRETRIAL SCHEDULING ORDER as to Kahari Smith: Motions to be filed by 9/27/2011; Jury Trial set for 10/24/2011 at 09:30 AM in Syracuse before Chief Judge Norman A. Mordue. Signed by Magistrate Judge George H. Lowe on 8/30/11. (rjb, ) (Entered: 08/30/2011) |
| 09/02/2011 | 6 | ORDER approving waiver of right to an immediate detention hearing as to Kahari Smith. Signed by Magistrate Judge George H. Lowe on 9/2/11. (rjb, ) (Entered: 09/02/2011) |
| 10/06/2011 | 7 | ORDER TO CONTINUE - Ends of Justice as to Kahari Smith. Time excluded from 10/6/2011 until 1/4/2012. Motions to be filed by 11/18/2011 and shall be returnable on 12/21/2011 on submit. All pretrial papers are due by 12/20/2011. Any Change of Plea shall be entered by 12/27/2011. Jury Trial set for 1/3/2012 09:00 AM in Syracuse before Chief Judge Norman A. Mordue. Signed by Chief Judge Norman A. Mordue on 10/6/2011. (jmb) (Entered: 10/07/2011) |
| 10/21/2011 | | Attorney update in case as to Kahari Smith. Attorney Peter Pullano added as CJA30 counsel. (jlr) (Entered: 11/16/2011) |
| 12/16/2011 | 8 | Letter as to Kahari Smith requesting The United States Is Not Seeking the Death Penalty (Katko, John) (Entered: 12/16/2011) |
| 12/21/2011 | 9 | CJA 7 as to Kahari Smith - Order Terminating Appointment of Counsel; representation by attorney Peter J. Pullano terminated. Signed by Judge Norman A. Mordue on 12/21/2011. (jmb) (Entered: 12/22/2011) |
| 01/03/2012 | | Terminate Deadlines and Hearings as to Kahari Smith. Trial to be reset. (jlr) (Entered: 01/03/2012) |
| 01/23/2012 | 10 | ORDER TO CONTINUE - Ends of Justice as to Kahari Smith. Time excluded from 1/23/2012 until 3/24/2012. Motions to be filed by 3/2/2012. All pretrial papers are due by 3/26/2012. Any Change of Plea shall be entered by 4/2/2012. Jury Trial set for 4/9/2012 at 9:00 AM in Syracuse before Judge Norman A. Mordue. Signed by Judge Norman A. Mordue on 1/23/2012. (jmb) (Entered: 01/23/2012) |
| 03/29/2012 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: GRAND JURY makes a partial report and returns Superseding Indictment. Application to seal and Order granting application to seal are authorized for filing with the court. Arrest Warrants for Sealed Defendants #2 through #11 are signed and authorized for filing. Tally Sheet is ordered sealed. APP: John Katko, AUSA, Grand Jury Foreperson, Clerk: Shelly Muller, Steno: Sue Byrne. (sal, ) (Entered: 04/04/2012) |
| 03/29/2012 | 11 | APPLICATION to Seal Superseding Indictment and Arrest Warrants by USA regarding Kahari Smith, SEALED DEFENDANT #2, SEALED DEFENDANT #3, SEALED DEFENDANT #4, SEALED DEFENDANT #5, SEALED DEFENDANT #6, SEALED DEFENDANT #7, SEALED DEFENDANT #8, SEALED DEFENDANT #9, SEALED DEFENDANT #10, SEALED DEFENDANT #11. (sal, ) (Entered: 04/04/2012) |
| 03/29/2012 | 12 | |

| | | |
|---|---|---|
| | | ORDER granting Application to Seal Superseding Indictment and Arrest Warrants regarding Kahari Smith, SEALED DEFENDANT #2, SEALED DEFENDANT #3, SEALED DEFENDANT #4, SEALED DEFENDANT #5, SEALED DEFENDANT #6, SEALED DEFENDANT #7, SEALED DEFENDANT #8, SEALED DEFENDANT #9, SEALED DEFENDANT #10, SEALED DEFENDANT #11. Signed by Magistrate Judge David E. Peebles on 3/29/12. (sal, ) (Entered: 04/04/2012) |
| 03/29/2012 | 13 | SUPERSEDING INDICTMENT as to Kahari Smith (1) count(s) 1s, 2s, Habakkuk Nickens #2 (2) count(s) 1, Jeffrey Powell (3) count(s) 1, Kenneth Jackson (4) count(s) 1, Titus Nickens (5) count(s) 1, Riadda Travet (6) count(s) 1, Christopher Mike (7) count(s) 1, Jermeere McKinnon (8) count(s) 1, Nathan King (9) count(s) 1, Dwayne Hester count(s) 1, Donald R. Johnson, Jr. (11) count(s) 1. (sal, ) (sal, ). Unsealed on 5/1/2012 (sal, ). (Entered: 04/04/2012) |
| 05/01/2012 | | TEXT Order to Unseal Case as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr.. Authorized by Magistrate Judge David E. Peebles on 5/1/12. (sal, ) (Entered: 05/01/2012) |
| 05/01/2012 | 19 | NOTICE TO DEFENDANT'S COUNSEL for Kahari Smith re 13 Superseding Indictment : A Superseding Indictment dated March 29, 2012 regarding your client has been filed with the court. In the event the defendant wishes to waive appearance for an arraignment, both the defendant and defendants counsel must complete and electronically file with the court the attached form by May 9, 2012. If the court does not receive the form by the above date the court will IMMEDIATELY schedule the arraignment of your client. Because of Speedy Trial issues, the court appearance for arraignment may be scheduled with very little advance notice(sal, ) (Entered: 05/01/2012) |
| 05/01/2012 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: Initial Appearance as to Habakkuk Nickens, Kenneth Jackson, Titus Nickens, Riadda Travet, Nathan King and Arraignment as to Kahari Smith (1) Count 1-2,1s,2s, Habakkuk Nickens (2) Count 1, Kenneth Jackson (4) Count 1, Titus Nickens (5) Count 1, Riadda Travet (6) Count 1, and Nathan King (9) Count 1 held on 5/1/2012. A copy of the superseding indictment is provided to all of the defendants. The defendants are all advised of their rights. Maximum penalty of charges is stated. Financial Affidavits are reviewed and Judge finds defendants eligible for counsel. Judge appoints William Sullivan, Esq. as counsel for defendnat Habakkuk Nickens; Simon Moody, Esq. for defendant Kenneth Jackson; John Kinsella, Esq. for defendant Titus Nickens; Jarrod Smith, Esq. for defendant Riadda Travet; and William Rose, Esq. for defendant Nathan King. Thomas Murphy, Esq. is present w/ defendant Kahari Smith for purposes of arraignment as he already initially appeared in this case on 8/30/2011. Based upon defendant Jackson's request, the superseding indictment is read by the clerk in court. All defendants enter not guilty pleas to the offenses charged. An amended scheduling order will be issued shortly. The Government moves for detention of all of the defendants. Defendant Kenneth Jackson waives his right to a detention hearing. Detention hearings are scheduled for defendants Habakkuk Nickens, Titus Nickens and Nathan King |

| | | |
|---|---|---|
| | | for 5/3/12 at 1:00 PM before Magistrate Judge Peebles. Detention hearing is scheduled for defendant Riadda Travet for 5/7/12 at 11:00 AM before Magistrate Judge Peebles. Defendant Khari Smith is continued on detention status. All defendants are remanded to the custody of the USMS. APP: John Katko, AUSA, Thomas Murphy, Esq., William Sullivan, Esq., Simon Moody, Esq., Jack Kinsella, Esq., Jarrod Smith, Esq., and William Rose, Esq.. Court Reporter : Diane Martens. (sal, ) Modified on 5/1/2012 to include John Katko in appearances. (sal, ). (Entered: 05/01/2012) |
| 05/01/2012 | 20 | AMENDED CRIMINAL PRETRIAL SCHEDULING ORDER as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr. Motions to be filed by 5/29/2012. Jury Trial set for 7/2/2012 at 9:30 AM in Syracuse before Judge Norman A. Mordue. Signed by Magistrate Judge David E. Peebles on 5/1/12. (sal, ) (Entered: 05/01/2012) |
| 05/22/2012 | 39 | Application for Search Warrant as to 602 Atlantic Avenue, Syracuse, New York. Signed by Magistrate Judge Peebles on 4/30/2012. (sal, ) (Entered: 05/22/2012) |
| 05/22/2012 | 40 | Search Warrant Issued as to 602 Atlantic Avenue, Syracuse, New York. Signed by Magistrate Judge David E. Peebles on 4/30/2012. (sal, ) (Entered: 05/22/2012) |
| 05/22/2012 | 41 | Application for Search Warrant as to 1250 Park Street, 2nd Floor, Syracuse, New York. Signed by Magistrate Judge David E. Peebles on 4/30/2012. (sal, ) (Entered: 05/22/2012) |
| 05/22/2012 | 42 | Search Warrant Issued as to 1250 Park Street, 2nd Floor, Syracuse, New York. Signed by Magistrate Judge David E. Peebles on 4/30/2012. (sal, ) (Entered: 05/22/2012) |
| 05/22/2012 | 43 | Application for Search Warrant as to 114 Ford Ave., Apt #4, Syracuse, New York. Signed by Magistrate Judge David E. Peebles on 4/30/2012. (sal, ) (Entered: 05/22/2012) |
| 05/22/2012 | 44 | Search Warrant Issued as to 114 Ford Ave., Apt. #4, Syracuse, New York. Signed by Magistrate Judge David E. Peebles on 4/30/2012. (sal, ) (Entered: 05/22/2012) |
| 05/22/2012 | 45 | Application for Search Warrant as to 240 West Brighton Avenue, Syracuse, New York. Signed by Magistrate Judge David E. Peebles on 4/30/2012. (sal, ) (Entered: 05/22/2012) |
| 05/22/2012 | 46 | Search Warrant Issued as to 240 West Brighton Avenue, Syracuse, New York. Signed by Magistrate Judge David E. Peebles on 4/30/2012. (sal, ) (Entered: 05/22/2012) |
| 05/22/2012 | 48 | Order to Seal Applications for Search Warrant, Affidavit in Support of Search Warrants, and Search Warrants as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr.. |

|  |  | Signed by Magistrate Judge David E. Peebles on 4/30/12. (sal, ) (Entered: 05/22/2012) |
|---|---|---|
| 05/22/2012 |  | TEXT ORDER to Unseal the Applications for Search Warrants and Search Warrants as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr.. The Affidavit in Support of the Applications for Search Warrants will remain sealed until further order of this court. Authorized by Magistrate Judge David E. Peebles on 5/22/12. (sal, ) (Entered: 05/22/2012) |
| 05/22/2012 | 49 | Search Warrant Returned Executed Served on 602 Atlantic Avenue, Syracuse, NY. (mnm) Modified on 8/10/2012 to indicate that this is a return of a search warrant and not a seizure warrant (sal, ). (Entered: 05/23/2012) |
| 05/22/2012 | 50 | Search Warrant Returned Executed 1250 Park Street, Syracuse, NY. (mnm) Modified on 8/10/2012 to indicate that this is a return of a search warrant and not a seizure warrant (sal, ). (Entered: 05/23/2012) |
| 05/22/2012 | 51 | Search Warrant Returned Executed on 114 Ford Avenue #4, Syracuse, NY.. (mnm) Modified on 8/10/2012 to indicate that this is a return of a search warrant and not a seizure warrant (sal, ). (Entered: 05/23/2012) |
| 05/22/2012 | 52 | Search Warrant Returned Executed on 240 West Brighton Avenue, Syracuse, NY. (mnm) Modified on 8/10/2012 to indicate that this is a return of a search warrant and not a seizure warrant (sal, ). (Entered: 05/23/2012) |
| 06/26/2012 | 54 | ORDER TO CONTINUE - Ends of Justice as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester and Donald R. Johnson, Jr. Time excluded from 6/26/2012 until 9/24/2012 from the Speedy Trial Act. Any Pretrial Motions to be filed by 9/4/2012. Any Change of Plea shall be entered by 10/1/2012. Jury Trial set for 10/9/2012 at 9:00 AM in Syracuse before Judge Norman A. Mordue. Signed by Judge Norman A. Mordue on 6/26/2012. (jmb) (Entered: 06/26/2012) |
| 06/28/2012 | 55 | Application for Search Warrant as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr.. Signed by Magistrate Judge David E. Peebles on 6/28/12. (sal, ) (Entered: 06/29/2012) |
| 06/28/2012 | 56 | Search Warrant Issued on 6/28/12. Signed by Magistrate Judge David E. Peebles on 6/28/12. (sal, ) (Entered: 06/29/2012) |
| 08/06/2012 | 57 | Search Warrant Returned Executed on 7/9/12. Signed by Det. John Gossin on 7/9/12. (sal, ) (Entered: 08/10/2012) |
| 10/05/2012 | 61 | Stipulation and ORDER TO CONTINUE - Ends of Justice: as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester and Donald R. Johnson, Jr. Time excluded from 10/5/2012 until 1/3/2013. Any Change of Plea shall be entered by 12/31/2012. All pretrial submissions shall |

| | | |
|---|---|---|
| | | be due on 12/24/2012. Jury Trial set for 1/7/2013 at 9:00 AM in Syracuse before Judge Norman A. Mordue. Motions to be filed by 11/21/2012. Signed by Judge Norman A. Mordue on 10/5/2012. (jmb) (Entered: 10/09/2012) |
| 12/03/2012 | 66 | NOTICE of Alibi as to Kahari Smith (Murphy, Thomas) (Entered: 12/03/2012) |
| 12/03/2012 | 67 | Certificate of Service by Kahari Smith (Murphy, Thomas) (Entered: 12/03/2012) |
| 12/04/2012 | 68 | MOTION To Declare Case a Complex Case by USA as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr. (Attachments: # 1 Affirmation, # 2 Proposed Order/Judgment)(Katko, John) (Entered: 12/04/2012) |
| 12/04/2012 | 69 | Certificate of Service by USA as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr re 68 MOTION To Declare Case a Complex Case (Katko, John) (Entered: 12/04/2012) |
| 12/05/2012 | 72 | AFFIDAVIT in Support by Kahari Smith re 68 MOTION To Declare Case a Complex Case (Murphy, Thomas) (Entered: 12/05/2012) |
| 12/06/2012 | | TEXT NOTICE - The Government's 68 MOTION To Declare this Case a Complex Case is currently pending before the Court. Defense counsel shall file any objections to the motion on or before 12/10/12. If no objections are filed, the Court will deem the motion unopposed. Endorsed by Judge Norman A. Mordue. (jlr) (Entered: 12/06/2012) |
| 12/17/2012 | 78 | FINDINGS AND ORDER: granting the # 68 Motion for designation of this case as complex as to Kahari Smith (1), Habakkuk Nickens (2), Jeffrey Powell (3), Jermeere McKinnon (8), Nathan King (9), Dwayne Hester (10) and Donald R. Johnson Jr. (11). A continuance is granted from 12/4/2012 to 4/1/2013. Any pretrial motions shall be filed by 1/31/2013. Signed by Judge Norman A. Mordue on 12/17/2012. (jmb) (Entered: 12/17/2012) |
| 12/17/2012 | | Motion filing deadline is 1/31/2013. (cbm ) (Entered: 12/19/2012) |
| 02/21/2013 | 88 | Letter as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr requesting To Reset the Omnibus Motions Deadlines (Katko, John) (Entered: 02/21/2013) |
| 02/22/2013 | 90 | Letter from Thomas J. Murphy, Esq. as to Kahari Smith requesting No objection to resetting omnibus motion deadlines. (Murphy, Thomas) (Entered: 02/22/2013) |
| 02/26/2013 | | TEXT ORDER - In a letter dated February 21, 2013, (Dkt. No. 88) the government requests: additional time to respond to the omnibus motion filed by defendant Habakkuk Nickens (Dkt. No. 83); and that the Court reset defendants' pretrial motion filing deadline, which has expired. The government's letter request (Dkt. No. 88) is granted to the extent it seeks an extension to respond to the omnibus motion by defendant Habakkuk Nickens. |

| | | |
|---|---|---|
| | | The government shall file its response on or before Thursday, March 28, 2013. To date, however, no defendant has requested permission to file a late omnibus motion, thus, the government's request that the Court reset the pretrial motion filing deadline is denied. Endorsed by Judge Norman A. Mordue on 2/26/13. (jlr) (Entered: 02/26/2013) |
| 02/26/2013 | | TEXT NOTICE - Jury Trial set for 4/1/13 is adjourned and will be reset after the decision on motion filed by Habakkuk Nickens. (jlr) (Entered: 02/26/2013) |
| 06/12/2013 | 106 | STIPULATION by USA to 90 Day Extension of Time (Katko, John) (Entered: 06/12/2013) |
| 06/13/2013 | 109 | ORDER on 106 Joint Stipulation as to Kahari Smith, Habakkuk Nickens, Titus Nickens, Jermeere McKinnon, Nathan King : Time excluded from 5/16/2013 until 8/14/2013. Any pretrial motions in this case shall be filed on or before 7/8/2013. Any change of plea shall be entered on or before 8/5/2013. Jury Trial set for 8/12/2013 at 9:00 AM in Syracuse before Judge Norman A. Mordue. All pretrial papers are due on or before 7/29/2013. Signed by Judge Norman A. Mordue on 6/13/2013. (sg ) (Entered: 06/14/2013) |
| 07/16/2013 | 116 | NOTICE OF HEARING as to Kahari Smith, Habakkuk Nickens, Titus Nickens, Jermeere McKinnon, Nathan King. The Jury Trial shall commence as set on 8/12/2013 at 09:00 AM in Syracuse before Senior Judge Norman A. Mordue. All pretrial papers are due on or before 7/29/13. (jlr) (Entered: 07/16/2013) |
| 07/16/2013 | 117 | MOTION for Reconsideration *of Trial Date* by USA as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr. (Attachments: # 1 Affidavit)(Katko, John) (Entered: 07/16/2013) |
| 07/17/2013 | 118 | RESPONSE in Support by Kahari Smith re 117 MOTION for Reconsideration *of Trial Date* (Murphy, Thomas) (Entered: 07/17/2013) |
| 07/17/2013 | 120 | STIPULATION by USA to 60 Day Extension of Time (Katko, John) (Entered: 07/17/2013) |
| 07/18/2013 | 121 | ORDER granting the Government's 117 Motion for Reconsideration as to the trial date as to defendants Kahari Smith (1), Titus Nickens (5), Jermeere McKinnon (8), Nathan King (9) and Habakkuk Nickens (2). The Jury trial will commence on October 1, 2013. All pretrial papers are due on or before 9/17/13. The time from 8/15/13 to 10/14/13 is excluded under the Speedy Trial Act. Signed by Senior Judge Norman A. Mordue on 7/18/13. (jlr) (Entered: 07/18/2013) |
| 07/18/2013 | | ORDER terminating the 117 Motion for Reconsideration as to Habakkuk Nickens (2), Christopher Mike (7) pursuant to the 121 Order granting the motion. Endorsed by Senior Judge Norman A. Mordue on 7/18/13. (jlr) (Entered: 08/16/2013) |
| 08/01/2013 | 123 | MOTION for Discovery by USA as to Kahari Smith, Nathan King. Motion Hearing set for 8/21/2013 10:00 AM in Syracuse before Senior Judge Norman |

| | | A. Mordue Response to Motion due by 8/5/2013 Reply to Response to Motion due by 8/12/2013. (Katko, John) (Entered: 08/01/2013) |
|---|---|---|
| 08/01/2013 | 124 | Certificate of Service by USA as to Kahari Smith, Nathan King re 123 MOTION for Discovery (Katko, John) (Entered: 08/01/2013) |
| 08/02/2013 | 126 | RESPONSE to Motion by Kahari Smith re 123 MOTION for Discovery (Murphy, Thomas) (Entered: 08/02/2013) |
| 08/02/2013 | 127 | Certificate of Service by Kahari Smith (Murphy, Thomas) (Entered: 08/02/2013) |
| 08/09/2013 | 131 | NOTICE OF HEARING as to Kahari Smith, Habakkuk Nickens, Titus Nickens, Nathan King. Jury Trial is reset for 10/1/2013 09:00 AM in Syracuse before Senior Judge Norman A. Mordue. All pretrial papers are due on or before 9/17/13. (jlr) (Entered: 08/09/2013) |
| 08/20/2013 | | TEXT NOTICE - The Government's 123 MOTION for Discovery returnable on 8/21/13 is on submit. No appearances. (jlr) (Entered: 08/20/2013) |
| 08/21/2013 | 134 | RESPONSE to Motion by Habakkuk Nickens as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr re 96 MOTION for Discovery (Attachments: # 1 Certificate of Service)(Sullivan, William) (Entered: 08/21/2013) |
| 08/21/2013 | 135 | ORDER denying as moot the Government's 123 Motion for Discovery as to Kahari Smith (1) and Nathan King (9). Signed by Senior Judge Norman A. Mordue on 8/21/13. (jlr) (Entered: 08/21/2013) |
| 08/30/2013 | 136 | Proposed Voir Dire by Habakkuk Nickens as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr (Sullivan, William) (Entered: 08/30/2013) |
| 08/30/2013 | 137 | PROPOSED VERDICT FORM by Habakkuk Nickens as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr (Sullivan, William) (Entered: 08/30/2013) |
| 08/30/2013 | 138 | Proposed Jury Instructions by Habakkuk Nickens as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr (Sullivan, William) (Entered: 08/30/2013) |
| 08/30/2013 | 139 | Court Ordered Questionnaire as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr (Sullivan, William) (Entered: 08/30/2013) |
| 08/30/2013 | 140 | Certificate of Service by Habakkuk Nickens as to Kahari Smith, Habakkuk Nickens, Jeffrey Powell, Kenneth Jackson, Titus Nickens, Riadda Travet, Christopher Mike, Jermeere McKinnon, Nathan King, Dwayne Hester, Donald R. Johnson, Jr re 136 Proposed Voir Dire, 139 Court Ordered Questionnaire, |

| | | 137 Proposed Verdict Form, 138 Proposed Jury Instructions, (Sullivan, William) (Entered: 08/30/2013) |
|---|---|---|
| 09/12/2013 | 148 | Proposed Jury Instructions by Kahari Smith (Murphy, Thomas) (Entered: 09/12/2013) |
| 09/12/2013 | 149 | Proposed Voir Dire by Kahari Smith (Murphy, Thomas) (Entered: 09/12/2013) |
| 09/12/2013 | 150 | Court Ordered Questionnaire as to Kahari Smith (Murphy, Thomas) (Entered: 09/12/2013) |
| 09/12/2013 | 151 | PROPOSED VERDICT FORM by Kahari Smith (Murphy, Thomas) (Entered: 09/12/2013) |
| 09/12/2013 | 152 | Certificate of Service by Kahari Smith (Murphy, Thomas) (Entered: 09/12/2013) |
| 09/16/2013 | 153 | NOTICE OF ATTORNEY APPEARANCE Geoffrey J.L. Brown appearing for USA as Co-counsel with/for Attorney: With *John M. Katko* (Brown, Geoffrey) (Entered: 09/16/2013) |
| 09/16/2013 | 154 | Court Ordered Questionnaire as to Kahari Smith, Habakkuk Nickens, Titus Nickens (Katko, John) (Entered: 09/16/2013) |
| 09/16/2013 | 155 | TRIAL BRIEF by USA as to Kahari Smith, Habakkuk Nickens, Titus Nickens (Katko, John) (Entered: 09/16/2013) |
| 09/16/2013 | 156 | Proposed Jury Instructions by USA as to Kahari Smith, Habakkuk Nickens, Titus Nickens (Katko, John) (Entered: 09/16/2013) |
| 09/16/2013 | 157 | Proposed Voir Dire by USA as to Kahari Smith, Habakkuk Nickens, Titus Nickens (Katko, John) (Entered: 09/16/2013) |
| 09/16/2013 | 158 | Certificate of Service by USA as to Kahari Smith, Habakkuk Nickens, Titus Nickens re 157 Proposed Voir Dire, 154 Court Ordered Questionnaire, 156 Proposed Jury Instructions, 155 Trial Brief (Katko, John) (Entered: 09/16/2013) |
| 09/19/2013 | | TEXT Minute Entry for Change of Plea Hearing as to Kahari Smith on 9/19/2013 before Senior Judge Norman A. Mordue. APPR: John Katko, AUSA; Geoffrey Brown, AUSA; Thomas Murphy, Esq. Counsel waives formal reading of the Superseding Indictment. Plea entered by Kahari Quante Smith (1) of Guilty to Count 1 of the Superseding Indictment. Defendant admits to Overtacts 8, 9, 13, 19, 23, 24, 25, 28. Count 2 to be dismissed at sentencing. Plea Agreement Accepted and Incorporated into the record as to Kahari Smith. Defendant remanded. (Court Reporter Eileen McDonough) (jlr) (Entered: 09/20/2013) |
| 09/19/2013 | 164 | PLEA AGREEMENT as to Kahari Smith. (jlr) (Entered: 09/20/2013) |
| 09/19/2013 | 165 | GUIDELINE ORDER as to Kahari Smith. The Sentencing is set for 1/27/2014 at 10:00 AM in Syracuse before Senior Judge Norman A. Mordue. Government and Defendant Sentencing Memo Deadline 1/6/2014. NOTE: All memoranda shall be double-spaced and no longer than 10 pages in length. Any letters of support shall NOT be filed and shall be sent via regular mail or hand |

| | | delivered to chambers with copies to the opposing counsel and the US Probation Office on or before 1/6/2014. Signed by Senior Judge Norman A. Mordue on 9/19/13. (jlr) (Entered: 09/20/2013) |
|---|---|---|
| 09/20/2013 | 166 | TEXT ORDER finding as moot the 141 Motion in Limine as to Habakkuk Nickens (2) and the 143 Motion in Limine as to Habakkuk Nickens (2). Defendant has entered a guilty plea. The jury trial scheduled for 10/1/2013 is canceled. Endorsed by Senior Judge Norman A. Mordue on 9/20/13. (jlr) (Entered: 09/20/2013) |
| 12/05/2013 | | TEXT NOTICE OF HEARING as to Kahari Smith. The Sentencing is reset for 3/4/2014 at 10:00 AM in Syracuse before Senior Judge Norman A. Mordue. All sentencing memoranda shall be filed on or before 2/11/2014. All memoranda shall be double-spaced and no longer than 10 pages in length. Any letters of support shall NOT be filed and shall be sent via regular mail or hand delivered to chambers with copies to the opposing counsel and the US Probation Office on or before 2/11/2014.(jlr) (Entered: 12/05/2013) |
| 01/13/2014 | 200 | PRESENTENCE INVESTIGATION REPORT - INITIAL DISCLOSURE [LODGED] as to Kahari Smith. The Presentence Investigation Report in this matter is now available for review. Any objections to the report shall be served on the Probation Office within 14 days of this notice, by mailing a hard copy to the Probation Officer. Please contact the probation officer who prepared the report if you have any questions.**[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (dct, ) (Entered: 01/13/2014) |
| 01/14/2014 | 201 | NOTICE OF ATTORNEY APPEARANCE Carla B. Freedman appearing for USA with/for Attorney: John Katko (Freedman, Carla) (Entered: 01/14/2014) |
| 02/10/2014 | 214 | SENTENCING MEMORANDUM by USA as to Kahari Smith (Freedman, Carla) (Entered: 02/10/2014) |
| 02/11/2014 | 215 | SENTENCING MEMORANDUM by Kahari Smith (Attachments: # 1 Exhibit (s), # 2 Exhibit(s))(Murphy, Thomas) (Entered: 02/11/2014) |
| 02/13/2014 | 219 | PRESENTENCE INVESTIGATION REPORT - FINAL DISCLOSURE [LODGED] as to Kahari Smith. The final version of the Presentence Investigation Report, including all revisions and the most recent Addendum is now available for review. This version of the report will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. Any further distribution or dissemination is prohibited.]** (dct, ) (Entered: 02/13/2014) |
| 02/27/2014 | 224 | Letter from Grovernment Regarding Witnesses at Sentencing as to Kahari Smith (Freedman, Carla) (Entered: 02/27/2014) |
| 03/03/2014 | | |

| | | |
|---|---|---|
| | | TEXT NOTICE OF HEARING as to Kahari Smith. The Court has reset the Sentencing for 3/25/2014 at 02:00 PM in Syracuse before Senior Judge Norman A. Mordue. (jlr) (Entered: 03/03/2014) |
| 03/03/2014 | 225 | Letter from Thomas J. Murphy, Esq. as to Kahari Smith requesting Defendant's mother speaking at sentencing (Murphy, Thomas) (Entered: 03/03/2014) |
| 03/25/2014 | | TEXT Minute Entry for Sentencing held on 3/25/2014 for Kahari Smith (1) before Senior Judge Norman A. Mordue. APPR: Carla Freedman, AUSA; Thomas Murphy, Esq. Defendant is sentenced on Count 1s of the Superseding Indictment to 420 months imprisonment; 5 years supervised release. $100 special assessment, due immediately. Appeal rights explained. Judge recommends to the BOP that the defendant participate in the Drug Progam while incarcerated, if eligible and that he be housed as close to home as is available. Defendant remanded. (Court Reporter Diane Martens) (jlr) (Entered: 03/26/2014) |
| 03/26/2014 | 242 | DISMISSAL OF COUNT 2 of the Superseding Indictmnet on Government Motion as to Kahari Smith. (jlr) (Entered: 03/26/2014) |
| 03/28/2014 | 243 | JUDGMENT: as to Kahari Smith (1), Count 1s. Defendant sentenced to imprisonment for a term of 420 months, to be followed by supervised release for a term of 5 years. $100.00 Special Assessment due immediately. Count 2s, Dismissed on Motion of the Government. Signed by Senior Judge Norman A. Mordue on 3/28/2014. (nmk) (Entered: 03/31/2014) |
| 03/31/2014 | | TEXT NOTICE: as to Kahari Smith - Attorneys appointed pursuant to the Criminal Justice Act are reminded that CJA Vouchers are to be submitted no later than 45 days after the final disposition of the case, unless good cause is shown. Refer to the Court's website: http://www.nynd.uscourts.gov/criminal-justice-act for comprehensive information relating to court appointed representation. (nmk) (Entered: 03/31/2014) |
| 03/31/2014 | 244 | **STATEMENT OF REASONS [LODGED]** as to Kahari Smith **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (dictcbm ) (Entered: 03/31/2014) |
| 04/03/2014 | 247 | NOTICE OF APPEAL by Kahari Smith No fee paid. (Murphy, Thomas) (Entered: 04/03/2014) |
| 04/04/2014 | 248 | Letter from Thomas J. Murphy, Esq. as to Kahari Smith requesting Assignment of appellate attorney (Murphy, Thomas) (Entered: 04/04/2014) |
| 04/04/2014 | 249 | ELECTRONIC NOTICE AND CERTIFICATION: as to Kahari Smith sent to US Court of Appeals regarding the # 247 Notice of Appeal - Final Judgment. (nmk) (Entered: 04/04/2014) |
| 04/07/2014 | | TEXT NOTICE - Counsel is directed to apply to the Second Circuit as to his 248 Letter from Thomas J. Murphy, Esq. as to Kahari Smith requesting Assignment of appellate attorney.(jlr) (Entered: 04/07/2014) |

| | |
|---|---|
| 05/08/2014 | USCA Case Number is 14-1054 for <u>247</u> Appeal filed by Kahari Smith. (cbm ) (Entered: 05/08/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/09/2014 14:51:59 | | |
| **PACER Login:** | at0090 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:11-cr-00317-NAM |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

**A-15**



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

*************************************************

UNITED STATES OF AMERICA,

              v.

(1)  KAHARI SMITH, a/k/a Kiss,
(2)  HABAKKUK NICKENS, a/k/a HB,
(3)  JEFFREY POWELL, a/k/a Ghost,
(4)  KENNETH JACKSON, a/k/a Karome,
(5)  TITUS NICKENS, a/k/a Tit,
(6)  RIADDA TRAVET, a/k/a Rico,
(7)  CHRISTOPHER MIKE, a/k/a Jah or C-Mike,
(8)  JERMEERE MCKINNON, a/k/a Hood,
(9)  NATHAN KING, a/k/a Nate,
(10) DWAYNE HESTER, a/k/a Black, and
(11) DONALD R. JOHNSON, JR., a/k/a D-Jigga,

              Defendants.

No. 5:11-CR-317   (NAM)

<u>SUPERSEDING INDICTMENT</u>
Vio: 18 U.S.C. § 1962(d)
     18 U.S.C. § 1959(a)(1)

<u>COUNTY</u>: ONONDAGA

*************************************************

<u>THE GRAND JURY CHARGES:</u>

<u>COUNT ONE</u>

<u>THE ENTERPRISE</u>

At all times material to this Indictment:

1.     Defendants:

              KAHARI SMITH, a/k/a Kiss,
              HABAKKUK NICKENS, a/k/a HB,
              JEFFREY POWELL, a/k/a Ghost,
              KENNETH JACKSON, a/k/a Karome,
              TITUS NICKENS, a/k/a Tit,
              RIADDA TRAVET, a/k/a Rico,
              CHRISTOPHER MIKE, a/k/a Jah or C-Mike,
              JERMEERE MCKINNON, a/k/a Hood,
              NATHAN KING, a/k/a Nate,

**DWAYNE HESTER, a/k/a Black, and**
**DONALD R. JOHNSON, JR., a/k/a D-Jigga,**

and others, were members and associates of a criminal organization in Syracuse, New York, known

as the "V-Not Gang," whose members and associates engaged in acts involving murder, robbery,

drug trafficking, and witness tampering, in Onondaga County, within the Northern District of New

York and elsewhere.

      2.      The V-Not Gang, including its leadership, members, and associates, constituted an

"enterprise" as defined by Title 18, United States Code, Sections 1961(4) and 1959(b)(2), that is, a

group of individuals associated in fact.  The enterprise was engaged in, and its activities affected,

interstate and foreign commerce.  The enterprise was an ongoing organization whose members

functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

**PURPOSES OF THE ENTERPRISE**

      3.      The purposes of the V-Not Gang included, but were not limited to, the following:

      a.      Enriching the members of the V-Not Gang through, among other things,
control of and participation in the distribution of controlled substances in V-
Not Gang territory and elsewhere;

      b.      Maintaining control over V-Not Gang territory;

      c.      Preserving, protecting, and expanding the power and reputation of the V-Not
Gang through the use of intimidation, violence, threats of violence, assaults,
attempted murders, and murders;

      d.      Promoting and enhancing the V-Not Gang, its activities, and the activities of
its members and associates; and

2

  e.  Exposing and pressuring V-Not Gang members and others who cooperate with

law enforcement.

## MANNER AND MEANS OF THE ENTERPRISE

  4.  The V-Not Gang operated in a multi-block area on the far south side of the City of

Syracuse, New York.  The northern border of the V-Not Gang's territory was West Newell Street.

The western border was comprised of Valley Drive and streets connected thereto, Barnes Avenue

and Seneca Place.  The southern border consisted of East and West Seneca Turnpike.  The eastern

border included Onondaga Creek Boulevard, Ballantyne Road, South Salina Street, Florence

Avenue, Monticello Drive and Maywood Drive.

  5.  From at least 2003 up to approximately 2006, the V-Not Gang's income was derived

primarily from the sale of marijuana.  As the desire for more money increased, so did the need to

control drug sales in other areas outside V-Not Gang territory where some of the gang members

resided.  In and around 2006, some members of the V-Not Gang began to move their marijuana sales

to the area of V-Not Gang territory in and around the 4600 block of South Salina Street, to include

Seneca Drive, Crippen Avenue, Orlando Avenue, and Clarence Avenue.  They also began to steal

large quantities of marijuana from the people of the nearby Onondaga Nation Reservation.  Other

V-Not Gang members continued their drug sales in the Valley Drive area of the V-Not Gang

territory.

  6.  At some point prior 2006, V-Not Gang members began to distribute cocaine base

(crack) in their territory and elsewhere.  By 2006, such crack cocaine distribution was commonplace.

In or about 2006, the V-Not Gang began to obtain crack cocaine from a source known to V-Not

Gang member Silas Collier, a/k/a Slice.  V-Not members also began to pool their money to purchase

3

Case 14-58, Document 132, 07/15/2014, 1271380, Page47 of 128

**A-18**

crack cocaine from this drug source. As a group, they would make large purchases of crack cocaine approximately every two weeks. Upon delivery, the crack would be broken up and distributed amongst the V-Not Gang members based on how much money each person contributed. After Silas Collier, a/k/a Slice, was murdered in May 2007, the V-Not Gang began to use V-Not Gang member Jeffrey Powell's crack cocaine supplier, among others, to continue their drug trafficking business.

7.      The major crack cocaine dealers in the V-Not Gang would supply crack cocaine to lower ranking or younger gang members. The lower level dealers, usually around 15 to 16 years of age, would then sell to "licks," a slang term used to describe customers who would come into V-Not Gang territory to buy drugs. V-Not Gang members would also sell larger quantities of crack cocaine to customers in other areas of the City of Syracuse. As V-Not Gang members became more successful at selling crack cocaine and marijuana, they elevated their status in the gang by purchasing larger quantities of those drugs and then selling them to other gang members. In turn, the money they received from the other V-Not Gang members and associates were be used to purchase more drugs to continue the drug-dealing-cycle.

8.      This cycle of drug dealing continued virtually unabated since 2003, continuing even as multiple gang members were killed or went to prison for gun, drug, and violent crime offenses. The structure of the V-Not Gang members maintaining exclusive control over their territory, in large part to protect their ongoing drug trade, endured despite the killings and arrests.

9.      V-Not Gang members guarded the V-Not Gang territory to prevent drug sales by others in the territory or encroachment of any kind by rival gang members. If a non-V-Not Gang member or associate attempted to sell drugs within V-Not Gang territory, either on their own, or in conjunction with a rival gang, they would be summarily dismissed from the area and, likely, be

physically assaulted, stabbed or shot.  Additionally, any rival gang members who passed through the V-Not Gang territory, even if they were not selling or attempting to sell drugs, were subject to attacks to ensure that the territory remained firmly under V-Not control.

      10.     There were several aspects of the V-Not Gang that developed and remained constant throughout the years:

        a.     V-Not Gang members always used the safety and sanctuary of the gang territory as much as possible to possess drugs and make drug sales, to meet and congregate as a gang to discuss gang-related issues such as retaliating against rival gangs, and to hide from police and rival gangs.  One of the places within the V-Not Gang territory where V-Not Gang members routinely congregated was 321 Shirley Drive, in a garage where they have been known to gamble and conduct other gang-related activity.  They also routinely congregated in front of the Valley Superette at 614 Valley Drive and the Golden Gate Market at 4619 South Salina Street;

        b.     V-Not Gang members who happened to be in the area at the time of an encroachment by a rival gang member or unwanted drug dealer, routinely responded with violence to protect the territory, with these responses sometimes being coordinated amongst V-Not Gang members;

        c.     V-Not Gang members often wrote gang-related graffiti on buildings and schools in their territory.  Such graffiti was in the form of the words "V-Not" or "Slice," the latter of which was a form of homage to slain V-Not Gang member Silas Collier, a/k/a Slice;

        d.     V-Not Gang members on occasion used hand signs to represent gang identity.  The V-Not hand sign was meant to convey the letter "V" and was done primarily by opening a wide gap between the middle and ring fingers;

5

e.      V-Not Gang members routinely armed themselves with firearms in order to: (1) protect their territory and drug trade; (2) project a violent attitude to rival gang members; and (3) retaliate against those who committed acts of violence against V-Not Gang members. V-Not Gang members hid guns at various locations within the gang territory so that they were readily available for gang members to use when necessary. These guns were routinely used by V-Not Gang members to shoot at rival gang members both within V-Not Gang territory and elsewhere. V-Not Gang members also used assault rifles to retaliate against rival gangs;

f.      V-Not Gang members had long standing feuds with other street gangs, including Bricktown, O-Block, Elk Block, 110/1500, and various members of gangs from the east side of Syracuse. These feuds resulted in multiple shootings and some murders. V-Not Gang members often used guns to conduct shootings in rival gang territories in furtherance of these gang wars;

g.      V-Not Gang members routinely paid tribute to slain V-Not Gang member Silas Collier, a/k/a Slice. Tributes to Collier have taken the form of "R.I.P. Slice" tattoos, clothing, rap music/rap videos and graffiti; and

h.      More recently, V-Not Gang members, and those associated with them, utilized social media web sites like Facebook, MySpace, and YouTube to glorify and perpetuate the V-Not Gang through photos, writings, drawings, and at least one gang-related rap video that glorifies the V-Not Gang.

11.      V-Not Gang members, especially in the early years of the gang, generally had a familial affiliation with an established gang member, lived in the gang territory at some point, and/or demonstrated a propensity to do one or more of the following: (1) engage in drug trafficking; (2)

protect the gang territory; (3) engage in gang-related violence; or (4) retaliate against rival gangs for acts of violence or disrespect, even if the individual gang member was not the subject of the violence and disrespect.  V-Not Gang member's gained respect and stature by demonstrating a proficiency in one or more of these areas.

12.     The V-Not Gang continued to operate as a criminal enterprise despite attrition when members were incarcerated for criminal offenses, left the gang, or were killed.  Rival gang members and others were aware of the continued existence of the V-Not Gang, the protection of its territory, and its continued criminal operations despite attrition.

## THE RACKETEERING CONSPIRACY

From at least 2003, the exact date being unknown to the grand jury, and continuing thereafter up to the date of the indictment, in the Northern District of New York and elsewhere, the defendants,

**KAHARI SMITH, a/k/a Kiss,**
**HABAKKUK NICKENS, a/k/a HB,**
**JEFFREY POWELL, a/k/a Ghost,**
**KENNETH JACKSON, a/k/a Karome,**
**TITUS NICKENS, a/k/a Tit,**
**RIADDA TRAVET, a/k/a Rico,**
**CHRISTOPHER MIKE, a/k/a Jah or C-Mike,**
**JERMEERE MCKINNON, a/k/a Hood,**
**NATHAN KING, a/k/a Nate,**
**DWAYNE HESTER, a/k/a Black, and**
**DONALD R. JOHNSON, JR., a/k/a D-Jigga,**

being persons employed by and associated with the enterprise known as the V-Not Gang, described in paragraphs 1 through 12 of this indictment, which enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, knowingly, and intentionally did combine, conspire, confederate, and agree together and with each other and with others known and unknown to the grand jury, to violate Title 18, United States Code, Section 1962(c), that is, to

7

conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts involving:

      (1) murder, in violation of New York Penal Law, Sections 125.25, 110.05, and 105.17;

      (2) robbery, in violation of  New York Penal Law, Sections 160.05, 160.10, and 160.15;

      (3) conspiracy to possess with intent to distribute cocaine base (crack) and marijuana, as well as possession with intent to distribute and distribution of cocaine base (crack) and marijuana, in violation of Title 21, United States Code, Sections 841(a) and 846; and

      (4) multiple acts indictable under the federal statute prohibiting witness tampering, specifically Title 18, United States Code, Section 1512(b)(3).

      It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## OVERT ACTS[1]

      In furtherance of the conspiracy and in order to affect the objects thereof, the defendants and their co-conspirators, known and unknown to the grand jury, committed and caused to be committed the following overt acts, among others, in the Northern District of New York and elsewhere:

      1.      On or about August 23, 2005, **TITUS NICKENS,** in the presence of **HABAKUKK NICKENS,** brandished a handgun in the vicinity of 146 West Florence Avenue, Syracuse.

---

[1] The a/k/a's ("also known as") for each of the defendants are not restated in the Overt Acts section.

2.      On or about October 6, 2005, **TITUS NICKENS,** in the presence of two V-Not Gang associates, in the vicinity of 100 Hall Avenue, Syracuse, attempted to rob two drug customers of their money and valuables by pointing a shotgun at them as they sat in their car, at which time a struggle ensued, the gun discharged, shooting one of the V-Not members in the arm.

3.      On or about December 11, 2005, **RIADDA TRAVET** possessed a loaded .357 revolver in the 4600 block of South Salina Street, Syracuse.

4.      On or about January 4, 2006, **JEFFREY POWELL** possessed approximately 2.1 grams of cocaine base (crack) and $240 in U.S. currency in the 200 block of West Newell Avenue, Syracuse.

5.      On or about April 19, 2006, **CHRISTOPHER MIKE** possessed a quantity of cocaine base (crack) and $128 in U.S. currency at 161 Bertram Place, Syracuse.

6.      On or about December 7, 2006, **DWAYNE HESTER,** in the presence of **KENNETH JACKSON,** possessed approximately 2.5 grams of cocaine base (crack) at 708 James Street, Apt. 229, Syracuse.

7.      On or about May 28, 2007, **TITUS NICKENS,** in the presence of other V-Not Gang members in the 1000 block of Ballantyne Road, Syracuse, shot a rival O-Block Gang member in the stomach with a 9 mm handgun that had been involved in at least five previous shootings in and around V-Not Gang territory in 2007.

8.      On or about October 24, 2007, **KAHARI SMITH** possessed approximately 1.2 grams of cocaine base (crack) in the presence of **TITUS NICKENS, DWAYNE HESTER,** and **DONALD JOHNSON, JR.,** in the 200 block of Seneca Drive, Syracuse, at which time a loaded starter pistol, which resembled a .38 caliber pistol, was found on the ground near all of them.

Case 14-58, Document 132, 07/15/2014, 1271380, Page53 of 128

9.      On or about November 7, 2007, **KAHARI SMITH, JERMEERE MCKINNON, TITUS NICKENS, JEFFREY POWELL,** and others, possessed more than 18 grams of cocaine base (crack), a quantity of marijuana, and more than $900 in U.S. currency, at 262 Seneca Drive, Apartment 1E, Syracuse.

10.     On or about March 1, 2008, **DONALD JOHNSON, JR.** possessed approximately 2 grams of cocaine base (crack) in a car used by at least one other V-Not Gang member in the 6200 block of South Salina Street, Syracuse.

11.     On or about June 9, 2008, **DWAYNE HESTER,** in a vehicle with **KENNETH JACKSON** and another V-Not Gang member in the 200 block of Green Street, Syracuse, possessed approximately 2 grams of cocaine base (crack) and $1,198 in U.S. currency.

12.     On or about June 19, 2008, **HABAKUKK NICKENS** possessed approximately 12 grams of cocaine base (crack) in the 100 block of Grove Street, Syracuse.

13.     On or about March 23, 2009, **KAHARI SMITH** possessed approximately 4.6 grams of cocaine base (crack) and $361 in U.S. currency in the presence of **DONALD JOHNSON, JR., HABAKUKK NICKENS,** and another person, in the 1600 block of Teall Avenue, Syracuse.

14.     On or about May 2, 2009, **HABAKUKK NICKENS** and **CHRISTOPHER MIKE,** in the presence of **RIADDA TRAVET,** assaulted a person in a residence on Columbus Avenue, Syracuse, and then stole a .50 caliber handgun from the premises.

15.     On or about May 4, 2009, **HABAKUKK NICKENS** possessed a .38 caliber handgun at a residence on Crippen Place, Syracuse, and fired several shots at others from that handgun.

16.     On or about May 4, 2009, **HABAKUKK NICKENS**, in the presence of **RIADDA TRAVET**, fired a handgun several times at a person in a building on West Brighton Avenue, Syracuse.

17.     On or about May 21, 2009, **RIADDA TRAVET** threatened a witness who was going to testify against **HABAKUKK NICKENS** in relation to the shooting that occurred on May 4, 2009.

18.     On or about June 3, 2009, **DONALD JOHNSON, JR.** possessed approximately 8 grams of cocaine base (crack) and $360 in U.S. currency in a car in the 1800 block of South Avenue, Syracuse.

19.     On or about November 1, 2009, **KAHARI SMITH, RIADDA TRAVET,** and **JEFFREY POWELL** were together in Elk Block Gang territory in Syracuse when **POWELL** shot an Elk Block Gang member in the head.

20.     On or about December 31, 2009, **HABAKUKK NICKENS** attempted to shoot two rival Elk Block Gang members in a barber shop in the 2000 block of South Salina Street, Syracuse.

21.     On or about June 11, 2010, **CHRISTOPHER MIKE** possessed approximately 2 grams of cocaine base (crack) and $1,020 in U.S. currency in the 1200 block of Midland Avenue, Syracuse.

22.     On or about August 8, 2010, **HABAKUKK NICKENS** possessed approximately 2.69 grams of cocaine base (crack) and a digital scale in a vehicle in the vicinity of 820 West Brighton Avenue.

23.     On or about October 23, 2010, **KAHARI SMITH, CHRISTOPHER MIKE, JEFFREY POWELL, HABAKUKK NICKENS, TITUS NICKENS, KENNETH JACKSON,**

**DWAYNE HESTER,** and other V-Not Gang members engaged in a gang fight with multiple members of the Bricktown Gang at the Juke Box night club in Syracuse.

24.     On or about October 23, 2010, **KAHARI SMITH, CHRISTOPHER MIKE, JEFFREY POWELL, KENNETH JACKSON,** and at least one other V-Not Gang member, were together in a car when **KENNETH JACKSON** fired at least 21 shots from an AK-47 assault rifle into a Bricktown Gang member's house on West Brighton Avenue, Syracuse.

25.     On or about November 26, 2010, **KAHARI SMITH, JEFFREY POWELL, HABAKUKK NICKENS,** and two other V-Not Gang members, were together in a vehicle on a highway in Syracuse when **SMITH** fired several shots into a car containing multiple Bricktown Gang members, killing Kihary Blue and injuring Jarrell Williams.

26.     On or about January 4, 2011, **NATHAN KING** fired several shots from a handgun into the home of a rival Bricktown Gang member on Armstrong Place, Syracuse, in retaliation for a previous shooting by Bricktown Gang members of **TITUS NICKENS** and **KAHARI SMITH** on October 28, 2010 on Interstate 81 in Syracuse.

27.     On or about March 18, 2011, **KENNETH JACKSON** and **DONALD JOHNSON, JR.** shot at a Bricktown Gang member in the vicinity of 1919 South State Street, Syracuse.

28.     On or about March 19, 2011, **KAHARI SMITH** shot Bricktown Gang member Jaycee Floyd in the leg in the 500 block of Oakwood Avenue, Syracuse.

29.     On or about May 26, 2011, **JEFFREY POWELL,** in the presence of **KENNETH JACKSON** and **DWAYNE HESTER,** sold approximately 1.8 grams of cocaine base (crack) to a customer in the area of Hickory and Lodi Streets, Syracuse.

12

30.     On or about June 1, 2011, **JEFFREY POWELL** sold approximately 3.5 grams of cocaine base (crack) to a customer in the area of Hickory and Lodi Streets, Syracuse.

31.     On or about June 22, 2011, **JEFFREY POWELL** directed fellow V-Not Gang member **JERMEERE MCKINNON** to sell a .22 caliber handgun to a person, and **JERMEERE MCKINNON** thereafter delivered to the person in Syracuse a starter pistol that closely resembled a .22 caliber handgun.

32.     On or about June 27, 2011, **JEFFREY POWELL,** in the presence of **DWAYNE HESTER,** possessed two 9 millimeter handguns and a quantity of cocaine base (crack) on Lodi Street, Syracuse.

33.     On or about July 27, 2011, **JEFFREY POWELL** sold a quantity of cocaine base (crack) to two customers in the area of Hickory and Lodi Streets, Syracuse.

34.     On or about July 28, 2011, **JEFFREY POWELL** sold approximately 1.1 grams of cocaine base (crack) to a customer in the area of Hickory and Lodi Streets, Syracuse.

35.     On or about September 28, 2011, **JERMEERE MCKINNON,** in the presence of **NATHAN KING** and another now-deceased V-Not Gang member, sold a .380 caliber handgun to a person for $500 in the vicinity of 602 Atlantic Avenue, Syracuse.

36.     On or about October 18, 2011, **JERMEERE MCKINNON** negotiated sales of cocaine base (crack) to three customers in the 4600 block of South Salina Street, Syracuse.

37.     On or about October 18, 2011, **JERMEERE MCKINNON** was driven in a car by **NATHAN KING** to the 100 block of Calthrop Avenue, Syracuse, where he attempted to sell a quantity of cocaine base (crack).

38.    On or about December 24, 2011, **CHRISTOPHER MIKE** and fellow V-Not Gang member Sherman Jackson attempted to rob one or more rival gang members in the vicinity of South Alvord Street and Highland Street, Syracuse, at which time **CHRISTOPHER MIKE** fired a .22 caliber handgun at the rival gang members hitting one of them in the back and then was shot, and Sherman Jackson suffered fatal stab wounds.

39.    On or about January 12, 2012, **DWAYNE HESTER** possessed approximately 4.2 grams of cocaine base (crack), a digital scale, $300 in U.S. currency, rap lyrics referencing the V-Not and Bricktown gangs, and mail sent from various incarcerated V-Not Gang members, one of which referenced a possible source of cocaine for the V-Not Gang in Atlanta, Georgia.

## SPECIAL SENTENCING ALLEGATIONS

**The Grand Jury further alleges that:**

1.    From at least 2003, the exact date being unknown to the grand jury, and continuing thereafter up to the date of the indictment, in the Northern District of New York and elsewhere, the defendants,

> **KAHARI SMITH, a/k/a Kiss,**
> **HABAKKUK NICKENS, a/k/a HB,**
> **JEFFREY POWELL, a/k/a Ghost,**
> **KENNETH JACKSON, a/k/a Karome,**
> **TITUS NICKENS, a/k/a Tit,**
> **RIADDA TRAVET, a/k/a Rico,**
> **CHRISTOPHER MIKE, a/k/a Jah or C-Mike,**
> **JERMEERE MCKINNON, a/k/a Hood,**
> **NATHAN KING, a/k/a Nate,**
> **DWAYNE HESTER, a/k/a Black, and**
> **DONALD R. JOHNSON, JR., a/k/a D-Jigga,**

and others known and unknown to the Grand Jury, combined, conspired, confederated, and agreed with each other to knowingly and intentionally distribute 280 grams or more of cocaine base (crack

Case 14-58, Document 132, 07/15/2014, 1271380, Page58 of 128

cocaine), in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A); all in violation of Title 21, United States Code, Section 846.

2.     On or about November 27, 2010, in the Northern District of New York, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the V-Not Gang, and for the purpose of gaining entrance to and maintaining and increasing position in the V-Not Gang, an enterprise engaged in racketeering activity, defendant

**KAHARI SMITH**

and others known and unknown, unlawfully committed an act of murder, to wit, with the intent to cause the death of another person, caused the death of such person or of a third person, the victim being Kihary Blue, in violation of New York Penal Law Section 125.25(1) and Title 18, United States Code, Section 1959(a)(1).

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO

### Murder of Kihary Blue In Aid Of Racketeering Activity

1.     Paragraphs 1 through 12 of Count One are incorporated and re-alleged herein.

2.     At all times relevant to this Indictment, the enterprise described in paragraphs 1 through 12 of Count One, through its members and associates, engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), namely, acts involving:

(1) murder, in violation of New York Penal Law, Sections 125.25, 110.05, and 105.17;

(2) robbery, in violation of New York Penal Law, Sections 160.05, 160.10, and 160.15;

(3) conspiracy to possess with intent to distribute cocaine base (crack) and marijuana, as well

as possession with intent to distribute and distribution of cocaine base (crack) and marijuana, in violation of Title 21, United States Code, Sections 841(a) and 846; and

(4) multiple acts indictable under the federal statute prohibiting witness tampering, specifically, Title 18, United States Code, Section 1512(b)(3).

3.      On or about November 27, 2010, in the Northern District of New York, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the V-Not Gang, and for the purpose of gaining entrance to and maintaining and increasing position in the V-Not Gang, an enterprise engaged in racketeering activity, defendant

**KAHARI SMITH**

and others known and unknown, unlawfully committed an act of murder, to wit, with the intent to cause the death of another person, caused the death of such person or of a third person, the victim being Kihary Blue, in violation of New York Penal Law, Section 125.25(1).

All in violation of Title 18, United States Code, Section 1959(a)(1).

Dated: ~~April~~ ~~2012~~  March 29, 2012

A TRUE BILL,    *Name Redacted

███████████████

FOREPERSON

RICHARD S. HARTUNIAN
UNITED STATES ATTORNEY

By: _____
      John M. Katko
      Assistant U.S. Attorney
      Bar Roll No. 502457

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

SEP 1 9 2013

---

UNITED STATES OF AMERICA

v.

KAHARI SMITH,

Defendant.

---

Case No. 11-CR-317 (NAM)

Plea Agreement

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, and defendant KAHARI SMITH (hereinafter "the defendant"), by and through the defendant's counsel of record, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure:

1) **The Defendant's Obligations:**

   a) **Guilty Plea:** The defendant will change the defendant's previously-entered plea of "not guilty" and plead guilty to the Count One of the Superseding Indictment (hereinafter "Indictment"), which charges him with conspiracy to engage in a pattern of racketeering activity as part of his membership in the V-Not Gang, in violation of Title 18, United States Code, Section 1962(d).

   b) **Special Assessment:**  The defendant will pay an assessment of $100 per count of conviction pursuant to 18 U.S.C. § 3013.  The defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $100, payable to the U.S. District Court, at the time of sentencing.

    c) **Compliance with Other Terms of Agreement:** The defendant will comply in a timely manner with all of the terms of this plea agreement.

2) **The Government's Obligations:**

    a) **Dismissal of remaining charges:** Upon imposition of a sentence consistent with the terms of this agreement, the government will move to dismiss all charges against the defendant in the above-captioned case other than those to which the defendant pled guilty pursuant to this agreement and on which the Court imposed sentence.  Such dismissal will be without prejudice, permitting the government to seek reinstatement of any and all of those charges if the guilty plea and sentence do not remain in effect.

    b) **Non-prosecution for other offenses:** For so long as the defendant's guilty plea and the sentence remain in effect, the government will not seek other federal criminal charges against the defendant based on conduct described in the indictment and/or in the paragraph of this agreement entitled "Factual Basis for Guilty Plea," occurring before the date on which the defendant signs this agreement.  This agreement does not prevent the government from seeking charges based on other conduct.

    c) **Compliance with Other Terms of Agreement:** The government will comply in a timely manner with all of the terms of this plea agreement.

3) **Potential Maximum Penalties:** The defendant understands that the Court can impose the following maximum penalties for the offense to which the defendant agrees to plead guilty and may be required to impose mandatory minimum terms of imprisonment, all as set out below:

    a) **Maximum term of imprisonment:** Life. (18 U.S.C. § 1963)

    b) **Maximum fine:** $250,000. (18 U.S.C. § 3571(b)(3))

c) **Supervised release term:** In addition to imposing any other penalty, the sentencing court may require the defendant to serve a term of supervised release of up to 5 years, to begin after imprisonment.   See 18 U.S.C. § 3583(b)(1).   A violation of the conditions of supervised release during that time period may result in the defendant being sentenced to additional term of imprisonment of up to 5 years.

d) **Other adverse consequences:**  Other adverse consequences may result from the defendant's guilty plea as further described in paragraph F below.

4)   **Elements of Offense(s):**  The defendant understands that the following are the elements of the offense to which the defendant agrees to plead guilty.  The defendant admits that the defendant's conduct satisfies each and every one of these elements.

a)   First, that the conspiracy, agreement, or understanding described in the Indictment, was formed, reached, or entered into by two or more persons;

b)   Second, that at some time during the existence or life of the conspiracy, agreement, or understanding, the defendant knew the purpose of the agreement, and then deliberately joined the conspiracy, agreement, or understanding; and,

c)   Third, that the conspiracy involved the participation, directly or indirectly, in the affairs of an enterprise known as the V-Not Gang, which was engaged in or had some effect on interstate commerce, and which engaged in a pattern of racketeering activity that included multiple acts of violence and/or the possession with intent to distribute and the distribution of cocaine base (crack).

5) **Factual Basis for Guilty Plea:**  The defendant admits the following facts, that those facts demonstrate the defendant's guilt for the offense to which the defendant is pleading guilty, and that there are no facts establishing a viable defense to that offense:

Case 14-58, Document 132, 07/15/2014, 1271380, Page63 of 128

a) At some time after 2003, up to May 2012, in the Northern District of New York and elsewhere, the defendant combined, conspired, confederated, and agreed with numerous others as members of a Syracuse street gang known as the V-Not Gang to engage in a pattern of racketeering activity that included, among other things, possessing with intent to distribute and distribution of cocaine base (crack) and various acts of violence.  The V-Not Gang operated within a specifically defined geographic area on the far south side of the City of Syracuse, New York.  V-Not Gang members routinely guarded that territory and resorted to acts of violence, if necessary, to ensure that no rival gang members encroached upon their territory to sell drugs, or for any other reason.  By tightly controlling their defined geographic area, V-Not Gang members maintained an exclusive territory within which only their members or associates could distribute their crack cocaine.  Various gang members also sold crack cocaine outside the gang territory on a regular basis.  The gang also routinely engaged in acts of violence both within and outside their territory in furtherance of their gang activities.

b) The defendant was a member of the V-Not Gang during the time of the conspiracy charged in the Superseding Indictment.  The defendant's membership and association with the gang can be shown by, among other things, the following: (1) testimony from multiple cooperating gang members from various Syracuse street gangs, including the V-Not Gang, all of whom identify the defendant as being a member of the V-Not Gang; (2) tattoos the defendant has on his body which include a large "V" on his left tricep, a large "N" on his right tricep, and another one on his left forearm which pays homage to slain V-Not Gang member Silas Collier, a/k/a Slice; (3)

4

Case 14-58, Document 132, 07/15/2014, 1271380, Page64 of 128

multiple photos obtained from the defendant's MySpace account which depict him flashing the V-Not Gang sign and holding large wads of U.S. currency; (4) similar gang-related photos obtained from other MySpace and Facebook accounts; (5) multiple gang-related photos obtained from the defendant's cell phone which show him with other V-Not Gang members flashing gang signs; and (6) multiple post-arrest admissions about his association with V-Not. In addition, there are multiple overt acts alleged in the Indictment that demonstrate the defendant's association with the gang, including Overt Acts: #8 (possessing crack cocaine and a starter pistol in the presence of co-defendants Titus Nickens, Dwayne Hester and Donald Johnson, Jr., on October 24, 2007); #9 (possessing crack cocaine, marijuana and U.S. currency, along with co-defendants Jermeere McKinnon, Titus Nickens, Jeffrey Powell and others on November 7, 2007); #13 (possessing crack cocaine and U.S. currency in the presence of co-defendant Donald Johnson, Jr., on March 23, 2009); #19 (present with co-defendants Riadda Travet and Jeffrey Powell when Powell shot a rival gang member in the head on November 1, 2009); #23 (participation, along with co-defendants Christopher Mike, Jeffrey Powell, Habakkuk Nickens, Titus Nickens, Kenneth Jackson, Dwayne Hester, and others, in a gang fight against Bricktown Gang members on October 23, 2010); #24 (participation in a drive-by shooting of a rival gang member's house, along with co-defendants Christopher Mike, Jeffrey Powell and Kenneth Jackson); #25 (firing several shots into a rival gang member's car while in a vehicle with co-defendants Jeffrey Powell, Habakkuk Nickens, Willie Sanders and one other person, which resulted in the death of Kihary Blue and the wounding of Bricktown Gang member Jarrell Williams, on November 26, 2010); and #28

(shooting of Bricktown Gang member Jaycee Floyd on March 19, 2011). The defendant admits that he engaged in the conduct alleged in each and every one of these overt acts and did so to further the racketeering enterprise.

c) As part of his membership in the V-Not Gang, the defendant and/or others associated with the gang obtained crack cocaine from various sources and redistributed it to others. By virtue of their membership in the gang, the defendant and others were able to possess and sell that crack cocaine at various locales in and around the V-Not Gang's territory.

d) The defendant's relevant conduct involved the distribution by the defendant, or by co-conspirators committing reasonably foreseeable acts in furtherance of the criminal activity undertaken jointly with the defendant, of at least 196 but less than 280 grams of cocaine base (crack) and the possession of dangerous weapons, namely handguns, in connection with the gang's drug trafficking activity.

6) **Sentencing Stipulations**:

(1) Pursuant to U.S.S.G. § 2A1.1, the defendant is accountable for First Degree Murder for his killing of Kihary Blue, as alleged in Overt Act #25 of the Indictment. Thus, the total offense level in this case is 43.

(2) Pursuant to U.S.S.G. § 2D1.1, the defendant is accountable for at least 196 but less than 280 grams of cocaine base (crack), based upon the relevant conduct of this defendant which is readily provable by the United States at this time, without consideration of information provided by the defendant which is protected by U.S.S.G. § 1B1.8.

(3) Pursuant to U.S.S.G. § 2D1.1(b)(1), the defendant is also accountable for possessing a dangerous weapon (ie: handguns), directly or indirectly, in connection with the V-Not Gang's drug trafficking activity.

(4) The government will recommend a 2-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G.§3E1.1(a) if, (i) through the time of sentencing, the government is convinced that the defendant has demonstrated "acceptance of responsibility" for the offense(s) to which the defendant is pleading guilty; and (ii) the government does not determine that the defendant, after signing this agreement, committed any other federal, state, or local crimes, or engaged in conduct that constitutes "obstruction of justice," as defined in U.S.S.G.§3C1.1.

(5) The government will move for an additional 1-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G.§3E1.1(b) if the government is convinced that the defendant has accepted responsibility within the meaning of U.S.S.G.§3E1.1(a) and further assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, and the defendant otherwise qualifies for such adjustment by having a combined offense level of 16 before receipt of any acceptance of responsibility adjustment under U.S.S.G.§3E1.1(a).

7) **Waiver of Rights to Appeal and Collateral Attack:**   The defendant waives (gives up) any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. §§ 2241 and 2255, to appeal and/or to collaterally attack:

    a)  The conviction) resulting from the defendant's guilty plea;

    b)  Any sentence to a term of imprisonment of ~~life or less~~; 360 MONTHS OR LESS   *SGM* *KS*

    c)  Any sentence to a fine within the maximum permitted by law;

    d)  Any sentence to a term of supervised release within the maximum permitted by law;

    e)  Any order of forfeiture or restitution imposed by the Court that is consistent with governing law and is not contrary to the terms of this agreement.

Nothing in this appeal waiver is meant to be or should be construed as a representation of or agreement concerning the appropriate sentence in this case.

---

A.  **Right to Counsel:** The defendant has a right to assistance of counsel in connection with settlement of this case and understands that right.   Defense counsel has advised the defendant of nature of the charges to which the defendant is agreeing to plead guilty and the range of possible sentences.

B.  **Waiver of Trial-Related Rights:** The defendant has the following additional constitutional rights in connection with the charges in this case: (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present defense evidence; and (vi) to remain silent and be protected against compelled self-incrimination.   The defendant understands that by pleading guilty, the defendant waives (gives up) these rights.

C. **Court Not Bound by Plea Agreement:** This plea agreement is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure. The Court is neither a party to, nor bound by this Plea Agreement. The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the United States Probation Office. If the Court rejects the provisions of this agreement permitting the defendant to plead guilty to certain charges in satisfaction of other charges, the Court will permit the defendant to withdraw the plea of guilty before sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

D. **Court Not Bound by Agreed-Upon Recommendations, Stipulations, and Requests:** If this agreement contains any provisions under Fed. R. Crim. P. 11(c)(1)(B) by which the government agrees to recommend, stipulates, or agrees not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the federal sentencing guidelines, or a policy statement, or sentencing factor does or does not apply, such a recommendation, stipulation, or request does not bind the Court, which may make independent factual findings by a preponderance of the evidence and may reject such recommendations, requests, and stipulations between the parties. If the Court rejects one or more recommendations, stipulations, or requests, the defendant is not entitled to withdraw the defendant's plea of guilty and is not released from the obligations described in this agreement. Under such circumstances, the government reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations, stipulations, or requests set out in this agreement.

E.  **Sentencing:**

    a.  **Maximum terms of imprisonment:**  The defendant understands that the Court has discretion to impose a sentence within the statutory maximum sentence(s) set out in this agreement.  If the defendant is pleading guilty to multiple charges, the Court may be required by law to have the sentences of imprisonment on the convictions resulting from those charges run consecutively to each other. Otherwise, the Court has discretion to have sentences of imprisonment run concurrently or consecutively.  *See* 18 U.S.C. § 3584.

    b.  **Mandatory minimum terms of imprisonment:**  If specified in this agreement, the conviction on one or more charges to which the defendant has agreed to plead guilty may require imposition of a mandatory minimum term of imprisonment.  In such cases, the court must impose a term of imprisonment no less than the required mandatory minimum term unless an exception to that requirement applies.  Such exception may be dependent on a motion by the government.

    c.  **Sentencing guidelines:**

        i.  The actual sentence to be imposed upon the defendant is within the discretion of the sentencing Court, subject to the statutory maximum and mandatory minimum penalties, as described above, and the provisions of the Sentencing Reform Act and the United States Sentencing Guidelines promulgated thereunder.  While the Court is not bound to impose a sentence within the applicable sentencing guidelines range, it must take into account the sentencing guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

  ii.  Any estimate of the defendant's offense level, criminal history category, and sentencing guidelines range provided before sentencing is preliminary and is not binding on the parties to this agreement, the Probation Office, or the Court.   Until the Probation Office has fully investigated the defendant's criminal history, it is not possible to predict with certainty the defendant's criminal history category and, in some cases, the defendant's offense level.

  iii.  Under certain circumstances, the defendant's criminal history may affect the defendant's offense level under the federal sentencing guidelines.  If the presentence investigation reveals that the defendant's criminal history may support an offense level different than an offense level stipulated in this agreement, the parties are not bound by any such stipulation as to the defendant's offense level and may advocate with respect to how the defendant's criminal history affects the offense level.

d. **Factual findings:**  The defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the defendant or stipulated by the parties.  In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay.   The Defendant understands that the sentence imposed may be determined based upon such judicial fact-finding.

11

e. **Use of the Defendant's Statements:** The defendant understands that the sentencing court may consider any statement that the defendant has made or makes in this Plea Agreement, during the guilty plea, to the Probation Office, and at sentencing when imposing sentence. In addition the government may be able to use the defendant's statements in this agreement and at the guilty plea and at sentencing in any criminal, civil, or administrative proceeding. For example, if the defendant fails to enter a guilty plea (as required by this agreement) or the defendant's guilty plea is later withdrawn or vacated for any reason other than the Court's rejection of this Plea Agreement under Fed. R. Crim. P. 11(c)(5), the government may introduce the defendant's statements into evidence in any prosecution. If, however, the Court rejects this Plea Agreement under Fed. R. Crim. P. 11(c)(5), and the defendant withdraws the guilty plea pursuant to Fed. R. Crim. P. 11(d)(2)(A), the government will not be permitted to use any of the defendant's statements in this Plea Agreement. To the extent that Rule 11(f) of the Federal Rules of Criminal Procedure and/or Rule 410 of the Federal Rules of Evidence are inconsistent with this paragraph, the defendant waives (gives up) any protections under those rules.

f. **Government's Discretion to Recommend a Sentence:** Unless a stipulation in this agreement explicitly limits the government's discretion with respect to its recommendations at sentencing, this agreement does not prevent the government from urging the sentencing Court to find that a particular offense level, criminal history category, ground for departure, or guidelines range applies; from recommending a specific sentence within the applicable guidelines range as

determined by the Court or as urged by the government; or, if the government deems appropriate, recommending that the Court impose a sentence above the applicable guidelines range.

g. **Sentencing-Related Information:**  The government has the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the count(s) to which the defendant has agreed to plead guilty, subject only to the limitation described in U.S.S.G. §1B1.8.  No stipulation in this plea agreement limits the obligations of both parties to ensure that the sentencing Court has all information pertinent to its determination of an appropriate sentence.  The parties may provide any factual information relevant to sentencing to the Probation Office and/or to the Court, without limitation, before or after the completion of the Presentence Investigation Report.  The parties agree that the submission of such information shall not be deemed "advocacy" in violation of any stipulation in this plea agreement.

h. **Supervised Release Term and Conditions:** If the defendant is placed on supervised release, under some circumstances, including the defendant's violation of one or more supervised release conditions, the Court may extend the term of supervised release, and may modify, reduce, or enlarge the conditions of such release.

F. **Other Adverse Consequences**: The following are some examples of the adverse consequences of pleading guilty other than the sentence imposed by the Court, along with any judicial order of forfeiture and/or restitution:

Case 14-58, Document 132, 07/15/2014, 1271380, Page73 of 128

a.  Conviction of a felony may result in the loss of civil rights, including, but not limited to, the right to vote and the right to possess firearms.

b.  If the defendant is not a United States citizen, such conviction may result in deportation or removal from the United States, and may bar readmission to the United States if the defendant leaves the country.  Under federal law, removal or deportation may be an almost certain consequence of a conviction for a broad range of federal offenses, including, but not limited to, aggravated felonies, as defined in 8 U.S.C. § 1101(a)(43), and crimes of moral turpitude, which includes crimes involving fraud.  Removal and other immigration consequences are the subject of a separate proceeding.  No one, including the defendant's attorney and the Court, can predict with certainty the effect of the conviction resulting from this agreement on the defendant's immigration status. The defendant understands this uncertainty and nonetheless wishes to plead guilty regardless of any immigration consequences that the guilty plea may entail, even if the consequence is the defendant's automatic removal from the United States.

c.  A felony conviction may adversely affect the defendant's ability to hold certain professional licenses and may impair the defendant's ability to do business with federal, state, and local governments or to receive benefits from such governments.

There may be other adverse consequences as well, some of them unforeseeable.  It may be difficult or impossible to predict all of the adverse consequences of the defendant's guilty plea.  The defendant agrees that any resulting adverse consequences, whether or not foreseen or foreseeable, will not provide a basis for withdrawing from the guilty plea

described in this agreement or otherwise challenging the resulting conviction and sentence.

G. **Restitution:** Independent of any agreement to pay restitution, and whether there is any such agreement, the sentencing Court may be required to order that the defendant pay restitution to any victim of the offense(s) of conviction under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. In addition, the sentencing Court may have the authority to order that the defendant pay restitution to any victim of the offense(s) of conviction pursuant to 18 U.S.C. §§ 3663 & 3664.

H. **Forfeiture:** If the defendant has agreed to forfeiture of assets, the defendant agrees to the following terms and conditions:

    a. The defendant hereby forfeits, to the United States, all right, title, and interest of any nature in any and all assets that are subject to forfeiture, including substitute assets, as set forth above, whether those assets are in the possession or control of the defendant, a nominee, or some other third party.

    b. The defendant consents to the entry of an order of forfeiture of the assets described above.

    c. The defendant is aware that pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, a preliminary order of forfeiture becomes final as to a given defendant at sentencing or at any time before sentencing if the defendant consents. The defendant consents that the preliminary order of forfeiture in this case shall become final as to the defendant before sentencing, as of the date the preliminary order of forfeiture is entered by the Court. The defendant understands that the government, upon entry of the preliminary order of

forfeiture, will address any potential third party claims pursuant to Rule 32.2(c), and seek to finalize forfeiture.

d. Forfeiture of the defendant's assets will not satisfy all, or any portion of, a fine, restitution, or other monetary penalty that the Court may impose upon the defendant in addition to forfeiture.  Satisfaction of all, or any portion of, any restitution, fine, or other penalty that the Court may impose upon the defendant in addition to forfeiture will not satisfy all, or any portion of, any forfeiture judgment ordered by the Court.

e. In the event that any successful claim is made, by any third party, to the assets described above, the defendant agrees to forfeit substitute assets equal in value to the assets transferred to any such third party.  The defendant agrees that forfeiture of substitute assets shall not be deemed an alteration of the Defendant's sentence.

f. The defendant agrees to cooperate with the United States by taking whatever steps are necessary to pass clear title to the United States of any forfeitable assets, including but not limited to, surrendering title; completing any documents or legal proceedings required to transfer assets to the United States; and taking necessary steps to ensure that assets subject to forfeiture are not sold, disbursed, expended, destroyed, damaged, hidden or otherwise made unavailable for forfeiture or removed beyond the jurisdiction of the Court.

g. The defendant waives the right to a jury trial on the forfeiture of assets.  The defendant waives all constitutional, legal, and equitable defenses to the forfeiture of assets, as provided by this agreement, in any proceeding, including but not limited to any jeopardy defense or claim of double jeopardy or any claim or

Case 14-58, Document 132, 07/15/2014, 1271380, Page76 of 128

A-47

defense under the Eighth Amendment to the United States Constitution, including any claim of an excessive fine.

h. The defendant acknowledges that the government may institute civil or administrative proceedings against any or all of the defendant's forfeitable assets, including, but not limited to substitute assets and any forfeitable assets not identified by the defendant, and agrees not to contest any such forfeiture proceedings.

i. The defendant represents and warrants that the defendant has no direct or indirect interest in any property, real or personal, or other asset subject to forfeiture by virtue of this plea agreement, other than those listed above.

j. The defendant acknowledges joint and several liability for the amount of any money judgment set forth above.

k. In the event the government determines that the defendant has breached any condition of this plea agreement, none of the forfeited property shall be returned to the defendant, nor shall the defendant assert any claim to the forfeited property. The defendant shall not reacquire any forfeited property, directly or indirectly, through family members, nominees, friends, or associates.

I. **Determination of Financial Condition and Payment of Interest and Penalties:**

a. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party.

b. The defendant will promptly submit a complete, accurate, and truthful financial statement to the United States Attorney's Office, in a form it provides and as it directs.

c. The defendant authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

d. Interest and penalties may accrue, as a matter of law, on any unpaid financial obligation imposed as part of the defendant's sentence, from as early as the date of sentencing.

J. **Remedies for Breach**:

a. Should the government determine that the defendant, after the date the defendant has signed this plea agreement, (i) has committed any further crime or violated any condition of release or supervision imposed by the Court (whether or not charged); (ii) has given false, incomplete, or misleading testimony or information; or (iii) has moved to withdraw the defendant's guilty plea for reasons other than those described in this agreement or otherwise has breached any term or condition of this plea agreement or supplemental agreements with the government, the government will have the right, in its sole discretion, to void this agreement, in whole or in part. In the event of such breach, the defendant will remain obligated to plead guilty and otherwise comply with the terms of this agreement and will not be permitted to withdraw the defendant's guilty plea under this agreement. The defendant will be subject to prosecution for any federal criminal violation of

which the government has knowledge, including but not limited to charges that this Office has agreed to dismiss or not to prosecute under this agreement.

b.  If the defendant breaches this agreement, the government will have the following remedies, among others, available to it:

 i.  To bring prosecution for any federal criminal offenses dismissed or not prosecuted under this agreement.  The defendant waives (gives up) any defense or objection to the commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date on which the defendant signed this plea agreement, notwithstanding the expiration of the statute of limitations between the signing of the agreement and the commencement of any such prosecution.

 ii.  In connection with any such prosecution, any information, statement, and testimony provided by the defendant, and all leads derived therefrom, may be used against the defendant, without limitation and without regard to any rights the defendant may have under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

 iii.  To utilize any information, statement, or testimony provided by the defendant in any proceeding, including at sentencing, notwithstanding U.S.S.G. §1B1.8;

 iv.  To advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range without regard to any contrary stipulations contained in this agreement;

Case 14-58, Document 132, 07/15/2014, 1271380, Page79 of 128

    v. To refrain from making any sentencing-related motion favorable to the defendant without regard to any provision in this agreement obligating the government to consider making or make such motion upon fulfillment of certain conditions;

    vi. To urge the sentencing Court to take the defendant's breach into account when imposing sentence;

    vii. To recommend any sentence the government deems appropriate, even if such recommendation is at odds with any stipulation in this agreement.

K. **Limitations**: This agreement is between the United States Attorney's Office for the Northern District of New York and the defendant.  References to "the government" in this agreement refer only to that Office.  This agreement does not bind any other federal, state, or local prosecuting authorities.  Furthermore, this agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability, proceedings relating to the forfeiture of assets, and proceedings by the Department of Homeland Security, Bureau of Citizenship and Immigration Services relating to the immigration status of the defendant.

L. **Agreement Must be Signed; Modifications Must be Written or on the Record**: This agreement, to become effective, must be signed by all of the parties listed below.  No promises, agreements, terms, or conditions other than those set forth in this plea agreement will be effective unless memorialized in writing and signed by all parties or confirmed on the record before the Court.

M. **Agreement to Plead Guilty Voluntary**: The defendant acknowledges reading each of the provisions of this plea agreement with the assistance of counsel and understands its provisions. The defendant further acknowledges that the defendant's agreement to plead guilty is voluntary and did not result from any force, threat, or promises (other than the promises in this plea agreement and any written supplemental agreements or amendments).


RICHARD S. HARTUNIAN
United States Attorney
Northern District of New York


_____          _____
John M. Katko                                                          9/19/13
Assistant United States Attorney                          Date
Bar Roll No. 502457


_____          _____
Kahari Smith                                                        SEPT. 19, 2013
Defendant                                                            Date


_____          _____
Thomas Murphy, Esq.                                        SEPT. 19, 2013
Attorney for Defendant                                      Date
Bar Roll No. 102248

January 7, 2014


Judge Norman Mordue
Federal Bldg.
Clinton Avenue
Syracuse New York
13205

Dear Judge Mordue:

My name is Sharon Gatewood –Walley I am writing to you in regards to Kahari Smith a young man due to be sentenced in your Court room. I have known Kahari's mother since we were children and our mothers have known one another since they were children. Our two families have a great deal of history Kahari has been raised in a Christ Centered Home and has been a loving, and supportive hands on father, of 3 little boys the youngest being only 3 years old.

As we know there has been a terrible tragedy in the loss of two young men and a loss for two good families, I understand that Kihary Blue must be remembered and justice served, this letter is an effort to bring something to mind that maybe overlooked, and that is the innocent Children. I am hoping that you will also consider them and that the court will leave the door open for redemption and forgiveness for their sake.

Kahari before this incident was a young man that was a loyal and good son to his parents and grandparents with no violent history or charges. Kahari was working hard to change his life around he completed his GED successfully through the Youth Build program where he also completed a trade in construction, all in an effort to become a working single father with a marketable trade. Through that program he proved to be a good student and leader and was chosen to represent the program through interviews with the News Media and even met the Governor, Governor Patterson as one of the programs consumer representatives.

To incarcerate this young man for the next 30 years without the possibility of rehabilitation and redemption seems to be more of a waste of human life and an even bigger lost to those 3 young children who have not made any mistakes. I agree that this young man has made a horrific mistake that he has to live with and face God for; no one should have lost their lives however there are no entirely innocent individuals involved in this incident. Please consider all of this in sentencing. America is the country of second chances, and forgiveness is the greatest gift given to humanity by God, please reciprocate what God has given to us all, a fellow human being, not just another number on a case docket, thank you for this opportunity.

Sincerely,
Sharon Gatewood- Walley

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------
UNITED STATES OF AMERICA,

                  Plaintiff,

        v.                                SENTENCING MEMORANDUM

KAHARI SMITH,                       11-CR-317 (NAM)

                  Defendant.
---------------------------------------------------------------

On September 19, 2013, the defendant, Kahari Smith, pled guilty to Count I of a two

count Superceding Indictment, 11-CR-317.  Pursuant to his Plea Agreement, the defendant

admitted his involvement in overt acts 8,9, 13, 19, 23, 24, 25 and 28.

## CONTENTS OF THE PRE-SENTENCE INVESTIGATION REPORT

We disagree with page 21, ¶63 which increases the offense level by 2 because Jarrell

Williams suffered a leg wound which is being characterized as a serious physical injury.

Article 10 of the N.Y. State Penal Law defines serious physical injury as "physical injury

which creates death or serious and protracted disfigurement, protracted impairment of health or

protracted loss of impairment of the functions of any bodily organ."  There is nothing in the

Indictment nor in any discovery produced by the Government that the injury was of a nature

that would fit the definition of serious physical injury.  We submit that the 2 point assessment

should be disallowed by the sentencing court.

The same holds true for a 5 point assessment for Overt Act #19 in which it is alleged that Jeffrey Powell shot an Elk Block member in the head with the defendant and Riadda Trivet present. We contend that this was an independent act of defendant Powell and not part of a conspiracy. We feel that this should also be disallowed reducing defendant Smith's level from a final computation of 41 to 34.

SENTENCE ISSUES

The Plea Agreement and the change of plea hearing resulted in the dismissal of Count II of the Superceding Indictment being dismissed. Count II charged defendant Smith with the murder of Kihary Blue.

The defendant admitted firing shots at the vehicle that the victim Kihary Blue was riding in on November 26, 2010 and has accepted responsibility for it in a letter to Senior District Judge Mordue dated January 20, 2014. The defendant believes that it was possible that he shot Kihary Blue which resulted in his death.

I would point out however that this is not 100% supported by the forensic evidence provided by the Government via discovery.

It is alleged that the defendant fired a 40 caliber hand gun multiple times at the victim's vehicle. The autopsy report provided by the Government states that the cause of death was a gunshot wound to the head. The report indicates that a deformed projectile was present. There is no designation as to the caliber or type of recovered projectile.

I attach as Exhibit "A", a copy of a Syracuse Police Department report listing the type and location of 10 projectiles. Item #1 is a 38 caliber casing, Item #2 is a 9 millimeter casing and Items #3 and #10 are 40 caliber casings, two with the Hornady brand and six with the Winchester brand. I attach Exhibit "B" which is a two page Supplemental Report which raises the issue on page 2 of whether or not the projectiles were fired from the same firearm. It states that Items 13.1 (38 caliber) and 13.10 (Winchester 40 S & W) were eliminated as having been fired from the same firearm.

This raises the question of how many shooters and guns were there?

Again, defendant Smith has accepted responsibility but he is no firearms expert. The discrepancies pointed out should be given consideration for sentencing purposes as no expert's report has been provided by the Government to explain the forensic gaps which exist.

Defendant Smith has admitted firing a weapon (never recovered) at the Bricktown Gang vehicle. He did not have a specific victim or indicate what his intent was. There is no evidence to indicate whether death or serious physical injury was the intended objective. Does firing at a moving vehicle with tinted windows with an unknown number and identity of occupants constitute murder or was it an act of retribution without the specific goal of death?

It is clear however that my client regrets the outcome of the death of Kihary Blue.

## THE VICTIM

Defendant Smith had no beef with Kihary Blue.  He knew the victim from playing basketball and had seen the victim in the presence of Bricktown members on several occasions and knew from conversations with others that Kihary Blue hung with members of the Bricktown gang but was not considered to be a member of the gang.

I have been provided by the U.S. Attorney's Office with a copy of a letter which Henniger basketball coach, Eric Saroney wrote to the court.  Mr. Ceroni tells the positive characteristics of Kihary Blue and indicates that he had dropped out of one college and was anticipating a transfer to another for the spring 2011 semester and was helping out with the Henniger basketball practices around the time of the fatal incident.

As a defense attorney, I feel obligated to point out that Kihary Blue was not totally an innocent bystander.  The late Syracuse Chief of Police Thomas J. Sardino defined innocent bystanders as those persons who do not put themselves in the zone of danger and who do not associate with criminal types which may expose them to danger.

Kihary Blue had been in the presence of the Bricktown members, especially Shiquan Evans and unless he was living in a vacuum, knew of the bad blood between Bricktown and V-Not.  Indeed, he was present at the fight at the Jute Box when a V-Not member was stabbed by a Bricktown member.  Nonetheless, he continued to hang around with the Bricktown members.

I was provided with and have enclosed a photograph which was found on the Internet with Shiquan Evans having his arm around Kihary Blue who is extending his middle finger to the photographer.

Shiquan Evans was arrested and convicted for murder for the killing of an infant several days after the killing of Kihary Blue in a mistaken act of retribution against the V-Not gang.

Kihary Blue hung around with violent people who had not other purpose in life than to survive by means of criminal conspiracies and various acts of violence.

There is no question that he did not deserve to be shot or to die, but he certainly had control over his destiny in terms of his companions and whether they would be good or bad companions.

Unfortunately, he placed himself in the zone of danger by hanging around with those persons which contributed, in part, to being in the wrong place at the wrong time.

The press has all but deified this young man who had some extremely questionable associations.  This should also be taken into consideration at sentencing.

### PREVIOUS SENTENCES IN THIS CASE

The presentence report dated January 13, 2014 indicates that seven persons have been sentenced thus far with respect to this conspiracy.

The longest sentence listed in terms of the presentence report was that administered to Jeffrey Powell which was 121 months imprisonment. The Post Standard lists Willie Sanders as receiving a sentence of four years (48 months) in prison for being present with other gang members in the drive-by shooting which killed Kihary Blue.

It is interesting to note that none of the other occupants of the vehicle including the driver (H. Nickens) was charged with murder. Kahari Smith was charged under N.Y. State law with murder in the second degree but no one else was and the killing of Kihary Blue is being attributed to the most part to Kahari Smith who obviously needed assistance from the driver of the vehicle and also information provided by another member of the vehicle that a Bricktown vehicle was in front of them.

Again, the longest sentence listed in the presentence report is 121 months.

Kahari Smith indicated in his Plea Agreement that he would not appeal any sentence of 360 months or less.   A sentence of 360 months is dramatic and severe compared to the sentences received by the other V-Not members and what would be received in State court. Defendant Smith was willing to engage in a change of plea many months ago but I was informed that the U.S. Attorney's Office would not engage in any plea negotiations with him unless and until all others in the conspiracy pled guilty.

As soon as the Government had secured guilty pleas from the remaining members who had not done so, defendant Smith changed his plea.

If this were a State court action, we would not be talking about a 30 year sentence. Mr. Smith has several years of prison time under his belt and is 28 years of age. A sentence of 30 years with 15% off for good behavior would still result in having to serve 24 years.

There are members of this conspiracy who have pled guilty who have been sentenced below the guidelines; Riadda Trivet was present at a shooting and had guidelines of 151 to 188 months and was sentenced to 92 months imprisonment.

As the presentence report indicates, my client was in a vehicle which was shot up by Bricktown members and his three year old son was present at the time. After the killing of Kihary Blue, he was present in another vehicle which was shot up by Bricktown members and his girlfriend and the driver of the vehicle were shot.

He got into a life which unfortunately is a life of violence and was of a mentality that he needed to strike back at the Bricktown gang as they had made an attempt on his life without regard for the fact that his three year old son was present in the vehicle.

I believe that he explains the gang mentality that he got into in his letter to Senior Judge Mordue.

He grew up in a loving family in the Valley area of Central New York and letters have been sent by a number of people to Judge Mordue vouching for his positive attributes and not excusing the gang activity and the resultant death of Kihary Blue.

-7-

He did not have many criminal convictions for any violent actions prior to this incident.

His father is disabled and his mother has had a serious bout with cancer. There is little doubt that they will both die while he is in prison. He also has three young children which he was very attentive to and certainly will not be a force in their lives and they will grow up without a visible and active father figure. Changes in technology will also result in his re-entry into a very different and unfamiliar world in terms of the technologies that will be present when he leaves prison.

His conscience will gnaw at him for what he has done as it should. He is not a psychopathic person. He does have a moral compass and he does have a conscience. He was raised in a church going family and he has some reasons for his gang activities which he does not consider to be any excuse or justification for them.

He is not a hardened killer and bears no bad attitude. He has been extremely courteous and cooperative with me since I was assigned to this case. He has been in custody for several years now and only has one write-up in that time for getting in a fight with another inmate who attacked him first.

The corrections officers at the Schenectady County Jail and the Montgomery County Jail have indicated that he is not a problem for them and that they have observed his family support and has had many weekend visitations from his family. I would ask that the court consider all the aforementioned as well as the presentence report and the letter from the defendant, family members and friends which have been received.

I would request that the court sentence him to no more than a straight 360 months, not

360 months to life which would be Draconian.


Dated:        February 10, 2014

Respectfully submitted,

Thomas J. Murphy, Esq.
Greene, Hershdorfer & Sharpe
Attorney for Defendant, Kahari Smith
One Lincoln Center, Suite 330
Syracuse, New York 13202-1317
(315) 422-6154
Bar Roll No. 102248

TO:   AUSA Carla Freedman
      Janna A. Kulokowski, U.S. Probation
      Kahari Smith

**CNYLEADS CS Property Page 1**

| Agency Name | | | | | ORI | | License Code | Beat | | DR Number | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Syracuse Police Department | | | | | NY0330100 | | 3401 | | | 10-542257 | |

| Incl. Address Num | | PreEx | Street Name | | | Street Type | Suffix | Bldg | | APT# | City | | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 181 North | | | | | | | | Syracuse | | NY | |

| Item # | Date of Recovery | Time of Recovery | Description of Item (Object, Make, Model, Color, Size, Etc) | Serial #, Caliber, Miscellaneous | Collected By IBM, Name or Initials |
|---|---|---|---|---|---|
| 01 | 11/28/2010 | 11:20 | Indumil .38 Special spent shell casing | 181North left shoulder of roadway | TM 528 |
| 02 | 11/28/2010 | 11:25 | WCC 09 spent shell casing | 181North left shoulder of roadway | TM 528 |
| 03 | 11/28/2010 | 11:27 | Hornady 40 S&W spent shell casing | 181North left shoulder of roadway | TM 528 |
| 04 | 11/28/2010 | 11:28 | Winchester 40 S&W spent shell casing | Expansion joint in roadway L/lane | TM 528 |
| 05 | 11/28/2010 | 11:32 | Winchester 40 S&W spent shell casing | 181North left shoulder of roadway | TM 528 |
| 06 | 11/28/2010 | 11:39 | Winchester 40 S&W spent shell casing | 181North left shoulder of roadway | TM 528 |
| 07 | 11/28/2010 | 11:38 | Hornady 40 S&W spent shell casing | 181North left shoulder of roadway | TM 528 |
| 08 | 11/28/2010 | 11:40 | Winchester 40 S&W spent shell casing | 181North left shoulder of roadway | TM 528 |
| 09 | 11/28/2010 | 11:42 | Winchester 40 S&W spent shell casing | 181North left shoulder of roadway | TM 528 |
| 10 | 11/28/2010 | 11:46 | Winchester 40 S&W spent shell casing | 181North left shoulder of roadway | TM 528 |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |
| | / / | : | | | |

False Statements made herein are punishable as a Class A Misdemeanor pursuant to 210.45 IN NYSPL AFFIRMED UNDER PENALTY OF PERJURY

| | Administrative Use Only | | | 4 |
|---|---|---|---|---|
| PRINT NAME    SIGNATURE | SUPERVISOR NAME (PRINT) | ID#    APPROVED DATE | APPROVED BY SIGNATURE | of |
| Thomas Slack    0568   Electronically Signed | Sgt John R Linnertz | 0389   03/21/11 | Approved Electronically | 4 |

Form 14.06 (Rev. 04/08)

A-63

**LABORATORY #:**   L10-1468
**AGENCY CASE #:**   10-542257

## Bullets

Items 6, 7, 8, and 9 have physical and design characteristics consistent with being .40/10mm caliber and general rifling characteristics of 6 lands and grooves with a left hand twist.  Among the semiautomatic firearms that could have possibly fired them are the following:

| | |
|---|---|
| Colt, 10mm Auto | Smith & Wesson, 40 S & W |
| Daewoo, 40 S & W | Storm Lake, 40 S & W |
| Keltec, 40 S & W | Walther, 40 S & W |

*NOTE: This list should NOT be considered all-inclusive.*

Microscopic examination and comparison of Items 6, 7, 8, and 9 revealed that there was agreement of all discernible class characteristics and some agreement of individual characteristics.  Significant combinations of corresponding microscopic markings were not observed.  Therefore, these bullets were neither identified nor eliminated as having been fired from the same unknown firearm.

## Cartridge Cases

Items 13.1 and 13.2 have a disagreement of class characteristics to Items 13.3, 13.4, 13.5, 13.6, 13.7, 13.8, 13.9, and 13.10 and were eliminated as having been fired from the same firearm.

Microscopic examination and comparison of Items 13.1 and 13.2 revealed that there was agreement of some discernible class characteristics and no observed agreement of individual characteristics.  Significant combinations of corresponding microscopic markings were not observed.  Therefore, these cartridge cases were neither identified nor eliminated as having been fired in the same unknown firearm.  Both Items 13.1 and 13.2 have heavy apparent oxidation and/or corrosion and few marks.

Microscopic examination and comparison of Items 13.3, 13.4, 13.5, 13.6, 13.7, 13.8, 13.9, and 13.10 revealed that there was agreement of combinations of individual and all discernible class characteristics.  It is concluded that these cartridge cases were fired in the same unknown firearms.

This report contains the conclusions, opinions and interpretations of the certifying examiner whose signature appears on the report.  I certify that this report accurately reflects the results of an examination, comparison, or test performed by me.  False statements made herein are punishable as a class A misdemeanor pursuant to Section 210.45 of the Penal Law of the State of New York.

AFFIRMED UNDER PENALTY OF PERJURY

**Results Certified By:** _____          **Date:**   12/14/2010

J. Justine Kreso
Firearms Examiner

*"SEEKING TRUTH THROUGH SCIENCE"*

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,

                              Plaintiff,

vs.                                   11-CR-317

KAHARI SMITH,

                              Defendant.
------------------------------------------------------x

          Transcript of *SENTENCING* held on ~~May 16, 2012,~~ MARCH 25, 2014

at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York, the

HONORABLE NORMAN A. MORDUE, Presiding.


                    A P P E A R A N C E S

For Plaintiff:       OFFICE OF THE UNITED STATES ATTORNEY
                     100 South Clinton Street
                     James Hanley Federal Building
                     Syracuse, New York 13261
                         BY:  CARLA B. FREEDMAN, Esq.
                              Assistant United States Attorney

For Defendant:       GREENE HERSHDORFER LAW FIRM
                     One Lincoln Center
                     Suite 330
                     Syracuse, New York 13202
                         BY:  THOMAS J. MURPHY, ESQ.

```
                                                              2
                    US v. Smith - 11-CR-317
```

1          (Open court:)

2          THE COURT:  Will the clerk call the case, please,

3    and have counsel note their appearances for the record.

4          THE CLERK:  2011-CR-317, United States of America

5    versus Kahari Smith.

6          Please note your appearances for the record.

7          MS. FREEDMAN:  For the United States, Carla

8    Freedman, good afternoon, your Honor.

9          THE COURT:  Ms. Freedman, good afternoon.

10         MR. MURPHY:  For the defendant, Thomas J. Murphy,

11   good afternoon, your Honor.

12         THE COURT:  Mr. Murphy, good afternoon.

13         Kahari Smith, your case is on for sentencing at

14   this time.

15         Let me inquire of counsel:  Do counsel have the

16   presentence report dated January 13th, 2014, revised

17   February 12th, 2014, and the addendum dated February 12th,

18   2014?

19         MS. FREEDMAN:  Yes, your Honor, the government does

20   have that.

21         MR. MURPHY:  The defense has that, your Honor.

22         THE COURT:  And did you share it with your client?

23         MR. MURPHY:  Yes, sir.

24         THE COURT:  In addition to the presentence report,

25   there were seven letters I did receive, also, that I have

```
                                                          3
                  US v. Smith - 11-CR-317
```

1    read and reviewed.

2           Did the government get copies of those?

3           MS. FREEDMAN:  I did, your Honor.

4           THE COURT:  Let me ask the government:  Do you have

5    any objections to the facts as stated in the presentence

6    report?

7           MS. FREEDMAN:  We have none.

8           THE COURT:  Defense?

9           MR. MURPHY:  The only objection we had was to

10   Page 21, Paragraph 63 relative to the increase in the offense

11   level by two in the Jarrell Williams shooting.

12          THE COURT:  In regard to a serious injury?

13          MR. MURPHY:  That was the only objection.

14          THE COURT:  I have reviewed that, your argument,

15   and I'm going to make a finding -- there were two shootings.

16   One is the victim -- the shooting with Riadda Travet and the

17   Elk Block people, the shooting they had there.  I can't

18   remember the victim's name at this second.

19          MS. FREEDMAN:  Jerome Thomas, your Honor.

20          THE COURT:  Yes, that that was not serious physical

21   injury.  And, also, the shooting of the driver, the shooting

22   of the driver, overt act 25, where Kihary Blue was killed.

23          MR. MURPHY:  Yes, sir.

24          THE COURT:  Now, do counsel have any objections to

25   the offense level calculations as stated in the presentence

```
                                                        4
                US v. Smith - 11-CR-317
```

1   report?

2          MS. FREEDMAN:  None from the government, your

3   Honor.

4          THE COURT:  Mr. Murphy?

5          MR. MURPHY:  None from the defense, your Honor,

6   based on the ruling you just made.

7          THE COURT:  And do you agree with the Criminal

8   History computation set forth in the presentence report?

9          MS. FREEDMAN:  The government does, your Honor,

10  yes.

11         MR. MURPHY:  Defense does, your Honor.

12         THE COURT:  I'm ready to sentence the defendant.

13         Does the government move sentence at this time?

14         MS. FREEDMAN:  We do move sentence.

15         THE COURT:  Do you wish to be heard?

16         MS. FREEDMAN:  Your Honor, just briefly.

17         I know the Court has reviewed the sentencing

18  memorandum that I filed on February 10th of 2014 and I ask

19  that the Court sentence the defendant within the advisory

20  Guideline range of 360 months to life.  I believe, even with

21  the adjustments, the Guideline range remains 360 months to

22  life.

23         I wanted to comment very briefly on a couple of

24  points raised in defense counsel's sentencing memo.

25         First, I just want to address the issue of the

5

US v. Smith - 11-CR-317

1    forensics reports in relation to the shooting done by the

2    defendant where Kihary Blue was shot by the defendant and

3    killed.  It should be clear the report that defense counsel

4    attaches shows that there were a total of eight .40 caliber

5    shell casings recovered along the side of the road on 81

6    north.  In addition to those eight shell casings, there were

7    two other shell casings recovered.  Again, this is from the

8    side of the road.  When they were put there is anybody's

9    guess.  One of them was a .38.  One of them was a 9.  These

10   are two spent shell casings.

11          Additionally, when there was a forensics report

12   done of the ballistics evidence, those eight shell casings

13   were examined along with four bullet fragments that were

14   found in the vehicle in which Kihary Blue was riding.

15          Defense counsel -- perhaps it was an error -- but

16   he misstates and misreads the report.  He indicates that 13.1

17   and 13.10, which refers to two separate bullet fragments,

18   were not from the same gun.  The report doesn't say that at

19   all.

20          What the report actually says is that the .38

21   fragment and the 9 mm fragment, which are 13.1 and 13.2, are

22   not fired from the same gun as the .40 caliber but, in fact,

23   all of the .40 caliber evidence is consistent with the same

24   gun.  So, counsel, I believe, has read that wrong.

25          This pertains particularly to defense counsel's

6

US v. Smith - 11-CR-317

1    comments on Page 2 where he states, and I quote, "The

2    defendant believes that it was possible that he shot Kihary

3    Blue which resulted in his death", and he indicates that it's

4    not a hundred percent supported by the forensic evidence.

5        Your Honor, it's not possible.  It's a hundred

6    percent probable that the defendant shot and killed Kihary

7    Blue.  The forensics evidence is consistent and I would point

8    out that, in addition to the forensics evidence, there are at

9    least three cooperating witnesses to this event who were

10   eyewitnesses, all of whom relate the following:  "The

11   defendant was in the front seat passenger car and was armed

12   with a .40 caliber weapon".

13       While the other people in his vehicle may have been

14   armed, nobody else had a .40 caliber weapon and nobody else

15   fired.  Upon seeing the other vehicle in which Kihary Blue

16   was merely a back seat passenger, by all accounts, the

17   defendant fired multiple times into that vehicle, one of the

18   bullets striking the back of the head of Mr. Blue and killing

19   him and another bullet fragment injuring the passenger

20   Jarrell Williams.

21       So, I would submit to your Honor, it's not

22   possible.  It's probable.

23       I would further point out that the defendant signed

24   a plea agreement where he admitted to killing Kihary Blue.

25   He stipulated that he caused the murder of Kihary Blue and he

7

US v. Smith - 11-CR-317

1 accepted responsibility in an interview with probation where

2 he also admits to killing Kihary Blue.  So the government

3 takes offense at this being possible.

4      The last point I want to address is starting on

5 Page 4 of defense counsel's memo entitled "the victim", I

6 think, with all due respect to Mr. Murphy -- who I've had the

7 pleasure of handling many cases with and I have great respect

8 for -- but, your Honor, I believe Mr. Murphy really crossed

9 the line in some of the comments that he makes.

10      In sum, he essentially hints at the fact that

11 Mr. Blue is responsible for his murder.  He indicates on

12 Page 4, "I feel obligated to point out that Kihary Blue was

13 not totally an innocent bystander".  He points out that

14 Mr. Blue was in the presence of Bricktown members and that he

15 hung out with Bricktown members.  On Page 5, he goes on to

16 comment, that the victim in this case, Mr. Blue, "placed

17 himself in the zone of danger by hanging around with those

18 persons which contributed to him being in the wrong place at

19 the wrong time".

20      Your Honor, I believe Mr. Murphy has crossed the

21 line.  I think that that's outrageous to make that statement.

22 Mr. Blue was, in fact, an innocent bystander.  His crime was

23 knowing kids that he had grown up with since childhood, long

24 before any gang affiliation, and having the tremendous

25 misfortune of being in a back seat of a car in route to a

8

US v. Smith - 11-CR-317

1   party.  They weren't on their way to commit gang activity or

2   criminal activity.  He was merely a back seat passenger in a

3   vehicle occupied by childhood friends of his.  There's been

4   no evidence whatsoever that Mr. Blue was in any way

5   affiliated with this gang and I submit that he was merely an

6   innocent bystander and a terrible, terrible tragic victim of

7   the defendant's heinous violence where he opened fire on a

8   car full of people.  It wouldn't have been justified for any

9   of them to get hit but certainly not for Mr. Blue.

10          Your Honor, I have nothing else to add with respect

11  to my comments to defense counsel's memo.  Again, I would ask

12  that this Court sentence the defendant within the Guideline

13  range of somewhere between 360 months to life.  We certainly

14  do not feel that 360 months is appropriate in this case as

15  being at the very bottom of the range.  I have nothing more

16  to add.

17          As the Court is aware from a letter I filed on

18  February 27th, there are two victims who wish to speak to the

19  Court now.

20          One of them is Miss Twanda Rufus, Kihary Blue's

21  mother, and following her will be Jaleya Miller, Kihary

22  Blue's sister.

23          I also want to point out -- and I know the Court

24  has reviewed carefully Coach Erik Saroney's letter that he

25  submitted.  Mr. Saroney is here today in support of Kihary

9

US v. Smith - 11-CR-317

1   Blue's family.  He stands by the letter and, again, I advised
2   him that you had carefully read that letter.
3              THE COURT:  I have carefully read the letter.
4              MS. FREEDMAN:  He wanted you to know he was here.
5              At this time, with the Court's permission, I would
6   call up Miss Rufus and Miss Miller so that they can each
7   address the Court.
8              THE COURT:  Okay.
9              MS. RUFUS:  Hi.
10             THE COURT:  Good afternoon.
11             MS. RUFUS:  My name is Twanda Rufus.  I'm Kihary
12  Blue's mom.  I just wanted to let you know that...
13             THE COURT:  You want a glass of water?
14             MS. RUFUS:  No, thank you.
15             By my son being gone, my family and I has been hurt
16  terribly, drastically.  Our life has totally changed.  My son
17  was not out there.  He wasn't no gang banger.  He wasn't no
18  drug dealer.  My son had goals in life.  I was -- I'm a
19  single parent and I raised my kids good.  My son had goals.
20  He had dreams and he was following those dreams.  And for
21  somebody to just take my son life away like that, it's not
22  fair.  It's not.  I wouldn't want that on -- wish that on
23  anyone to have to bury their child.
24             And people out here shooting people and you don't
25  know who's in what car with tinted windows.  You just can't

US v. Smith - 11-CR-317

1  go around shooting people cars up like that.  You taking --
2  you taking people away from -- you're hurting -- like he
3  killed my son.  His family's hurting right now because he's
4  going to go to jail and my family -- me and my family, we're
5  hurting because my son is gone for life.  And I just don't --
6  I don't think that's right.
7        I don't know the young man.  I never seen him
8  before.  I don't know his family, but I want his -- him to
9  know that my son never did nothing to him.  My son never did
10  nothing to him.  And I know my son never did -- I'm not
11  saying he the perfect son -- but my son has traveled
12  everywhere and could go anywhere, any side of town.  My son
13  was always at and in tournaments and away and playing
14  basketball or football.  My son did every -- did all of that.
15  He can go anywhere.  And I know that bullet wasn't meant for
16  my son.  But something gots to be stopped from these kids
17  shooting each other and shooting up cars with family members,
18  babies.  Everything is in -- you don't know what's in there.
19  Something got to be done.
20        THE COURT:  I agree.
21        MS. RUFUS:  And I'm hurt and I'm hurt for life.  I
22  talks to my son every day, every day, and it hurts.  It hurts
23  deeply and that's something that I'm scarred for life behind
24  this.  I really am.  And I feel sorry for his family.  And
25  his boy's going to grow up without him.  It's not fair.  You

US v. Smith - 11-CR-317

1   know.

2           THE COURT:  Mm-mm.

3           MS. RUFUS:  All kids need they dad.  And I just --

4   that's enough for me.  I'm sorry.

5           THE COURT:  Thank you, miss review fuss.

6           MS. MILLER:  Hi.

7           THE COURT:  Miss Miller.

8           MS. MILLER:  I can just start?

9           THE COURT:  Yes, you can.

10          MS. MILLER:  On November 26th, 2010, my life

11  changed drastically.  Late night I received a phone call from

12  my cousin, "Kihary was shot", she screamed.  As I let those

13  words play over and over in my head, I dropped my phone and

14  collapsed.  My brother meant the world to me.  Kihary fought

15  for his life for five days.  But on December 1st, 2010, I

16  lost my big brother.

17          Seeing him in the hospital took a toll on me.  I

18  was confused and lost on how a human being could take another

19  human being's life like it's nothing.  My brother was an

20  amazing, outstanding, talented and determined person.  Kihary

21  had big dreams.  He was going to go to the NBA and move our

22  family out of Syracuse.  Before Kihary was shot, he was going

23  to attend Monroe Community College that following January and

24  his 20th birthday was in the same month.  Kihary was loved by

25  everyone and would make friends wherever he went.  He had a

US v. Smith - 11-CR-317

1   smile that would light up an entire room.  Some people might

2   say or think he was part of a gang just because who his

3   friends were.  Kihary remained friends with many of the same

4   people from his childhood, even though he didn't agree with

5   some of their life choices.  Because of this, he was looked

6   at as a gang member, even though he wasn't.

7          I am 17 years old.  I was 14 years old when I lost

8   my brother.  I was very young and clueless.  The funeral was

9   so packed.  There weren't enough seats or standing room.  So

10  many people loved Kihary and I still don't understand why he

11  is gone.  That's just a question that only God knows the

12  answers to.  When I found out that Kahari Smith was

13  responsible for his death, I felt closure for the part of who

14  did it.

15         As days, weeks, months and years go by, I became a

16  wise, young lady.  Knowing I can't wake up to my brother,

17  live with him any more or missing him hurts me to the core.

18  I've begun to get distant from my friends from time to time

19  just because I'm hurting inside and I don't want them to see

20  it.  I try my best to keep a smile upon my face and to laugh

21  to keep the tears from falling.  As I write this letter, my

22  eyes fill with water because I'm hurting of the pain Kahari

23  caused my family and I.

24         Have you ever felt alone, like all you have is

25  yourself but you know there's plenty of people who love you

13

US v. Smith - 11-CR-317

1  and is there for you?  I feel like this every day.  My life

2  will and can never be the same any more.  This experience has

3  really traumatized me.  Sometimes I'm afraid to go to sleep

4  or just close my eyes, period, because I will see Kahari's

5  face or have nightmares of him killing my brother.  I look at

6  life in a completely different way.  You never know when its

7  turn to go.

8        Because of all this, my brother missed my 15th,

9  16th, and 17th birthday, track metes, cheerleading games,

10  junior prom, and now he will miss my senior ball, upcoming

11  birthdays and one of the most important days of my life:  My

12  graduation.  I know my brother is very, very proud of me and

13  all my accomplishments, but it hurts me to know he's not here

14  to give me a hug or tell me how proud he is of me.  Part of

15  me wants to give up at times but I know that's not what my

16  brother would want.  No mother should have to bury their

17  child.  My mother is a strong lady.

18        When Kihary died, I felt like I died with him.  I

19  didn't care about anything.  I just wanted to be alone.

20  Every day I wake up wishing and hoping that all of this was

21  just a dream.  My nightmares are so bad I wake up in the

22  middle of the night crying or go to sleep in my mom's bed

23  because I'm afraid to sleep alone.  I will never forget my

24  brother's last words to me, "Nuna, man open the door", and it

25  hurts me even more that our last words weren't, "I love you"

14

US v. Smith - 11-CR-317

1   and "I love you, too".  Each and every day I'm hurting

2   because everyone sees me as a strong person but behind closed

3   door all I do is cry.

4           One thing I will say throughout this experience, I

5   learned how strong I can be.  If I would have never went

6   through this, I would never known how strong I really am.  I

7   also learned life is like an obstacle course.  There will be

8   things in your way as you go on, but it's up to you on how

9   you get through it.  I will never understand why all this

10  happened.  It still feels so unreal.  If Kahari would have

11  never had a gun and would have never been shooting, my

12  brother would still be here today.

13          Kahari Smith changed my entire life since

14  November 26th, 2010.  In my opinion, I wish he would serve

15  life in prison.  I feel he should never be let out and just

16  deal with it.  All I ask for is complete, absolute closure

17  and justice for Kihary.  I would do anything to have him

18  back.  I miss my brother so much and Kahari Smith took him

19  from me.  All I want is Kihary Lamar Blue back.

20          Can I ask him a question?

21          THE COURT:  I don't know if he will answer.

22          MS. MILLER:  He don't have to answer.  Can I look

23  at him?

24          THE COURT:  Yeah.

25          MS. MILLER:  Do you feel proud of yourself?

15

US v. Smith - 11-CR-317

1          THE DEFENDANT:  Not at all.

2          MS. MILLER:  Like how can you sleep at night

3    knowing you killed somebody?

4          THE DEFENDANT:  It's hard, but, at the same time,

5    you don't know my struggles.

6          MS. MILLER:  Okay, but still that's not an

7    appropriate answer.

8          THE DEFENDANT:  I have a three-year-old son.

9          MS. MILLER:  You should have been thought -- been

10   thinking about that --

11         THE DEFENDANT:  I have a son that's 6 years old.

12         MS. MILLER:  You should have thought about that

13   before you were shooting.  Apparently they wasn't on your

14   mind while you were shooting.

15         THE COURT:  Thank you, Miss Miller.

16         Mr. Murphy, sir.

17         MR. MURPHY:  Yes, your Honor.

18         Let me point out -- and obviously Ms. Freedman has

19   indicated I've crossed some sort of unofficial imaginary line

20   that she has created because I certainly haven't been

21   chastised by the Court for the contents of my sentencing

22   memorandum.

23         Let me point out I sent out a letter from Kahari

24   Smith, along with other character letters, in advance of

25   creation of the sentencing memorandum.  And let me make it

US v. Smith - 11-CR-317

1  perfectly clear that Kihary Blue certainly was an unwilling

2  victim.  He didn't deserve to die.  He shouldn't have been

3  killed.  My client accepted responsibility for that at his

4  change of plea hearing.  He accepted responsibility for it in

5  the letter he sent to you.

6            THE COURT:  Yes, he did.

7            MR. MURPHY:  As a defense attorney, however,

8  without his approval, I constructed a sentencing memorandum

9  and I pointed out certain issues within this case that I felt

10  were necessary and one issue was the forensics, which was a

11  problem from the beginning.  Because I raised this a long

12  time ago, years ago, the fact that three different types of

13  bullets were found at the exact location and that the bullet

14  recovered at the autopsy was the fourth.  And what was the

15  explanation for it?  Well, there never was one.

16            So I point that out to illustrate the fact that

17  this is for sentencing purpose.  This isn't a perfect case at

18  all.  But does he believe that firing those bullets into that

19  car killed Kihary Blue?  Yes, he does.  Yes, he does.  And he

20  has to deal with his own conscience and his own demons for

21  the rest of his life, as a result of doing that.  But they're

22  two different things -- what he feels, what he believes, what

23  he has accepted and, for defense purposes, zealous defense

24  purposes, what I feel should be pointed out to the Court.

25  And, you know, in representing somebody, you have to do these

17

US v. Smith - 11-CR-317

1   things.  They might not be popular things to say.  They might

2   upset the U.S. Attorney, but, nonetheless, if you're doing

3   your job, you have to say these things.

4           Now, it was interesting that Miss Miller stated

5   that some people thought that her brother was a gang member

6   because of his associations with them.  He had been seen with

7   those folks on numerous occasions and alls I'm stating is

8   that this wasn't some -- this wasn't a drive-by.  His mother

9   said, she said, I believe this bullet wasn't intended for

10  him.  It wasn't.  My client had no idea that he was in that

11  car.  He thought that he was in a car with Bricktown members

12  and the Bricktown members and the V-Not members had been

13  warring for sometime and anybody that hung around with them

14  knew that.  So, you know, yes, he was an unwilling victim but

15  he did place himself in the zone of danger by having those

16  bad companions.  I'm just pointing that out.

17          Again, you know, this isn't a perfect case all

18  around.  It's not like he stalked somebody and shot a person

19  that he knew.  Again, he has accepted responsibility.  He has

20  pled guilty already.  You know, today's proceeding is not to

21  determine whether he did it or he didn't do it -- he's

22  admitted to that -- it's what penalty he should suffer as a

23  result of doing it.

24          Now, he's a young man.  His parents obviously

25  aren't young people.  His mother's had bouts with cancer.

18

US v. Smith - 11-CR-317

1    His dad -- his stepdad is disabled.  No doubt these folks are

2    going to die when he's in jail and every single birthday of

3    his three sons and every Father's Day and every holiday, he's

4    going to be in a prison cell and he's going to know that he

5    didn't have to be there.  He could have been someplace else.

6    But he got caught up in the life.  And I think he explained

7    that as best he could in that letter to you.

8            This isn't a case of somebody that tested the

9    system, that made all kinds of motions, that went to trial,

10   that tried to do everything under his power to get out from

11   underneath this particular offense.  He's admitted to it.

12           But for him to receive a maximum penalty I think

13   would be unjust under the circumstances.  He didn't fight it

14   to that particular extent and he wished to plead guilty some

15   time ago, months and months and months ago but the U.S.

16   Attorney's Office wouldn't allow him to do that until every

17   single other member of the conspiracy had made a plea.  So,

18   it's not like he was the last man standing and he pled

19   because everybody else did.  He wanted to in advance of this.

20   He wanted to get this over.  He knows he's going to have a

21   long federal prison sentence.  He's accepted that and he is

22   willing to begin that.

23           So, there are two different arguments here.  It's

24   my argument as to what his sentence should be and the other

25   is the fact that anything I'm saying does not reflect his

19

US v. Smith - 11-CR-317

1   views.  He's made -- he's made it crystal clear and he

2   doesn't choose to address the Court today.  He's already sent

3   his letter in.  You know, he's going to suffer for the rest

4   of his life.  He regrets his action.  There isn't any

5   question about it.  I'm just pointing out I think all the

6   other attendant facts and circumstances that need to be

7   evaluated in conjunction with his sentence.

8           Thank you.

9           THE COURT:  Kahari Smith, you wish to say nothing?

10          THE DEFENDANT:  Yeah, I want to talk.

11          MR. MURPHY:  Okay.

12          THE DEFENDANT:  I want to say sorry to my family

13  first, sorry to his family for the loss.  But what I'm saying

14  is me as a man, I accept my responsibility.  But at the same

15  time I was under pressure in the streets, too.  I got a

16  six-year-old son.  At three years old, he was the victim of a

17  shooting, as well.  As a father I felt like I got to protect

18  my family.  That's how I felt at the time, knowing it wasn't

19  the right decision.  It wasn't at all.  It's worst decision I

20  ever made in my life.  But, at the same time, my son three

21  years later still remember that day like it was yesterday.

22  Every day -- any visit he asking, is this the guy that got

23  shot, dad, is this and that.  To that day my son remember

24  when the beef started.

25          I have been a street guy all my life.  I have two

US v. Smith – 11-CR-317

1   good parents, mother, father, whole family, I love all y'all,

2   baby mothers, Shianne (phonetic), I love all ya'll support,

3   cousins, everybody in my family, I love all of you.  Thank

4   you all for being here for me.

5          I'm sorry to his family once again.  I also played

6   basketball and he was a good kid, but at the same time, like

7   as myself, who was a product of our environment.

8          THE COURT:  Now, did you want -- was his mother

9   going to speak?

10          MR. MURPHY:  Yes.  Regina Cole Smith, his mother,

11   would like to speak, as well.

12          THE COURT:  Miss Smith.

13          MS. SMITH:  Good afternoon, your Honor.

14          THE COURT:  Good afternoon.

15          MS. SMITH:  Your Honor, my name is Regina Cole

16   Smith.  I am the mother of Kahari Smith.  Thank you for the

17   opportunity to address the Court.

18          I would like to first convey my sympathy for the

19   blue family during the tragic events surrounding my son's

20   case.  My family and I are deeply sorry for your loss.

21          I am not going to stand here and try to paint a

22   perfect picture of my son as being an angel because that is

23   not the case.  But I can assure you he is not the person the

24   media and others have portrayed.  He has made mistakes, just

25   like all of us have.  I truly do not know what happened in

21

US v. Smith – 11–CR–317

1  the incidents that brought him to this moment, but I know

2  that the situation is not clear cut.  The racketeering charge

3  itself confirms that.  Even the final charge of racketeering

4  is a mirky label because it lumps together many possible

5  activities that does not require specific proof that one

6  person was directly responsible for committing any of them.

7        As his mother, I believe he still has the potential

8  to contribute to his family and community.  Kahari has been a

9  great father to his three sons, ages 3, 6 and 9.  Kahari is

10  and has always been a loving, respectful and caring son,

11  brother, father, uncle, nephew, cousin and friend.  The

12  number of people present here today shows that others also

13  have faith in his character and fundamental decency as a

14  human being and how much he is truly loved.

15        I hope that, at best, he can use incarceration to

16  think clearly about how life is and about how precious life

17  is.  I fear that if my son is sentenced to decades in prison,

18  it will undermine his potential.  I believe that such a

19  sentence will be out of sync.  With the uncertainties already

20  surrounding this tragic case because all of these many

21  unknown parts of the case, I ask the Court to please show

22  leniency on my son upon his sentencing.

23        Again, your Honor, I thank you for the opportunity

24  to address the court.

25        THE COURT:  Okay.  All right.

22

US v. Smith - 11-CR-317

1      Kahari Smith, I have reviewed and considered all

2  the pertinent information, including, but not limited to, the

3  presentence investigation reports, the addendum, the plea

4  agreement, the submissions by counsel.  I've considered the

5  2013 edition of the Sentencing Guidelines, as well as the

6  factors outlined in 18 U.S.C. 3553(a).

7      I am adopting the factual information contained in

8  the presentence investigation report.

9      However, as I referred to earlier, with respect to

10  pseudo Counts 2 and 3 of the Guideline calculation, the Court

11  finds the victims did not sustain serious bodily injury.

12  Consequently, the combined total offense level is reduced by

13  one level because there is no longer a unit increase for this

14  conduct with a multiple count adjustment.  The only impact

15  would be to the multiple count adjustment with the loss of

16  one half unit with no subsequent increase in the combined

17  offense level.

18      So, the total offense level would be 40 instead of

19  41 and the Guideline range of imprisonment would stay at the

20  same, at 360 months to life, based on the Criminal History

21  Category of VI.

22      So, accordingly, the Court finds your total offense

23  level is 40.  You do have a Criminal History Category of VI.

24  You have a Guideline range of imprisonment of 360 months to

25  life.

23

US v. Smith - 11-CR-317

1    Upon your plea of guilty to Count 1 of the
2    superseding indictment, it is the judgment of the Court that
3    you are hereby committed to the custody of the Bureau of
4    Prisons for a period of 420 months.
5    I find the sentence to be sufficient but not
6    greater than necessary to comply with the purposes of
7    sentencing.  After considering the defendant's background,
8    the extremely violent nature of the offense and the need to
9    afford adequate deterrence and to protect the community, the
10   Court feels that this sentence reflects the seriousness of
11   the defendant's conduct, which includes multiple times using
12   firearms and involvement in numerous acts of violence as a
13   gang member, including the killing of Kihary Blue.
14   The Court recommends you participate in a drug
15   abuse program while you are incarcerated and be designated to
16   a facility as close to your home in Syracuse as is possible.
17   Now, you wrote me a letter, a lengthy letter, and
18   you told me a lot of things about yourself and about the
19   shooting and the kind of person you are.
20   But I take a look at what happened on 11/1 when you
21   were with Riadda Travet.  I think Everett Thomas was the
22   driver of the car.  It was Jeffrey Powell and you were down
23   in the Elk Block territory.  That was the time that Powell
24   shot Jerome Thomas in the head and you came back to the
25   car -- there was one shot fired -- and you said, and the

24

US v. Smith – 11–CR–317

1    report states you told them, quote, you F'ed up, you only

2    fired one shot.  I should have shot them.  So that tells me

3    something about you there.  Jerome Thomas was shot in the

4    right side of his head.  The round stayed there.  A year

5    later it had to be removed because the fragments were causing

6    problems.

7            Then there's the fight at the Jukebox after which

8    outside one of your friends Dwayne Hester was stabbed that

9    night.  As a result of that, you and other members of the

10   group, V-Nots, came to your home and put together a plan.

11   Because you couldn't find any Bricktown members to shoot at,

12   you came up with the idea of going to the home of the Clarks

13   where Jerome Clark and Cartell Clark lived at 622 West

14   Brighton Avenue.  You went there with your friends with an

15   AK47 and put 22 rounds through the front of that house.

16   There were 11 people sleeping in that home, four little kids

17   from infants to 11 years old, I think, and seven adults.  How

18   nobody got killed, I don't know, but they didn't.  That was

19   10/23/10.

20           11/26/ten, the shooting of Kihari Blue.  I don't

21   think I have to say much more about it, except you shot time

22   after time after time in that car encouraging the car to keep

23   up on the car you were chasing.

24           But I think what really bothers me is after Kihary

25   Blue is dead and now it's four months later.  It's 3/19/11.

25

US v. Smith - 11-CR-317

1   You shot Bricktown member Jaycee Floyd in a drive-by in the

2   500 block of Oakwood Avenue.  So that kind of tells me more

3   about you than just what happened to Kihary Blue.  You

4   continued your violence and, therefore, I put a sentence

5   in -- it's not a minimum sentence.  It was more than the

6   minimum.

7           Upon your release from imprisonment, you shall be

8   placed on supervised release for a term of 5 years.  While

9   you are on supervised release, you shall not commit another

10  federal, state or local crime.

11          You shall comply with the standard conditions that

12  have been adopted by this court and you shall comply with the

13  following special conditions.  There's four of them.

14          You shall participate in a program for substance

15  abuse, which shall include testing for the use of controlled

16  substances, controlled substance analogues and alcohol and

17  that may include inpatient or outpatient treatment.  The

18  program must be approved by your probation officer.

19          Secondly, you shall refrain from the use of alcohol

20  and be subject to alcohol testing and treatment while under

21  supervision.

22          Third, you shall contribute to the cost of any

23  evaluation, testing, treatment, and/or monitoring services

24  that are rendered in an amount to be determined by your

25  probation officer.  That would be based on your ability to

26

US v. Smith – 11–CR–317

1   pay or the availability of third–party payments.

2           Fourth, you shall not associate with any member,

3   associate or prospect of the V–Not gang or any other criminal

4   gang, club or organization.

5           At this time you shall pay to the clerk of the

6   court a special assessment of $100, which is due and payable

7   immediately.

8           I find you do not have the ability to pay a fine.

9   Therefore, a fine is not warranted in this case.

10          Both parties have a right to appeal this sentence

11  in certain limited circumstances.

12          When you entered your plea of guilty, you said if I

13  sentence you to 360 months or less, there would be no appeal.

14  So I gave you more than that.  It's 5 years past that.

15  Therefore, you have a right to appeal whether I was correct

16  in my judgment when imposed a sentence greater than the 360

17  months.

18          So I'm going to remand you to the custody of the

19  United States Marshal's service in accordance with the terms

20  of this sentence.

21          Counselor, would you file his notice of appeal for

22  him?  Help him in that regard?

23          MR. MURPHY:  Yes, your Honor.

24          THE COURT:  I'm not assigning you to the appeal but

25  simply to make sure he's covered on that.

27

US v. Smith - 11-CR-317

1       MR. MURPHY:  To make sure his rights are protected,
2   yes, sir.
3       THE COURT:  And I think with so many people here, I
4   just got to say something.  I have had so many of these
5   cases.  I'm the judge that started out with the Boot Camp.
6   In that case there were seven dead young men.  Then it went
7   on to the Elk Block.  Then Brighton Brigade.  Then it was
8   gang after gang.  Bricktown, yes, the Bricktown.
9       And from my point of view as a judge, I'm seeing
10  this senseless killing.  It bothers me very much and I can
11  tell by the mothers and the sister that spoke today, it tears
12  you apart.  You can't believe it's happening but I don't know
13  how it's going to end, though.  That's my problem.  I just
14  feel sorry for everybody what's happened here.
15      The defendant talked about his three sons.  He's
16  not going to see those three sons.  They're going to be all
17  grown up when he gets through, you know.  You hurt a lot of
18  people, let a lot of people down here that support you, a lot
19  of people here that believe what kind of person you are.
20  But, anyway, I don't need to say anything more.
21      I thank the people for coming down for the
22  defendant.  Most of the defendants in the cases come down
23  alone.  There's just one person back there.  So, those of you
24  who love him and care about him, thank you for coming.  The
25  others, I'm so glad you came down to see how the justice

A-91

28

US v. Smith - 11-CR-317

1    system works and I hope you learn from it.  Thank you.

2             THE CLERK:  Court stands adjourned.

3             (Proceedings were adjourned.)

A-92

C E R T I F I C A T I O N


          I, DIANE S. MARTENS, Registered Professional

Reporter, DO HEREBY CERTIFY that I attended the foregoing

proceedings, took stenographic notes of the same, that

the foregoing is a true and correct copy of same and the

whole thereof.




                                    _____

                                    DIANE S. MARTENS, FCRR

AO 245B   NNY(Rev. 09/12) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

| Northern | District of | New York |
|---|---|---|

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| V. | |

Kahari Smith
a/k/a Kiss

| Case Number: | DNYN511CR000317-001 |
|---|---|
| USM Number: | 19263-052 |

Thomas J. Murphy, Esq.
One Lincoln Center, Suite 330
Syracuse, New York 13202-1309
(315)422-6154
Defendant's Attorney

## THE DEFENDANT:

X   pleaded guilty to count(s)   1 of the Superseding Indictment on September 19, 2013.

G   pleaded nolo contendere to count(s)
which was accepted by the court.

G   was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1962(d) | Conspiracy to Engage in a Pattern of Racketeering Activity | 03/29/2012 | 1 |

The defendant is sentenced as provided in pages 2 through _____6_____ of this judgment.  The sentence is imposed in accordance with 18 U.S.C. § 3553 and the Sentencing Guidelines.

G   The defendant has been found not guilty on count(s)

X   Count 2 is dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

March 25, 2014
Date of Imposition of Judgment

Norman A. Mordue
Senior U.S. District Judge

March 28, 2014
Date

JAK

**A-94**

AO 245B    NNY(Rev. 10/05) Judgment in a Criminal Case
        Sheet 2 — Imprisonment

|  | Judgment — Page | 2 | of | 6 |
|---|---|---|---|---|

DEFENDANT:        Kahari Smith
CASE NUMBER:    DNYN511CR000317-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**420 months**

X   The court makes the following recommendations to the Bureau of Prisons:

    **The defendant participate in a drug treatment program while incarcerated and be designated to a facility as close to his home in Syracuse, New York as possible.**

X   The defendant is remanded to the custody of the United States Marshal.

G   The defendant shall surrender to the United States Marshal for this district:

    G   at _____ G a.m.  G p.m.  on _____ .

    G   as notified by the United States Marshal.

G   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    G   before 2 p.m. on _____ .

    G   as notified by the United States Marshal.

    G   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:


Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.


                                  _____
                                    UNITED STATES MARSHAL

                     By _____
                                    DEPUTY UNITED STATES MARSHAL

AO 245B   NNY(Rev. 10/05) Judgment in a Criminal Case   Case 5:11-cr-00317-NAM   Document 243   Filed 03/28/14   Page 3 of 6
Sheet 3 — Supervised Release

| | Judgment—Page | 3 | of | 6 |

DEFENDANT:         Kahari Smith
CASE NUMBER:    DNYN511CR000317-001

### SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:    **5 years**

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

x   The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

x   The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Deselect, if inapplicable.)

☐   The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

### STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment, or if such prior notification is not possible, then within five days after such change;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, import, or manufacture any and all controlled substance and all controlled substance analogues, as defined in 21 U.S.C. § 802, and any paraphernalia related to any controlled substances, except that possession and use of a controlled substance properly prescribed by a licensed medical practitioner is permitted;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement;

14) the defendant shall not possess a firearm, destructive device, or any other dangerous weapon;

15) the defendant shall provide the probation officer with access to any requested financial information; and

16) the defendant shall submit his or her person, and any property, house, residence, vehicle, papers, effects, computer, electronic communications devices, and any data storage devices or media, to search at any time, with or without a warrant, by any federal probation officer, or any other law enforcement officer from whom the Probation Office has requested assistance, with reasonable suspicion concerning a violation of a condition of probation or supervised release or unlawful conduct by the defendant. Any items seized may be removed to the Probation Office or to the office of their designee for a more thorough examination.

Case 14-58, Document 132, 07/15/2014, 1271380, Page125 of 128

A-96

AO 245B · NNY(Rev. 10/08)Judgment in a Criminal Case Case 5:11-cr-00317-NAM Document 243 Filed 03/28/14 Page 4 of 6
Sheet 3C — Supervised Release

| | | Judgment—Page 4 of 6 |
| --- | --- | --- |

DEFENDANT: Kahari Smith
CASE NUMBER: DNYN511CR000317-001

# SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall participate in a program for substance abuse which shall include testing for use of controlled substances, controlled substance analogues, and alcohol, and may include inpatient and/or outpatient treatment. The program shall be approved by the United States Probation Office.

2. The defendant shall contribute to the cost of any evaluation, testing, treatment and/or monitoring services rendered in an amount to be determined by the probation officer based on the defendant's ability to pay and the availability of third party payments.

3. The defendant shall refrain from the use of alcohol and be subject to alcohol testing and treatment while under supervision.

4. The defendant shall not associate with any member, associate, or prospect of the V-Not, or any other criminal gang, club, or organization.

# DEFENDANT'S ACKNOWLEDGMENT OF APPLICABLE CONDITIONS OF SUPERVISION

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

The conditions of supervision have been read to me. I fully understand the conditions and have been provided a copy of them.

_____     _____
Defendant                            Date

_____     _____
U.S. Probation Officer/Designated Witness    Date

A-97

|  |  | Judgment — Page  5  of  6 |
|---|---|---|
| DEFENDANT: | Kahari Smith | |
| CASE NUMBER: | DNYN511CR000317-001 | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $  100 | $ Waived | $ N/A |

G   The determination of restitution is deferred until _____ .  An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

G   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

   If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |
| **TOTALS** | $ _____ | $ _____ | |

G   Restitution amount ordered pursuant to plea agreement   $ _____

G   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

G   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   G   the interest requirement is waived for the    G   fine   G   restitution.

   G   the interest requirement for the    G   fine   G   restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

| | | Judgment — Page _6_ of _6_ |
|---|---|---|

DEFENDANT:        Kahari Smith
CASE NUMBER:   DNYN511CR000317-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**    X    In full immediately; or

**B**    G    Lump sum payment of $ _____ due immediately, balance due

       G   not later than _____ , or
       G   in accordance with   G  D,   G  E,   G  F, or   G  G below; or

**C**    G    Payment to begin immediately (may be combined with   G  D,   G  E, or   G  G below); or

**D**    G    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**E**    G    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
       term of supervision; or

**F**    G    Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
       imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**G**    G    Special instructions regarding the payment of criminal monetary penalties:


Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to **Clerk, U.S. District Court, Federal Bldg., 100 S. Clinton Street, P.O. Box 7367, Syracuse, N.Y. 13261-7367,** unless otherwise directed by the court, the probation officer, or the United States attorney.  If a victim cannot be located, the restitution paid to the Clerk of the Court for that victim shall be sent to the Treasury, to be retrieved if and when the victim is located.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

G    Joint and Several

       G    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and
       corresponding payee, if appropriate.


       G    The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part
       of the restitution ordered herein and may order such payment in the future.

G    The defendant shall pay the cost of prosecution.

G    The defendant shall pay the following court cost(s):

G    The defendant shall forfeit the defendant's interest in the following property to the United States:


Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Criminal Notice of Appeal - Form A

## NOTICE OF APPEAL

### United States District Court

_NORTHERN_ District of _NEW YORK_

Caption:

_UNITED STATES OF AMERICA_
                v.
_KAHARI SMITH_

Docket No.: _5:11-CR-00317_

_Norman A. Mordue_
_Sr._ (District Court Judge)

Notice is hereby given that _____ KAHARI SMITH _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment _X_ , other | _____ Sentence _____

entered in this action on _March 25, 2014_.
                        (date)                              (specify)

This appeal concerns: Conviction only |___| Sentence only | X | Conviction & Sentence |___| Other |___|

Defendant found guilty by plea | X | trial | | N/A | .

Offense occurred after November 1, 1987? Yes | X | No |    N/A [

Date of sentence: ɛMarch 25, 2014 _____ N/A |___|

Bail/Jail Disposition: Committed |_ X_ Not committed |    | N/A |

Appellant is represented by counsel? Yes  X ] No |    | If yes, provide the following information:

Defendant's Counsel:   _Thomas J. Murphy, Esq._

Counsel's Address:   _Greene, Hershdorfer & Sharpe_

                     _One Lincoln Center, Suite 330, Syracuse, New York 13202-1317_

Counsel's Phone:   _(315) 422-6154_

Assistant U.S. Attorney:   _Carla Freedman, Esq._

AUSA's Address:   _U.S. Attorney's Office, P.O. Box 7198_

                 _100 So. Clinton Street, Syracuse, New York  13261-7198_

AUSA's Phone:   _(315) 448-0962_

                                        _____
                                                    Signature

1 of 42