# 14-58(L),

## 14-3479 (con),14-1890 (con),14-339(con),14-771(con),14-1054(con)

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

JERMEERE MCKINNON, AKA HOOD; KAHARI SMITH, AKA SEALED DEFENDANT, AKA KISS; HABAKKUK NICKENS, AKA HB; JEFFREY POWELL, AKA GHOST,

*Defendants-Appellants,*

*v.*

KENNETH JACKSON, AKA KAROME; RIADDA TRAVET, AKA RICO; CHRISTOPHER MIKE, AKA JAH, AKA C-MIKE; NATHAN KING, AKA NATE; DWAYNE HESTER, AKA BLACK,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF ON BEHALF OF DEFENDANT-APPELLANT HABAKKUK NICKENS

Yvonne Shivers
Attorney At Law
7 Odell Plaza #130, P.O. Box 317
Yonkers, New York 10701
(914) 613-8949
*Attorney for Habakkuk Nickens*

# Table of Contents

Table of Authorities ........................................................................................................ iii

Statement of Subject Matter and Appellate Jurisdiction ................................................ i

Statement of Issues Presented for Review .................................................................... 1

Statement of the Case .................................................................................................... 2

Statement of Facts .......................................................................................................... 5

    A.  The Plea Agreement and Plea ............................................................................ 5

    B.  The Presentence Report ...................................................................................... 7

        1.  The Description of Gang Rivalry and Blue Shooting............................... 7
        2.  The Guidelines Calculation ..................................................................... 9
        3.  The Criminal History Category ................................................................ 9
        4.  Mr. Nickens' Personal and Family Background ...................................... 11
        5.  Help Breakdown the Silence ................................................................... 12

    C.  Sentencing Hearing and Sentencing .............................................................. 13

Argument ...................................................................................................................... 18

Point One

THE COURT COMMITTED PROCEDURAL ERROR BY
FAILING TO PERFORM AN ON THE RECORD *DRISKELL*
ANALYSIS AND BY INCLUDING MR. NICKENS'
MISDEMEANOR YOUTHFUL OFFENDER
ADJUDUCATION, FOR WHICH HE WAS SENTENCED TO
AND RECEIVED NO JAIL TIME, IN DETERMINING HIS
CRIMINAL HISTORY CATEGORY ........................................................... 18

Point Two

THE SENTENCE IMPOSED WAS PROCEDURALLY
UNREASONABLE AS IT WAS IMPOSSIBLE TO
REASONABLY CONCLUDE FROM A THOROUGH
FACTUAL ANALYSIS OF THE AVAILABLE RECORD
THAT MR. NICKENS' PARTICIPATION IN THE KIHARY

BLUE SHOOTING CONSTITUTED FIRST-DEGREE
MURDER ................................................................................................ 25

Point Three

THE SENTENCE IMPOSED WAS SUBSTANTIVELY
UNREASONABLE WHERE THE COURT ACCORDED
UNDUE WEIGHT TO MR. NICKENS' ROLE AS DRIVER IN
THE BLUE SHOOTIN AND INSUFFICIENT WEIGHT TO
MR. NICKENS' EXTRAORDINARY EFFORTS AT
REHABILITATION, ANTI-GANG COMMUNITY SERVICE
AND PRISON MINISTRY ..................................................................... 31

Conclusion ............................................................................................. 36

Certificate of Compliance ..................................................................... 37

# Table of Authorities

## Cases

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) .............................................................. 26
*Gall v. United States*, 552 U.S. 38 (2007) ................................................................ 19, 32
*Henderson v. United States,* 133 S.Ct. 1121 (2013) .................................................... 20, 23
*People v. Gonzalez*, 1 N.Y.3d 464 (2004) ................................................................. 29
*People v. Suarez,* 6 N.Y.3d 202 (2005) ..................................................................... 29
*United States v. Amante*, 256 Fed. Appx. 434 (2d Cir. 2007) ...................................... 22
*United States v. Carr*, 424 F.3d 213 (2d Cir. 2005)................................................ 26, 27
*United States v. Cavera,* 550 F.3d 180 (2d Cir. 2008)............................................ 20, 26
*United States v. DeSilva*, 613 F.3d 352 (2d Cir. 2010)................................................ 26
*United States v. Driskell*, 277 F.3d 150 (2d Cir. 2002) ........................................... *passim*
*United States v. Gordon*, 291 F.3d 181 (2d Cir. 2002)........................................... 20, 22
*United States v. Jackson*, 351 F.Supp.2d 108 (SDNY 2004) .............................. 26, 29, 30
*United States v. Johnson*, 2009 WL 3415354 (S.D.N.Y. Oct. 23, 2009) ....................... 21
*United States v. Johnson*, 567 F.3d 40 (2d Cir. 2009)................................................. 19
*United States v. Matthews*, 205 F.3d 544 (2d Cir. 2000)............................................ 20
*United States v. Norman*, __ F.3d __, 2015 WL 122013 (2d Cir. Jan. 9, 2015)........................ 35
*United States v. Olano*, 507 U.S. 725 (1993)............................................................. 23
*United States v. Parnell*, 524 F.3d 166 (2d Cir. 2008) ............................................... 22
*United States v. Ramos*, 739 F.3d 250 (5th Cir. 2014) ............................................... 24
*United States v. Rattoballi*, 452 F.3d 127 (2d Cir. 2006) ........................................... 20
*United States v. Rigas*, 583 F.3d 122 (2d Cir. 2009) ............................................ 20, 32
*United States v. Robinson*, 702 F.3d. 22 (2d Cir. 2012) ............................................. 20
*United States v. Romeo*, 385 Fed. Appx. 45 (2d Cir. 2010)........................................ 24
*United States v. Salameh*, 261 F.3d 271 (2d Cir. 2001)......................................... 26, 27
*United States v. Soto*, 2009 WL 765015 (2d Cir. March 25, 2009)........................... 20, 21
*United States v. Spiegelman*, 4 F.Supp. 2d 275 (S.D.N.Y. 1998)................................. 26

## Statutes

18 U.S.C. § 1111 ...................................................................................................... 9, 25
18 U.S.C. § 1959(a) ...................................................................................................... 5
18 U.S.C. § 1961(1) ...................................................................................................... 5
18 U.S.C. § 1962(d) ...................................................................................................... 5
18 U.S.C. § 1512(b)(3) .................................................................................................. 1
18 U.S.C. § 3553(a) ................................................................................................ 17, 19
18 U.S.C. § 3742 ...................................................................................................... 1, 5
18 U.S.C. § 3231 ............................................................................................................ 1

21 U.S.C. § 841(a) ................................................................ 5

21 U.S.C. § 846 .................................................................... 5

28 U.S.C. § 1291 .................................................................. 1

New York P.L. § 125.25 (1) ................................... 2, 5, 25, 26

New York P.L. § 125.25(4) ................................................. 29

New York P.L. § 155.25 ...................................................... 21

New York P.L.§ 155.30 ....................................................... 22

New York P.L. §160.05 ......................................................... 5

New York P.L. § 160.10 ........................................................ 5

New York P.L. § 160.15 ........................................................ 5

U.S. S.G. § 2A 1.1 ....................................................... *passim*

U.S.S.G. § 2A2.1(a)(1) ....................................................... 30

U.S.S.G. § 2D1.1(b)(1) ......................................................... 9

U.S.S.G. § 3E1.1 .................................................................. 6

U.S.S.G. § 4A1.1(d) ............................................................ 10

U.S.S.G § 6B1.4(d) ............................................................. 26

## Statement of Subject Matter and Appellate Jurisdiction

This is an appeal from a judgment, following a plea of guilty, of the United States District Court for the Northern District of New York (Mordue, J.), which had jurisdiction pursuant to 18 U.S.C. § 3231. The judgment was entered on September 8, 2014. A timely Notice of Appeal was filed on September 11, 2014.[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## Statement of Issues Presented For Review

1.      Whether the court committed procedural error by failing to perform an on the record *Driskell* analysis and by including Mr. Nickens' misdemeanor youthful offender adjudication, for which he was sentenced to and received no jail time, in determining his criminal history category.

2.      Whether the sentence imposed was procedurally unreasonable as it was impossible to reasonably conclude from a thorough factual analysis of the available record that Mr. Nickens' participation in the Blue shooting constituted first-degree murder.

3.      Whether the sentence imposed was substantively unreasonable where the court accorded undue weight to Mr. Nickens' role as driver in the Blue

---

[1]      The original Judgment dated April 29, 2014 (Doc. 265) was vacated (Doc. 265) after the notice of appeal was untimely filed (Doc. 257). The present Judgment, entered September 9, 2014 to permit a timely notice of appeal to be filed, is identical to the original Judgment.

1

shooting and insufficient weight to Mr. Nickens' extraordinary efforts at rehabilitation, anti-gang community service and prison ministry.

## Statement of the Case

Appellant Habakkuk Nickens was indicted for Racketeering Conspiracy (Count One) and Murder in Aid of Racketeering (Count Two) stemming from his involvement with a gang called the V-Not Gang, which sold drugs in an area of the south side of Syracuse, New York. Among the overt acts alleged in Count One, and the basis for the Murder in Aid of Racketeering charge, was the murder of Kihary Blue, a member of the rival Bricktown gang, on or about November 27, 2010, in a shooting during which Kahari Smith, Jeffrey Powell and Mr. Nickens were in a car – Mr. Nickens driving – and pulled up alongside another car in which there were rival Bricktown Gang members. Smith fired multiple shots at the car, killing Blue. A "Special Sentencing Allegation" in the indictment alleged that "with the intent to cause " Blue's death, the defendants did so "in violation of New York Penal Law Section 125.25(1)" (hereafter "P.L. 125.25") and 18 U.S.C. 1959(a)(1) (Indictment at A 33).[2]

Mr. Nickens pleaded guilty, to Count One of the Indictment – Racketeering Conspiracy – and stipulated in a plea agreement that, pursuant to Guideline section

---

[2]     Numbers in parentheses preceded by "A" refer to the Appendix submitted with this brief.

2A1.1, he was "accountable for First Degree Murder" for his participation in the murder of Kihary Blue." (Plea Agreement at 6).

The probation department, in determining that Mr. Nickens' criminal history category was III, added a criminal history point for Mr. Nickens' prior youthful offender adjudication of misdemeanor petit larceny, for which he had been sentenced to a one year conditional discharge. The court accepted this without performing the required on the record analysis, based on the factors set forth in *United States v. Driskell*, 277 F.3d 150 (2d Cir. 2002), of whether to consider the youthful offender adjudication in assessing Mr. Nickens' criminal history category. Based upon those factors, including the minor nature of the prior offense and the non-prison sentence Mr. Nickens received, no criminal history points should have been assessed for this adjudication, and Mr. Nickens' criminal history category should initially have been II rather than III. The court subsequently reduced Mr. Nickens' criminal history category to II from category III based upon its finding that criminal history III did not reflect the unlikelihood of recidivism in view of Mr. Nickens anti-gang outreach program and related community activities. Had Mr. Nickens' criminal history category been properly calculated in the first instance as category II, the court's reduction would have resulted in a criminal history category I, a lesser Guidelines range, and very possibly a lesser non-Guidelines sentence.

The court found that the federal first-degree murder Guideline was applicable in the killing of Kihary Blue and was so guided in sentencing Mr. Nickens. The totality of the available evidence, however, did not clearly establish that Mr. Nickens' acted with the requisite premeditation or intent to kill Blue or anyone else in the rival gang's car. Accordingly, the court made a clearly erroneous factual finding and was procedurally unreasonable in finding that Mr. Nickens committed first-degree murder in Blue's homicide.

Twenty-eight year-old Mr. Nickens' singular achievements, reflected in the presentence report, evidence presented at sentencing and more than thirty letters of support from clergy, family (including his son and two daughters), friends, fellow inmates and even a correction officer, were entitled to great weight in the court's sentencing determination. Perhaps most impressive among Mr. Nickens' achievements was his founding of "Help Break Down Silence"- a community outreach organization dedicated to diverting youth from gangs by providing positive recreational activities, which Mr. Nickens founded and continued to be actively involved with up until his arrest in May 2012 (S 5-7). Indeed, at sentencing Mr. Nickens expressed not only his sincere remorse for his crime, but also his intention to continue this work while incarcerated, even "pledg[ing]" to Blue's mother he would one day, through his work with the youth of their community, "replace [her] tears with a smile" (S 13-14, 16). Defense counsel

argued for a more lenient sentence, noting among other things that a "similarly situated" co-defendant, Jeffrey Powell, had received 121 months, and asking the court to consider imposing a similar sentence on Mr. Nickens (S 12).

The court, placing particular undue weight on Mr. Nickens' role as driver in the Blue shooting, imposed a non-Guidelines sentence of 240 months imprisonment (S 17).

### Statement of Facts

Mr. Nickens was charged in a Superseding Indictment (5:11-CR-317) with Racketeering Conspiracy (Count One) and Murder in Aid of Racketeering (Count Two). The indictment alleged that between 2003 and the date of the indictment, Mr. Nickens, as a member of the V-Not Gang, conspired to engage in acts involving murder (New York P.L. §§ 125.25, 110.05, 105.17), robbery (New York P.L. §§160.05, 160.10, 160.15), drug trafficking, and witness tampering in violation of 18 U.S.C. §§ 1962(d); 1961(1), (5), 1959(a)(1); 21 U.S.C. §§ 841(a), 846; 18 U.S.C. §1512(b)(3). Under Count One, the Indictment alleges 39 overt acts of which Mr. Nickens was allegedly involved in nine, including overt act 25, the murder of Kihary Blue (A 19).

A.  The Plea Agreement and Plea

On September 17, 2013, Mr. Nickens entered a plea agreement, and pleaded guilty to Count One of the Indictment.  Mr. Nickens agreed to, *inter alia*, the following sentencing stipulation under the plea agreement:

> (1) Pursuant to U. S. S. G. § 2A 1.1, the defendant is accountable for First Degree Murder for his participation in the murder of Kihary Blue, as alleged in Overt Act #25 of the Indictment. Thus, the total offense level in this case is 43.

(A 47).

During the plea allocution, the government stated that the plea agreement contained four stipulations, including "[t]he first one is the defendant admits his culpability with respect to overt act 25, the homicide of Kihary Blue, and that brings a total offense level 43" (A 81). The court informed Mr. Nickens that it was not bound by any of the stipulations in the plea agreement or by the sentencing Guidelines (A 83).  Mr. Nickens acknowledged that counsel discussed the Sentencing Guidelines with him and that he "underst[ood] how they work" (*Id.*).

Because of Mr. Nickens' guilty plea, the government agreed to a three-level downward adjustment under U.S.S.G. § 3E1.1 for acceptance of responsibility (A 47-48). The plea agreement contained a waiver of appeal or collateral attack with respect to the plea and any sentence at or below 121 months (A 48), which was explained, and Mr. Nickens stated he understood, during the plea allocution (A- 82, 84-85).  Mr. Nickens pleaded guilty to Count One of the Superseding Indictment, admitting Overt Acts 1, 12, 13, 14, 22, 23 and 25 (A 71-72).

B.  The Presentence Report

1.  Description of Gang Rivalry and Blue Shooting

As described in the Presentence Report, there was an ongoing rivalry between the V-Not gang, of which Mr. Nickens was a member, and the Bricktown gang, to which Blue belonged, which involved violent territorial and retaliatory clashes that intensified in October and November 2010.  Retaliation often took the form of one gang recklessly shooting into a group of rival gang members spotted at various venues such as clubs, bars or in vehicles, sometimes resulting in injury or death (*See* Presentence Investigation Report ("PSR") ¶¶ 20-31).  For example, three weeks before the November 26, 2010 shooting that resulted in Blue's death, a Bricktown gang member had shot four members of the V-Not gang at the garage where they were known to hang out (PSR ¶ 24).  Approximately a week before that, V-Not members Titus Nickens (Mr. Nickens' brother) and Kahari Smith had been shot while in a vehicle, on the highway, by a Bricktown gang member (PSR ¶ 2).  That shooting, in turn, was in retaliation for a shooting by V-Not gang members into the residence of a Bricktown gang member (PSR ¶ 22).  Mr. Nickens himself was the victim of two gang related attacks, in May and December 2009, wherein

he was in one instance jumped by several men in his apartment building and suffered a six-inch laceration to his head, and in the other incident was shot in the back, resulting in injury to his kidneys, spine and several fractured ribs (PSR ¶¶ 108-09). Mr. Nickens continues to suffer from "pain, muscle spasms, and 'crazy dreams'" from the latter incident (PSR ¶ 109).

The November 26, 2010 shooting was described in the presentence report as follows:

> On November 26, 2010, Bricktown gang associate Kihary Blue was fatally shot in the head and fellow gang associate Jarrell Williams was shot in the leg by V-Not gang member Kahari Smith. The victims were traveling on the highway in Syracuse with three other Bricktown associates when a van containing five V-Not gang members drove up beside their vehicle. At that time, Kahari Smith, the lone shooter, leaned out the front passenger seat window of the van with his .40 caliber handgun and fired multiple shots at the Bricktown vehicle, with one bullet hitting Blue in the back of the head and another bullet striking Williams in the leg. This murder was committed in furtherance of the ongoing series of violent clashes between the V-Not and Bricktown gangs that took place over several months leading up to the murder. Prior to the shooting, Kahari Smith called Willie Sanders for a ride. Jeffrey Powell was with Sanders at the time and went along with Sanders to pick up Smith. Sanders subsequently picked up Smith, Alton West, and **Habakkuk Nickens,** who took over the wheel because he had a driver's license while Sanders did not. Sanders, West, and Powell sat in the backseat while Kahari Smith sat in the front passenger seat. All were armed with a handgun. While they were driving around, Smith received a text that Bricktown gang members were having a party on North Salina Street. Consequently, they got on the highway and noticed a vehicle known to be driven by Bricktown gang members. After they confirmed the vehicle belonged to Bricktown, Smith told **Nickens** to speed up and stay alongside the vehicle. **Nickens** then drove the vehicle into position so that Smith, who was sitting in the front passenger seat, could fire his weapon at

8

the rival car. During the ensuing police investigation, eight .40 caliber shell casings were recovered from the highway and four spent bullets were recovered from inside the Bricktown vehicle PSR ¶ 25).

Mr. Nickens stated in his interview with the Probation Department that "he played no role in the murder," "did not know Kahari Smith was going to shoot into the car, and he never intended for anyone to die" (PSR at ¶ 51).

### 2. The Guidelines Calculation

Mr. Nickens' base offense level, based upon his plea to Racketeering Conspiracy and the underlying drug quantity and possession of firearms, was 32 (PSR ¶ 57). Pursuant to U.S.S.G. § 2D1.1(b)(1), however, because "a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States," the Probation Department applied U.S.S.G. § 2A1.1, the first-degree murder guideline (*Id.*). Thus, Mr. Nickens' base offense level was 43, which was "the guideline for the first degree murder of Kihary Blue … found in U.S.S.G.§ 2A1.1" (PSR ¶ 58).[3] His base offense level was decreased by three levels for acceptance of responsibility, for a total offense level of 40 (*Id.* ¶¶ 81-83).

### 3. The Criminal History Category

Based on two prior misdemeanor convictions – one in 2004 for petit larceny

---

[3]     This was the highest base offense level of three "pseudo-counts": two based on overt act 25 (murder and assault with intent to commit murder of Kihary Blue), and overt act 14 (robbery) (*see* PSR ¶¶58-77).

for which he was at the age of 18 adjudicated a youthful offender and received a conditional discharge, and another in 2006 for resisting arrest for which he received three years' probation – the probation department determined Mr. Nickens' criminal history score was two (PSR ¶¶ 87-90).[4]

The probation department described the 2004 (petit larceny) youthful offender adjudication as follows:

> Probation records confirm this disposition and reflect Nickens was a cashier at K-Mart when, over a period of several days, he failed to ring up merchandise and/or voided the purchase; all while still bagging the items for the customer (PSR ¶ 88).

Pursuant to U.S.S.G. § 4A1.1(d), two points were added to Mr. Nickens' criminal history score because he committed the present offense while on probation between 2006 and 2008 stemming from the resisting arrest conviction. This brought Mr. Nickens' total criminal history score to four, giving him a criminal history Category III (*Id*. ¶¶ 91-92). Based upon his total offense level of 40 and criminal history category of III, the probation department determined Mr. Nickens' Guidelines range was 360 months to life imprisonment (*Id*. ¶ 128).

The probation department cited Mr. Nickens' community outreach and numerous letters of support, "including from a corrections officer," as factors that

---

[4]  Mr. Nickens youthful offender conviction in 2003 for obstruction of governmental administration in the 2nd degree, a misdemeanor, was not included in the criminal history calculation (PSR ¶ 87). Mr. Nickens had no prior felony convictions (*Id*. at ¶¶ 93-100).

might warrant a downward departure from the criminal history category:

> The Court may want to consider a downward departure under U.S.S.G. §4A1.3, Inadequacy of Criminal History Category, because there appears to be reliable information that indicates a criminal history category of III substantially over-represents the likelihood that the defendant will commit further crimes. This reliable information includes the defendant's community outreach program, Help Breakdown Silence (HBS), and numerous letters of support, including from a corrections officer (PSR ¶ 139).

At a sentencing hearing on March 14, 2014, discussed *post* at 13, the court reduced Mr. Nickens' criminal history category to II.

### 4. Mr. Nickens' Personal and Family Background

Mr. Nickens, who was 28 years old at the time of sentencing, and his three older siblings (including co-defendant Titus Nickens) were raised in Syracuse in a tight-knit family (PSR ¶ 101). Working since the age of 13 years old, Mr. Nickens, at the age of 16, left his parents home to live with his girlfriend, with whom he had his first child, Habakkuk, Jr., at the age of 18 and his second child, Ariahanna, a few years later (PSR ¶ 102). Mr. Nickens also has a five-year old daughter, Aliyha (PSR ¶ 104). Mr. Nickens worked as many as three jobs at a time to support his young family, and until his incarceration continued to pay child support (PSR ¶ 102). The older children live under the shared custody of their mother and Mr. Nickens' mother. The youngest lives with her mother (PSR ¶¶ 103-04).

A hard worker by his parents' accounts, Mr. Nickens "moved up quickly into management positions" in some of his jobs (PSR ¶¶ 102, 106; *see* PSR ¶¶ 122-

11

23, noting promotions to "manager" and "team leader" in two such jobs between 2002 and 2005). However "peer pressure… being targeted by others in and around in the neighborhood and losing his job," eventually led to his involvement with the V-not gang (PSR ¶ 106). Mr. Nickens began drinking, occasionally, at the age of 16, but began drinking more heavily, smoking marijuana daily and sometimes using ecstasy, in or around 2007 or 2008 (PSR ¶ 111).

Mr. Nickens dropped out of high school in his junior year in 2003, but from 2005-2006 earned his GED and completed a nine month program in carpentry and construction with Jubilee Homes YouthBuild; an alternative education program under which he earned his GED while renovating housing and taking part in other community activities (PSR ¶¶ 113-14, 120). Thereafter, Mr. Nickens attended Onondaga Community College, earning 13 credits. In 2010 he became a state certified nursing home aide (*Id*.).

5. Help Breakdown the Silence

In 2011 – several months before his arrest in this case – Mr. Nickens founded a non-profit organization, Help Breakdown the Silence ("HBS"), with the goal of stopping gang violence:

> In 2011, he started a non-profit organization in Syracuse called Help Breakdown Silence (HBS) with a mission to help youth and to stop gun violence. (See employment section for a detailed description of this organization and its community outreach prior to the defendant's arrest.) The defendant emphasizes he is dedicated to this mission no

12

matter what others say and he has made a vow to help others by his anti-violence stance. He notes he continues to help others in jail by speaking during Bible studies and other programs, and by using himself as an example. He hopes to turn others away from violence and to provide them with a way out (*Id.*). (PSR ¶ 52).

The mission of HBS was "to break the silence between youth and their community, to rebuild community by stopping the cycle of violence, and to target youth by offering education and mentoring programs" (PSR ¶ 116). Mr. Nickens started HBS "by developing a business plan and organizing a team of volunteer staff" (*Id.*). He "leased office space and hosted 'stop the violence' and other events at local community centers and churches'"(*Id.*). Among the events hosted by HBS were charity giveaways, free food and entertainment, and theatrical productions on topics such as bullying, death by gun violence and HIV awareness (*Id.*).

Prior to his May 1, 2012 arrest, Mr. Nickens had been working full time for over a year (PSR ¶ 115). He worked in construction from 2006 to 2008, but was unemployed between 2008 part of 2010 (PSR ¶¶ 117-19).

C.  Sentencing Hearing and Sentencing

In his March 7, 2014 sentencing memorandum (Doc. 230), defense counsel wrote of Mr. Nickens' having parted from the gang and its activities and having intensified his involvement with community outreach:

Mr. Nickens removed himself from the conspiracy in November 2010

and distanced himself from all members of the community and he was already heavily invested in the nonprofit organization he started, HBS, Help Breakdown Silence, which was a foundation he organized to reach out and assist the youth in his community from entering into a life of violence. This foundation provided a network of community support for youth by organizing book drives, theatrical plays and educational assistance to young people in the community. Attached hereto as Exhibit "B" are copies of posters of some of the events that HBS held (Doc. 230 at 5).

Counsel also wrote of Mr. Nickens' work (in the kitchen and laundry rooms), study (typing and computer skills classes) and outreach since his incarceration (Doc. 230 at 6). In addition to a bible study program, counsel described a "Second Chance Program" Mr. Nickens started at Montgomery County Correctional Facility:

> This program teaches inmates to help become better members of society and how to make wise choices in their lives and have awareness of how their conduct impacts their lives and the lives of others. This program also teaches inmates how to interact appropriately with correctional officers, while including all races, creeds and ethnicities incarcerated at the Montgomery County Jail. This program utilizes skits, acting, and drama to illustrate positive change and provide a foundation for self-improvement (*Id*.). [5]

At a sentencing hearing on March 14, 2014, the Court found that a criminal history category of III overstated Mr. Nickens' likelihood to recidivate, and therefore reduced his criminal history category to II (A 97). Referring to Mr. Nickens' community work to stop gang violence, the court stated:

---

[5] Defense counsel re-filed the sentencing memorandum on April 23, 2014 (Doc.252), this time appending the letters that had been submitted on behalf of Mr. Nickens by family, friends, clergy, fellow inmates and a correctional officer.

The other issue was whether or not the criminal history category of a III overstates your likelihood to recidivate. And I took a look at what you did. And I don't know if you did this because you knew things were going to come down, you knew Kahari Blue had been killed, and then all of a sudden you started working on other things for the community and things of that nature. And I've taken that into consideration and I'm going to change your criminal history category from a III to a II (*Id.*).

At Mr. Nickens' April 25, 2014 sentencing, defense counsel submitted photographs documenting Mr. Nickens' work with HBS, including a photo from a hat and glove give away he organized, and a photo of Mr. Nickens with the HBS staff. Another document showed that as early as 2003, Mr. Nickens had prepared an executive summary of the community organization he was hoping to create (A 104-05). His plan included a community skating rink and other positive recreational activities to keep youth off the streets (A 106).

Defense counsel called Mr. Nickens "one of the more industrious clients I've ever represented, assigned or retained" (*Id.*). This was evident from Mr. Nickens' activities since his incarceration:

> In fact, during his incarceration, as the Court's aware from my memo, he has kept himself busy working six days a week in the kitchen. He has taken GED and computer classes and he on his own has formed several programs at the Montgomery County jail in which he has sought to assist his fellow inmates and he's even included corrections officers in that program and he seeks to teach inmates of all races and creeds and religions how to act appropriately while in jail, how to respect the correction officers, how to utilize them for their resources, all in an effort to become a better person upon their release. There are several letters in there from officers at that facility attesting to my client's work ethic and dedication to those programs and rehabilitating

15

himself. (*Id*.).

Letters submitted to the court with defense counsel's sentencing memorandum, thirty-one in total, reflected Mr. Nickens' work ethic and commitment to community outreach both in and out of prison. They consistently wrote as well of his expressed remorse and acceptance of responsibility (*Id*.).

Defense counsel summarized the letters of family members and friends who wrote of Mr. Nickens' leadership qualities, ambition, work ethic from a very early age, and his genuine commitment to family – including his three children – and community (A 107-11). Counsel noted that in addition to "working and educating himself in jail" Mr. Nickens had written two children's books: "the Book of Habakkuk, which is a story of Habakkuk's life with Biblical references illustrating how one can transition to a better life" and "Comparable Parables, breaking down Bible parables with illustrations for children so that they better understand those Bible passages" (A 111).

Defense counsel asked the court to impose on Mr. Nickens the same sentence it gave co-defendant Jeffrey Powell, whose role in Blue's shooting he argued was most akin to Mr. Nickens' role (A 111-12). The court responded that a "substantial difference" was that Mr. Nickens' drove the car and "kept the car up on their car so the shooting could continue" (A 112).

Mr. Nickens addressed the court, expressing his "[profound] apologies" to

the court and "to the ones who suffer the most for my erratic and repugnant
behavior, to the Blue family, my parents, my kids, my fiancé and my community"
(A 112). In an uncommon expression of insight and remorse, Mr. Nickens
continued:

> Your Honor, I fervently accept my responsibility but no matter what
> sentence you hand me, it will never compare to the pain I have inside
> for my involvement in such an abhorrent situation as this, all the pain
> Mrs. Blue holds for her loss. In a way I am a mirror reflection of
> Kihary. We both received the bad end of the apple, due to the
> company we keep. And, contrary to popular opinion, we both was
> above this, but guilty by association is true. But I want everyone
> between both cases, who was willing to stand up and make a
> difference? I was. And today I'm here to make amends not just
> reparations, but to let the people of court know that Kihary's death
> came with a cause because my life and my heart is dedicated to
> making sure my community don't produce no more deaths like
> Kihary's or any more Kahari Smiths or any more Habakkuk Nickens,
> a man who couldn't complete a transition because he changed places
> and things but didn't change the people he was around (A 113).

The court considered "all pertinent information, including, but not limited to,
the presentence investigation report, the addenda, the plea agreement,"
submissions by counsel, the 2012 Sentencing Guidelines, and the 18 U.S.C. §
3553(a) factors (A 115-16). The Court adopted the probation department's finding
that Mr. Nickens' total offense level was 40, and as per the March 14 sentencing
hearing, the Court found Mr. Nickens' criminal history category was II (A 101-02,
116). The Guideline range was, therefore, 324 to 405 months (A 116). The court
sentenced Mr. Nickens to 240 months imprisonment and five years post release

supervision, finding that "this non-Guideline [sentence] is sufficient but not greater than necessary to comply with the purposes of sentencing after considering the defendant's background, the extremely violent nature of this offense, and the need to afford adequate deterrence and to protect the community" (*Id*.). The court further stated:

> The Court finds the sentence reflects the seriousness of the defendant's conduct, which includes the use of firearms and his involvement in numerous acts of violence as a gang member, including the pivotal role he played in the murder of Kihary Blue.
> The Court has also considered the defendant's pre-arrest efforts for rehabilitation; specifically, his attempts to stop gang activity and provide education and mentoring to the youth in his community through the creation of the Help Breakdown Silence organization. The Court finds that these efforts are an indication that the defendant is less likely to recidivate or hurt his community after he has served his term of prison.
>
> I have also considered the 31 letters that I have received on the defendant's behalf, including at least one letter from a corrections officer, possibly two (A 116-17).

## ARGUMENT

### Point One

THE COURT COMMITTED PROCEDURAL ERROR BY FAILING TO PERFORM AN ON THE RECORD *DRISKELL* ANALYSIS AND BY INCLUDING MR. NICKENS' MISDEMEANOR YOUTHFUL OFFENDER ADJUDICATION, FOR WHICH HE WAS SENTENCED TO AND SERVED NO JAIL TIME, IN DETERMINING HIS CRIMINAL HISTORY CATEGORY

The court gave no reason for its questionable inclusion in determining Mr. Nickens' criminal history category of a youthful offender adjudication for

misdemeanor petit larceny for which he was not sentenced to any incarceration. It therefore procedurally erred in failing to "adequately and on the record" consider, per this Court's instruction in *United States v. Driskell*, 277 F.3d 150 (2d Cir. 2002), factors such as the nature of the offense and the sentence received and actually served. Moreover here, those factors weighed heavily against inclusion of the youthful offender adjudication, and Mr. Nickens' initial criminal history category, before the court's one level reduction, should accordingly have been II. Thus, had the court properly excluded this adjudication, Mr. Nickens' would have had a criminal history category of I, resulting in a lower Guidelines range, and there is every reason to believe the court would have imposed a lower non-Guidelines sentence.

Criminal sentences are generally reviewed for reasonableness, which "requires an examination of the length of the sentence (substantive reasonableness) as well as the procedure employed in arriving at the sentence (procedural reasonableness)." *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009). This Court reviews sentences for procedural and substantive unreasonableness using a deferential abuse-of-discretion standard. *Gall v. United States,* 552 U.S. 38, 46 (2007).

> A court commits procedural sentencing error where it fails to calculate the Guidelines range (unless omission of the calculation is justified), makes a mistake in its Guidelines calculation, or treats the Guidelines as mandatory. It also errs procedurally if it does not consider the § 3553(a) factors, or rests

its sentence on a clearly erroneous finding of fact. Moreover, a district court errs if it fails adequately to explain its chosen sentence, and must include "an explanation for any deviation from the Guidelines range."

*United States v. Cavera,* 550 F.3d 180, 189-90 (2d Cir. 2008) (*in banc*) (internal citations and footnotes omitted); *see also United States v. Robinson*, 702 F.3d. 22, 38 (2d Cir. 2012). This Court's "review for reasonableness, though deferential, will not equate to a 'rubber stamp.'" *United States v. Rigas*, 583 F.3d 122 (2d Cir. 2009)(quoting *United States v. Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006), *abrogated in part on other grounds*, *Kimbrough v. United States*, 552 U.S. 85, 108 (2007)).

In calculating a defendant's criminal history category, the district court may consider a prior offense for which a defendant received a youthful offender adjudication under New York's Criminal Procedure Law. *United States v. Driskell*, 277 F.3d 150, 151 (2d Cir. 2002); *United States v. Matthews*, 205 F.3d 544 (2d Cir. 2000). In deciding whether to consider a youthful offender adjudication in calculating a defendant's criminal history category, the district court must "examine the nature of this prior proceeding, the sentence received and actually served, and where the defendant was incarcerated." *Driskell*, 227 F.3d at 151. It must do so "adequately and on the record." *United States v. Soto*, 2009 WL 765015, *2 (2d Cir. March 25, 2009).

Because counsel did not object to the one point criminal history assessment

20

for this youthful offender adjudication, this Court's review is limited to plain error. *Henderson v. United States,* 133 S.Ct. 1121 (2013); *United States v. Gordon*, 291 F.3d 181, 191 (2d Cir. 2002).

The court here made no record at all regarding its inclusion of the youthful offender adjudication in the criminal history calculation. Therefore, this Court cannot know whether or not the district court considered the *Driskell* factors at all, let alone adequately. This alone was a procedural error requiring remand. *Soto*, 2009 WL 765015 at *2.

Moreover, even if the court had made the required record, its inclusion of the youthful offender adjudication in the criminal history calculation nonetheless was erroneous under the required *Driskell* analysis, First and foremost, Mr. Nickens was convicted of a misdemeanor offense, petit larceny,[6] for which he was sentenced to no jail time at all, but rather a one-year conditional discharge. He thus received, and served, no prison time in any facility, adult or otherwise, for the offense, which weighed heavily against considering it in calculating Mr. Nickens' criminal history category. *See e.g.*, *United States v. Johnson*, 2009 WL 3415354 *3-4 (S.D.N.Y. Oct. 23, 2009)(noting this Court's tendency to focus on whether youthful offender has been tried and convicted in adult court and served his time in an adult prison).

---

[6]     P.L. § 155.25 states, "A person is guilty of petit larceny when he steals property." Petit larceny is a class A misdemeanor. *Id.*

Moreover, nothing in the nature of the offense merited the one-point criminal history assessment. The misdemeanor, committed while Mr. Nickens was a cashier at a K-Mart, consisted of failing to ring up merchandise or voiding the purchases while still bagging the items for the customer. (PSR ¶ 88). There is nothing in the record about what was stolen or why Mr. Nickens may have committed this petty theft of merchandise, but even on its face the crime was not violent, involved no weapon, and plainly involved nothing of great monetary value, as he was not charged with even the lowest degree of grand larceny.[7] *Compare e.g.*, Driskell, 277 F.3d 150 (upholding assessment of criminal history points on prior youthful offender adjudication on underlying conviction of attempted murder, for which he was sentenced to 16 to 48 months); *United States v. Parnell*, 524 F.3d 166 (2d Cir. 2008) (prior youthful offender adjudication for offense of attempted 2nd degree burglary properly used in finding defendant a career offender); *United States v. Amante*, 256 Fed. Appx. 434 (2d Cir. 2007) (prior youth offender adjudication on underlying convictions of drug offenses for which defendant was sentenced to one to three years imprisonment properly considered in calculating sentence).

An error is "plain" if it is "clear or obvious at the time of appellate consideration." *Gordon*, 291 F.3d at 193. By this standard, the court's errors of

---

[7]     This would be grand larceny in the fourth degree, a Class E felony, which applies when the value of the property exceeds $1,000. New York P.L.§ 155.30.

failing to make an adequate record and including the youthful offender adjudication in the determination of his criminal history category, contrary to clearly established law, were "plain." *Id*.

Additionally, the court's errors affected Mr. Nickens' "substantial rights." *Henderson*, 133 S.Ct. at 1126 (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). For purposes of plain error analysis, an error affects the "'substantial rights' [of a defendant] if [it] is 'prejudicial' and 'affect[s] the outcome of the district court proceedings.'" *Id*. (citations omitted). Including the youthful offender adjudication resulted in Mr. Nickens having an initial criminal history category III, and a resultant Guidelines range of 360 months to life. The court subsequently reduced the criminal history category to II based upon its finding that category III "overstate[d] [Mr. Nickens'] likelihood of recidivism" (A 97). It is quite possible, based upon Mr. Nickens' unique and impressive personal history which the court felt merited a one-step reduction in his criminal history category, that had his criminal history category been II, the court would have reduced it to I and his Guidelines range would have been 292-365; substantially less than the 324-405 month range adopted by the district court.

The court imposed a non-Guidelines sentence, however this does not end the inquiry. The Guidelines calculation was the jumping off point, so to speak, for the court's ultimate sentencing determination. While the court was unwilling (we

argue unreasonably so in Point Two), to impose a sentence of 120 months as had been requested by counsel, there is nothing in the record that suggests it would not have imposed a significantly lower sentence than the one it did impose had the Guidelines range been lower. "A below Guidelines sentence does not automatically render harmless an improper Guidelines calculation, because the district court may have settled upon its particular sentence by *subtracting* a fixed number of years." *United States v. Ramos*, 739 F.3d 250, 253 (5th Cir. 2014)(emphasis in the original).

Given that it is impossible to say based on the record that the court would not have imposed a lower sentence, this Court should remand to the district court with the direction that "after hearing from the parties," the district court should determine whether it would have imposed a lesser sentence and, if so, as the error would then clearly have affected both Mr. Nickens' substantial rights and the fairness and integrity of the proceedings, vacate Mr. Nickens' sentence and resentence him. *See United States v. Romeo*, 385 Fed. Appx. 45, 50 (2d Cir. 2010)(upon identification of procedural error, remanding case to district court to determine if district court would have imposed a different sentence and, if so, to proceed with resentencing).

Point Two

THE SENTENCE IMPOSED WAS PROCEDURALLY UNREASONABLE AS IT WAS IMPOSSIBLE TO REASONABLY CONCLUDE FROM A THOROUGH FACTUAL ANALYSIS OF THE AVAILABLE RECORD THAT MR. NICKENS' PARTICIPATION IN THE KIHARY BLUE SHOOTING CONSTITUTED FIRST-DEGREE MURDER

Based on the totality of the record in this case, principally the description in the presentence report not only of the Blue shooting, but of the several other "drive-by" type shootings that were typical of the ongoing gang rivalry, the court's factual determination that Mr. Nickens, the chance, unarmed driver of the vehicle, premeditatedly and intentionally killed Blue and that he therefore committed first-degree murder for sentencing purposes, was clearly erroneous.

U.S.S.G. § 2A 1.1 for "First Degree Murder" applies "in cases of premeditated killing," "when death results from the commission of certain felonies" and "in cases when the offense level of a guideline is calculated using the underlying crime (e.g., murder in aid of racketeering)." *See* U.S.S.G. § 2A.1.1, Commentary, Applicability of Guideline. 18 U.S.C. § 1111 states:

> (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, ***and*** premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or

25

robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

**Any other murder is murder in the second degree**. [emphasis added]

New York Penal Law section 125.25(1) provides, "A person is guilty of murder in the second degree when:

  1. With intent to cause the death of another person, he causes the death of such person or of a third person.

This Court has held that the first-degree murder sentencing Guideline is applicable to the charge of second-degree murder under New York's P.L. § 125.25 (1). *United States v. Carr*, 424 F.3d 213 (2d Cir. 2005); *United States v. Salameh*, 261 F.3d 271 (2d Cir. 2001). The sentencing court, however, must also exercise its own discretion in determining the facts relevant to sentencing. *See* U.S.S.G § 6B1.4(d); *United States v. Spiegelman*, 4 F.Supp. 2d 275, 285 (S.D.N.Y. 1998); *see United States v. Jackson*, 351 F.Supp.2d 108 (SDNY 2004) (Lynch, J). Sentencing stipulations in plea agreements bind only the parties thereto, not the sentencing court. *Spiegelman*, 4 F.Supp.2d at 285; *see Jackson,* 351 F. Supp.2d 108. (finding first-degree murder statute inapplicable given facts of case despite parties' stipulation). The Commentary to U.S.S.G. § 6B1.4 provides that "in determining the factual basis for the sentence, the court will consider the stipulation, together with the results of the presentence investigation, and any other relevant

26

information."  A "clearly erroneous" factual finding constitutes procedural error. *Cavera,* 550 F.3d 180, 189-90.  "To hold that a factual finding is 'clearly erroneous,' we must be 'left with the definite and firm conviction that a mistake has been committed,'" *United States v. DeSilva,* 613 F.3d 352, 356 (2d Cir. 2010)(quoting *Cavera,* 550 F.3d at 204, quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 574 (1985) (internal quotations omitted)).

Regardless of the stipulation of the parties in the plea agreement that Mr. Nickens was accountable under U.S.S.G. § 2A1.1 for first-degree murder for his participation in the murder of Kihary Blue as alleged in Overt Act 25 of the indictment, the court was required to exercise its own discretion in determining the facts relevant to sentencing.[8]  And based upon the nature of the incident and Mr. Nickens' participation in it as described in the presentence report, Blue's murder was not intentional.  Rather, Blue's shooting, one of a series of mostly non-lethal gang shootings and retaliations over a period of several months, was akin to a drive-by, which is typically marked by no particular premeditation and quite often no particular intent to kill, but instead by recklessness or reckless disregard.

Several facts suggested that Mr. Nickens' lacked the requisite premeditation

---

[8]     This Court's decisions in *Carr*, 424 F.3d 213 (2d Cir. 2005) and *United States v. Salameh*, 261 F.3d 271 (2001) do not require a different result, as the issue here is not whether, generally, the first-degree murder Guideline may apply to a charge under New York State law of second-degree murder, but whether the court relied on clearly erroneous factual findings in determining that it applied here and in determining Mr. Nickens' sentence.

or intent.  Mr. Nickens' participation in the shooting as driver of the vehicle was purely by chance; the presentence report states that he was picked up last of a total of five people by Kahari Smith, who was evidently in charge on that occasion, and was designated to drive simply because he was the only person with a driver's license (PSR ¶ 25).  Further, their destination was a party Smith had been informed would be attended by Bricktown gang members; it was by chance that, on the way to the party, they spotted Bricktown gang members in a car. Mr. Nickens stated that when Smith told him to pull up next to the car, he did not know shots would be fired and that he did not intend to kill anyone. There is no evidence in the presentence report that Blue or any other particular Bricktown gang member was targeted. Mr. Nickens himself does not appear to have been armed.[9]  Even assuming, arguendo, that when Mr. Nickens pulled up next to the rivals' car he could have anticipated that shots would be fired, the presentence report does not establish that he had the intent to kill any of the occupants.  In fact, according to the presentence report, although everyone in the car except Mr. Nickens was carrying a gun, only Smith fired shots.  Had there been an intention to kill the Bricktown gang members, surely they all would have fired their weapons upon the Bricktown vehicle.

---

[9]    The presentence report stated the Mr. Nickens was the designated driver. "Sanders, West, and Powell sat in the backseat while Kahari Smith sat in the front passenger seat. All were armed with a handgun."  (PSR at ¶ 25). The "all" who were armed seems to refer to those in the immediately preceding sentence; Smith, Sanders, West and Powell.

Additionally, in past episodes between the gangs, including one instance in which Mr. Nickens himself had been shot, the participants usually recklessly fired into a group or crowd rather than shooting anyone point blank. The Blue shooting was consistent with that conduct. These types of shootings are usually not deemed intentional, premeditated crimes, but rather reckless. In New York, the charges for such conduct can range anywhere from depraved indifference murder to reckless manslaughter, but is clear that the mens rea involved is not intentional. *See* P.L. §§ 125.25(4); (depraved indifference murder); 125.15 (manslaughter in the second degree); *see also People v. Suarez,* 6 N.Y.3d 202 (2005); *People v. Gonzalez*, 1 N.Y.3d 464 (2004).

In discussing Mr. Nickens' participation in the crime at sentencing, the court stated that the fact that Mr. Nickens pulled the car up alongside the rival gang's car distinguished his conduct from the other non-shooters in the car (A 112). By focusing only on this aspect of the shooting, however, the court failed to adequately consider the totality of the circumstances surrounding the shooting which suggest that despite having pulled up to the rivals' car, Mr. Nickens did not have an intention to kill anyone.

Judge Lynch's thoughtful factual analysis in *United States v. Jackson*, provides an excellent counterpoint to the inadequate factual analysis by the district court here. Jackson pleaded guilty to a variety of firearms transportation and

possession offenses stemming from a shooting at a radio station. *Id*. at 110. Jackson, a bodyguard for rap artist Lil Kim, had accompanied her to a radio station for an interview, where they learned that a singer with whom she had a rivalry was also coming to the station to be interviewed. *Id*. When the other singer and his entourage arrived, a confrontation ensued, during which, Jackson told police, both sides fired shots and one person was wounded. *Id*. at 111. The presentence report gave an only cursory description of the events, stating Jackson had emptied the clip from his machine gun into the crowd. *Id*. The government provided no further details. *Id*.

The parties stipulated in the plea agreement to apply U.S.S.G. § 2A2.1(a)(1), the Guideline for assault with intent to commit murder, "because the object of the offense would have constituted first-degree murder." *Id*. at 113. The court, however, found that it was impossible from the record before it (principally the presentence report and Jackson's statement to the police) to find that Jackson was guilty of attempted first-degree murder. The court stated, "[t]o find a person guilty of attempted murder. Let alone of attempted murder in the first degree, requires a detailed inquiry into the state of mind and circumstances of a killing, which the casual characterizations of the parties here do not even begin to make possible." *Id*. at 114. The court indicated that on the facts before her, Jackson could have acted with intent, recklessly, or could even have acted in self-defense; in the absence of a

30

"mini trial" it could not make such a determination, accordingly the court found that the record "[did] not support a finding that the defendant was guilty of attempted first-degree murder or attempted murder at all," and that there was thus no basis for applying U.S.S.G. § 2A2.1. *Id*. at 116.

The lesson of *Jackson* is that, despite the parties' stipulation, the court performed its own factual analysis, and after carefully considering the totality of the circumstances based on the record before it found insufficient facts to support the application of the stipulated Guideline. Here, too, the facts did not support the application of the stipulated Guideline and the court should, likewise, not applied it.

Given the lack of sufficient evidence that the first-degree murder statute was applicable, the court should have applied the second-degree murder sentencing statute, § 2A1.2, pursuant to which the base offense level was 33. Mr. Nickens' sentencing range, after the three level downward adjustment for acceptance of responsibility, would then have been, under criminal history category II 151-188 months.[10]

In light of the court's clearly erroneous finding that the first-degree murder statute was applicable on this record, this Court should vacate Mr. Nickens' sentence and remand the case to the district court for resentencing.

---

[10] Of course, under criminal history category I (*see* Point One), the range would have been 135 to 168 months had the second-degree murder sentencing statute been applied.

Point Three

THE SENTENCE IMPOSED WAS SUBSTANTIVELY UNREASONABLE
WHERE THE COURT ACCORDED UNDUE WEIGHT TO MR. NICKENS'
ROLE AS DRIVER IN THE BLUE SHOOTING AND INSUFFICIENT WEIGHT
TO MR. NICKENS' EXTRAORDINARY EFFORTS AT REHABILITATION,
ANTI-GANG COMMUNITY SERVICE AND PRISON MINISTRY

The court gave undue weight to what it perceived (wrongly we maintain in Point Two) to be the nature of the crime in sentencing Mr. Nickens. Although the court stated that it had considered all of Mr. Nickens' accomplishments and the letters submitted on his behalf, and it imposed a non-Guidelines sentence, the sentence was nevertheless excessive and thus, substantively unreasonable in view of Mr. Nickens' singular efforts against gang violence well before his arrest, and remarkable prison ministry since his arrest, and in light of the sentences imposed on similarly situated codefendants.

In determining whether to set aside a sentence as substantively unreasonable, this Court must consider whether under "the totality of the circumstances" the sentence is so "shockingly high" that it "damage[s] the administration of justice." *Rigas*, 583 F.3d at 116, 122-23. In making this determination, the Court "may consider whether a factor relied on by a sentencing court can bear the weight assigned to it." *Id*. at 122. It is "quite reasonabl[e]" to attach "great weight" "to

[defendant's] self-motivated rehabilitation … undertaken on his own initiative" to "change his life." *Gall*, 522 U.S. at 57. The Court reviews the substantial reasonableness of the sentence deferentially. *Id*. at 46.

Mr. Nickens' "self-motivated rehabilitation. … undertaken on his own initiative" to change not only his own life but the lives of countless others, was entitled to "great weight" in sentencing. *Id*. It is quite evident that Mr. Nickens demonstrated early potential as a bright, talented, ambitious youngster from a stable family that provided a moral center and taught him the value of hard work. For whatever the reasons, somewhere along the line Mr. Nickens' life got off course. To this point, his story was hardly unusual.

What was unusual, in fact, striking, was Mr. Nickens' demonstrated commitment to turn his life around and to change the lives of other youth in his community as well. The mission of HBS, Mr. Nickens' brainchild, was "to break the silence between youth and their community, to rebuild community by stopping the cycle of violence, and to target youth by offering education and mentoring programs" (PSR ¶ 116). Mr. Nickens started HBS "by developing a business plan and organizing a team of volunteer staff" (*Id*.). He "leased office space and hosted 'stop the violence' and other events at local community centers and churches'"(*Id*.). Among the events hosted by HBS were charity giveaways, free food and entertainment, and theatrical productions on topics such as bullying, death by gun

violence and HIV awareness (*Id.*).  According to the HBS website:

> [T]he first annual stop the violence event took place in June 2011, when they served free food to over 150 people, gave away free stop the violence t-shirts and packets of information about the violence in the community and lives lost, and delivered a strong message about gun violence through their guest speaker from Mother's Against Gun Violence. In 2011, the organization also held a youth rally with messages about violence, STD and HIV awareness, and the effects of drugs on the community. During this event, they gave away 125 book bags filled with school supplies to send the message that education is the key to success (*Id.*).

After his arrest, Mr. Nickens demonstrated a selfless commitment to his new community; the inmates with whom he was incarcerated. Thus, a correctional officer was "proud" to write of Mr. Nickens' "positive influence on some of our other inmates," "drive and ambition," and trustworthiness (Doc. 252-1 at 25). And several inmates, most of whom attended Mr. Nickens' bible study classes at Montgomery Correctional Facility, wrote that Mr. Nickens had reached out to them, positively influenced and, in some instances, changed, their lives, and of his "passion" to help others (*See generally* Doc. 252-2 at 1-12).

The V-Not gang, of which Mr. Nickens, though a member, was not a founder or leader, sold drugs, possessed weapons and committed violent crimes against other gang members.  Blue's death was unquestionably a tragic event in the continuum of the gang rivalry. Mr. Nickens acknowledged his responsibility and regret and he apologized directly to Blue's mother at sentencing.  He recognized as

well that his and Blues' positions could easily have been reversed. And the court did not deem the crime, racketeering conspiracy, so egregious that it was unwilling to impose less than 240 months imprisonment on the participants. In fact, aside from Smith, Blue's shooter, who was sentenced to 420 months imprisonment, all of the co-defendants received lower sentences than Mr. Nickens. As cited by defense counsel at sentencing codefendant Powell received 120 months. Alton West, who was also in the back seat, was sentenced to 48 months imprisonment (Northern District Dct. No. 12-cr-00034). The court accorded Mr. Nickens' role as the chance driver in the Blue shooting, inordinate weight even considering the seriousness of that incident, which was one overt act in the racketeering conspiracy to which Mr. Nickens (and his co-defendants) pleaded guilty. *Cf. United States v. Norman*, __ F.3d __, 2015 WL 122013 (2d Cir. Jan. 9, 2015) (finding disparity in treatment of codefendants was warranted where unlike most similar codefendant, defendant did not plead guilty and continued to pursue fraudulent activity up until sentencing).

The district court gave undue weight to the nature of the crime and Mr. Nickens' role as driver in Blue's shooting and thus imposed an excessive, substantively unreasonable sentence. This Court should, accordingly, vacate Mr. Nickens' conviction and remand for resentencing.

## Conclusion

For the foregoing reasons, Mr. Nickens' sentence should be vacated and his case remanded for resentencing.

Dated: January 30, 2015

Respectfully submitted,

/s/

Yvonne Shivers
*Attorney for Habakkuk Nickens*

## CERTIFICATE OF COMPLIANCE

I certify pursuant to FRAP 32(a)(7)(B)(i), (C) that the foregoing brief was prepared on a computer using Microsoft Word. The proportionally spaced typeface, font size and spacing used was the following:

Name of Typeface: Times New Roman
Point Size:            14
Line Spacing:        Double

The total number of words in the brief, based upon Microsoft word count, inclusive of the cover, point headings, footnotes, table of contents and table of authorities, is 9,611.

_____/s/_____
Yvonne Shivers, Esq.